792 P.2d 815

**Paul E. FRANK, Claimant–Appellant,**

v.

**The BUNKER HILL COMPANY, Employer, Defendant–Respondent.**

No. 16595.

Supreme Court of Idaho.

May 24, 1988.

Addendum May 25, 1990.

John J. Rose, Jr., Wallace, for claimant-appellant.

Evans, Keane, Koontz, Boyd, Simko & Ripley, Coeur d'Alene, for defendant-respondent. William F. Boyd argued.

SHEPARD, Chief Justice.

This is an appeal by claimant from an order of the Industrial Commission which modified a previous award. The Commission had originally held that claimant was totally and permanently disabled, and its order of modification awarded only 55 percent total and permanent disability. We affirm.

On November 12, 1980, claimant was injured while employed by Bunker Hill as an underground miner. There was no question but that claimant's employment was covered by workmen's compensation.

Bunker Hill is a self-insured employer. Claimant had been an employee of Bunker Hill for approximately 17 years. During the previous ten months of 1980, claimant had received gross wages of approximately $27,000.00, and his wages for 1978 and 1979 were approximately $24,000.00 and $28,000.00 respectively.

At the time of his injury claimant was 35–years–old, married, with three minor children. He was born and grew up in Kellogg, Idaho, and had graduated from high school with a grade point average of 1.39. Following high school claimant spent two years in military service and then returned to Kellogg and employment at Bunker Hill. Claimant acquired no significant transferable skills in the military. Claimant's primary recreation was hunting, fishing and bowling, and he had no pre-existing physical impairments.

On the day of the accident claimant was traveling within the mine on a mine skip when a cable broke dropping claimant approximately 170 feet. Claimant was hospitalized until December 23, 1980, with severe injuries, *i.e.*, a bursting-type fracture of the T–10 vertebrae; fracture of the left femur midshaft; compound fracture of the right tibia and fibula; fracture of the left hemopelvis including the sacroiliac joint; nasal fracture; and a deep wound of the left buttock. Some of the injuries were treated the day of the accident, and later several surgeries were performed on some of the fractures, including a spinal fusion.

Following discharge from the hospital claimant improved slowly for several months. During that time, separations of the pelvis remained and healing of the fractures progressed slowly. Later, in July 1982, an additional fracture in the right ankle was diagnosed which had resulted in damage to the cartilage and articulating surfaces together with bone spuring. In the later part of 1982 claimant experienced increasing discomfort and indicated that the pain was worsened by any physical activity.

In November of 1982 claimant's treating physician, Dr. Verhoogen, determined that claimant had reached a stable condition.

Verhoogen noted that motion in claimant's left hip was decreased, as was flexion of the ankle, and that there was hyperextention of the back. Verhoogen indicated that claimant's right ankle might continue to worsen, and that the pelvic separations had not fused. Verhoogen did not rate claimant for purposes of permanent physical impairment, but opined that claimant would have difficulty returning to employment.

In February 1983, claimant was examined by a medical panel which concluded that claimant's condition was stationary and no further treatment was indicated. That panel rated claimant's total body impairment as 35 percent of the whole man. Verhoogen concurred with the 35 percent impairment rating, but indicated that the impairment rating was not indicative of claimant's overall disability.

Following a hearing, the Industrial Commission in July 1984 held that claimant should receive total temporary disability benefits from the time of the accident until March 31, 1983, and total permanent disability benefits thereafter, finding that claimant was an odd-lot worker. During that hearing various witnesses had testified that claimant was able to perform various job duties, and could be employed. Other witnesses testified that claimant would probably not be able to find employment in the regular labor market. Claimant had hoped to return to work as an underground miner, but mine closures and the area's general economic depression indicated that there was little prospect for such employment. Although claimant was furnished opportunities for a vocational retraining, he expressed little or no interest in reeducation or retraining.

In August 1984, Bunker Hill filed petitions for rehearing and for modification of award. The grounds for said petition were fraud, manifest injustice, and change in claimant's physical condition.

A hearing was held upon the petitions of Bunker Hill, and again conflicting evidence was presented. Testimony indicated that claimant had engaged in hunting and fishing and was able to drive a motor vehicle regularly. Further testimony indicated

that although offered programs in retraining and reeducation, claimant was unrealistic and disinterested, and did not wish to participate. Witnesses testified that claimant was employable, and indicated specific jobs which claimant could perform. On the other hand, other testimony indicated the poor economic conditions in Shoshone County, that there was a lack of sedentary work available for disabled persons, and it was "nearly imossible" to place claimant in competitive employment in Shoshone County.

Following that hearing the Industrial Commission held claimant was impaired 35 percent of the whole man, and due to limited education, work experience, and competition in employment claimant was awarded an additional 20 percent of the whole man in consideration of the non-medical factors.

Claimant initially asserts that the Commission committed procedural error in acting upon Bunker Hill's various petitions for reconsideration or modification. I.C. § 72–719 provides:

**Modification of awards and agreements—Grounds—Time within which made.**—(1) An application made by a party in interest filed with the commission at any time within five (5) years of the date of the accident causing the injury or date of first manifestation of an occupational disease, on the ground of a change in conditions, the commission may, but not oftener than once in six (6) months, review any order, agreement or award upon any of the following grounds:

(a) Change in the nature or extent of the employee's injury or disablement; or

(b) Fraud.

(2) The commission on such review may make an award ending, diminishing or increasing the compensation previously agreed upon or awarded, subject to the maximum and minimum provided in this law, and shall make its findings of fact, rulings of law and order or award, file the same in the office of the commission, and immediately send a copy thereof to the parties.

(3) The commission, on its own motion at any time within five (5) years of the date of the accident causing the injury or date of first manifestation of an occupational disease, may review a case in order to correct a manifest injustice.

■ In the instant case Bunker Hill initially filed a motion for rehearing alleging lack of substantial evidence to support the initial award of the Commission, and error of law. Thereafter Bunker Hill filed a supplemental petition for rehearing and petition for modification of the original award, alleging fraud and manifest injustice. Claimant argues that since the initial decision of the Commission was rendered July 18, 1984, Bunker Hill's petition for rehearing on the basis of manifest injustice could not have been filed until the expiration of six months following the initial decision of the Commission. We disagree. It is clear that I.C. § 72–719(3) permits the Commission to review a case "at any time within five years of the date of the accident...."

■ Claimant next asserts that Bunker Hill failed to meet its burden of proof in the hearing upon its application for modification. It is clear that the burden of proof is upon the party moving for a change or modification of an Industrial Commission award. *Howard v. Washington Water Power Company*, 65 Idaho 339, 144 P.2d 210 (1943); *Boshers v. Payne*, 58 Idaho 109, 70 P.2d 391 (1937); *Dumm v. Workmens Compensation Appeal Board*, 42 Pa.Cmwlth. 594, 401 A.2d 415 (1979). Prior to 1971 the only basis for a modification of an award was "on the ground of a change in condition." *See* I.C. § 72–607 as it existed prior to 1971. However, the Act now in effect provides for modification of awards on the following grounds: "(1) ... (a) Change in the nature of extent of the employee's injury or disablement; or (b) Fraud," and "(3) The commission, on its own motion ... may review a case in order to correct a manifest injustice." I.C. § 72–719(1)(a), (b) and (3).

As to manifest injustice as a ground for modification, the Commission held:

Since the matter is pending before the Commission on a motion for reconsideration also, the Commission may modify its

prior decision in any respect. Based upon the additional evidence received by the Commission at its hearing in April, 1985, it is concluded that it would have been a manifest injustice to the Employer to have awarded the Claimant benefits for total and permanent disability. The Findings of Fact show that the Claimant is not entitled to the award which was previously entered.

■ The term "manifest injustice," as a ground for reopening a workmen's compensation award, must be construed broadly. *Sines v. Appel,* 103 Idaho 9, 644 P.2d 331 (1982).

Upon the petitions for rehearing and for modification of award the Commission had before it all of the medical testimony previously introduced, indicating that claimant's condition had substantially stabilized, and without any substantial conflict that claimant's physical impairment was ratable at 35–39 percent of the whole man. There was further evidence indicating that claimant was employable at various jobs, but that he was not interested in retraining or reeducation. Other evidence indicated that claimant participates in a mining partnership, is on the board of directors of two mine development companies, and plays an active role in the management and operations of those companies. Although claimant does not receive cash compensation for performance of his duties, he receives stock and interest in the companies. In the hearing upon the petitions for reconsideration and modification of the award, Bunker Hill presented extensive videotape of the claimant, over the course of several days, engaging in substantial physical labor while assisting in the reroofing of a building.

■ This Court in making an appellate review of the findings of the Industrial Commission cannot engage in a *de novo* review of the facts. *Case of Graham,* 103 Idaho 824, 654 P.2d 1377 (1982). ID. CONST. art. 5, § 9 provides that this Court is limited to a review of the questions of law before the Industrial Commission, and thus in view of the testimony and evidence presented to the Commission, this Court,

absent clear error, must affirm the Commission's decision to modify the award.

■ Claimant asserts that Bunker Hill's evidence showing that claimant was able to engage in sporatic physical activity did not satisfy Bunker Hill's burden of proving that claimant was no longer totally and permanently disabled, citing *Petz v. Boise Cascade Corp.,* 58 Or.App. 347, 648 P.2d 372 (1982) and *Duncan v. Carlo Ditta, Inc.,* 206 So.2d 140 (La.Ct.App.1968). We hold that both cases are distinguishable from the case at bar. In *Petz, supra,* the Oregon court reversed the workmen's compensation board and held that the employer had failed to meet his burden of proof that claimant was no longer totally disabled notwithstanding evidence of claimant doing physical labor. The Oregon statute, ORS 19.125, provides: "Upon an appeal from a decree in a suit in equity, the Court of Appeals shall try the case anew upon the record." In contrast, our Constitution limits this Court to questions of law. In *Duncan,* claimant had offered evidence to rebut the evidence of the employer which prompted the court to weigh the evidence and rule in favor of claimant. In the instant case, by contrast, claimant offered no evidence to rebut employer's evidence upon the petition for rehearing and motion for modification of the award.

Finally, claimant asserts that there is not substantial and competent evidence to support the Commission's finding that claimant is not totally and permanently disabled, but rather is impaired 35 percent of the whole man, and disabled by reason of nonmedical factors an additional 20 percent of the whole man, *i.e.,* an award of 55 percent total permanent disability. If the Commission's findings are supported by substantial and competent evidence, it matters not whether this Court would reach the same conclusion as the Commission. *Nigherbon v. Ralph E. Feller Trucking, Inc.,* 109 Idaho 233, 706 P.2d 1344 (1985); *Lopez v. Amalgamated Sugar Co.,* 107 Idaho 590, 691 P.2d 1205 (1984). The evaluation of the evidence and the findings based thereon are matters for the Commission and will not be disturbed on appeal unless clearly

erroneous. *Nycum v. Triangle Dairy Co.*, 109 Idaho 858, 712 P.2d 559 (1985). The determination of the extent of a claimant's disability is a factual matter for the Industrial Commission, and if supported by substantial and competent evidence will not be reversed. *Griffin v. Potlatch Forests, Inc.*, 93 Idaho 174, 457 P.2d 413 (1969). We hold that the Commission's findings of fact and award of 55 percent permanent disability is supported by the record.

Some of the evidence, albeit conflicting, indicates that claimant is employable and could perform certain jobs. The Commission was entitled to consider claimant's motivation and desire to be employed. As some of the testimony indicated, "[v]ocational exploration found the client to be unrealistic and disinterested in completing the program stating that he felt that 'it is a waste of time' and he was only doing it to 'please the system.'"

The orders and decision of the Commission are affirmed. Costs to respondent.

BAKES and HUNTLEY, JJ., and TOWLES, J. Pro Tem., concur.

BISTLINE, J., dissents.

BISTLINE, Justice, dissenting.

It is first noted that the transcript of testimony taken by the full Commission at Coeur d'Alene, Idaho, on February 29, 1984, was over two hundred pages in length. Exhibits introduced consisted of the records of Dr. Verhoogen, Dr. LaRowe, Dr. Caldwell, and Dr. Newcombe, a letter from Dr. Cune, and depositions of Dr. Verhoogen (68 pages and 2 reports), Dr. Luther (66 pages plus 7 page panel report of Drs. Dwinnel, Luther, and Jones) selected and paid for by Bunker Hill, and Dr. Flynn (30 pages).

The Commission made a thorough and careful analysis and evaluation of the doctor's reports, their testimony, and the testimony of the other witnesses who testified live at the Coeur d'Alene hearings, which included only two witnesses produced by the Employer, a Mr. Faraca and a Mr. Schecket. We are presented with an excellent set of Findings of Fact and Conclusions of Law—a careful perusal of which is absolutely necessary to an enlightened view of what this case is all about, and particularly to fully understand the injustice done to the claimant by the disheveling of thoroughly entrenched Idaho case law.

## BEFORE THE INDUSTRIAL COMMISSION

## STATE OF IDAHO

### IC 80–341382

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND AWARD

This matter came on before the Commission for hearing pursuant to Claimant's application filed June 2, 1983. Claimant alleges that he suffered a compensable injury on November 12, 1980, while in the employ of the Bunker Hill Company, and that he is now totally and permanently disabled. Pintlar Corporation, the successor in interest to Employer, the Bunker Hill Company, admits in its Answer to Application for Hearing the nature and circumstances surrounding the employment and accident alleged by Claimant. The primary issue before the Commission is the extent of permanent disability which Claimant suffers.

A hearing was held before the full Commission on February 29, 1984. The parties have concluded the presentation of their evidence and have filed post-hearing memoranda of law, and the matter is now before the Commission for decision.

## FINDINGS OF FACT

### *Personal Background of Claimant*

I

On the date of his injury, November 12, 1980, Claimant was 34 years old, married, with three minor children. Mr. Frank was born and grew up in Kellogg, Idaho. He graduated from high school with a grade point average of 1.39. During at least the last year Mr. Frank attended high school, he worked a full night shift at the Bunker Hill Mine, and at the time of his accident had been an employee there for almost

seventeen years. Immediately after high school Claimant was drafted into the military, and after approximately two years of service returned to Kellogg and to the Bunker Hill Mine. During his military service Claimant was trained as a helicopter mechanic, but testified that his training was basic in nature and that he had no significant transferable skills as a result of that training. Prior to his accident, Mr. Frank's primary recreation consisted of outdoor activities such as hunting and fishing, and bowling. He had no physical complaints of any substance, nor preexisting physical impairments.

## II

During 1980, prior to Claimant's accident, he received in gross wages from his employment $26,919. Gross wages for 1978 and 1979 were $24,225 and $27,981 respectively.

### Nature of Industrial Accident
### III

On the morning of November 12, 1980 Claimant was traveling to his work position within the mine on a device known as a mine skip. The cable which pulled the skip broke, and Claimant fell approximately 170 feet, sustaining multiple injuries. Claimant was transported to Sacred Heart Medical Center in Spokane for treatment, where he remained until December 23, 1980.

## IV

Upon examination, Claimant was found to have suffered the following injuries:
1) "Bursting" type fracture of the T-10 vertebrae, which was displaced;
2) Fracture of the left femur midshaft;
3) Compound fracture of the right tibia and fibula;
4) Fracture of the left hemopelvis including the sacroiliac joint;
5) Nasal fracture;
6) Deep wound of the left buttock approximately four inches deep and three inches wide.

## V

The nasal fracture, the fractures of the right leg bones and the buttock wound were all treated the day of the accident. Claimant was held in skeletal traction, and on November 24, 1980, Harrington instrumentation was performed on the vertebral fracture. This process involved the insertion of rods with hooks on either side of the spine, and a spinal fusion was performed.

### Physical Impairment
### IX

Dr. Verhoogen did not rate Claimant for purposes of permanent physical impairment at that time, but noted that Claimant had limitation of motion in several respects as well as what Dr. Verhoogen believed to be a significant residual disability. Dr. Verhoogen expressed an opinion that Claimant would have difficulty returning to employment based upon the constant discomfort he experienced because of his many injuries.

## X

On February 28, 1983, Claimant was examined by a panel in Spokane. The panel, headed by Dr. R.D. Luther, concluded that Claimant's condition was stationary and that no further treatment was indicated. The panel rated Claimant's total body impairment, including residuals of all his injuries, as 35% of the whole man. As indicated above, Dr. Verhoogen was reluctant to rate Claimant for purposes of permanent physical impairment. At the time of his deposition, on October 24, 1983, Dr. Verhoogen did testify that, with respect to range of motion only, he concurred that the 35% of the whole man impairment rating of the panel was approximately correct. Dr. Verhoogen indicated that he did not believe that the impairment rating was indicative of his overall disability, or ability to work.

## XI

In most respects the medical testimony on record is consistent. The Spokane panel found a slightly greater impairment of motion in most respects than did Dr. Verhoo-

gen. Dr. Verhoogen, on the other hand, expressed greater concern for the residual effects of Claimant's right ankle than did the panel. Although Dr. Verhoogen endorsed an impairment rating with some reluctance, he tentatively agreed that the panel's rating of 35% of the whole man impairment was correct. The Commission finds Claimant impaired to the extent of 35% of the whole man.

### Claimant's Testimony

#### XII

Claimant testified that he experiences almost constant back pain except when reclining or lying down and that he can get relief from his back pain only by reclining or lying down. Claimant is able to sit for approximately 30 minutes, walk for five to six minutes, and then is able to sit again. Claimant must lie down for extended periods of time twenty-five or more days a month for relief of his back pain and regularly reclines for forty-five to sixty minutes at a time, interspersed between periods of sitting and briefly walking. Claimant experiences severe pain five to ten times a day, depending upon his activity, and states that he experiences nearly constant pain in his ankle, which is increased by walking.

### Vocational Rehabilitation

#### XIII

Case notes from Jim Faraca, Field Consultant for the Rehabilitation Division of the Industrial Commission, were offered and received into evidence. Those notes indicate that several months after his release from the hospital, Claimant was anticipating returning to work as an underground miner for Bunker Hill. In approximately September, 1981 Claimant became aware of the imminent closure of Bunker Hill and his bleak prospects for returning to work there. At that time, Faraca undertook to discover other vocational interests that Claimant might have and to discuss the potential for retraining with the Claimant. Although Faraca was interested in a retraining program for Claimant, Claimant expressed little or no interest in reeducation or retraining and wishes to either return to underground mining or to become self-employed owning a tavern/restaurant in the Coeur d'Alene area. Vocational compatibility testing was not undertaken until January, 1983. That testing, performed by Bob Jude of Transitional Employment Services for the Handicapped in Coeur d'Alene, was synopsized in a vocational evaluation report on March 15, 1983 (Defendants' Exhibit # 18). The results of that testing indicated that Claimant had adequate reading skills and inadequate arithmetic skills (especially where fractions were needed) to survive day to day life situations. Claimant displayed average abilities with respect to following oral directions, intellectual function capabilities, numerical skills, ability to visualize objects in space, and shop arithmetic skills. Claimant had above-average ability to manipulate mechanical tools, and although testing indicated that Claimant's abilities in the areas of eye-hand coordination and mechanical knowledge were of average or less, the evaluator was unsure of the validity of these results. The evaluator concluded that Claimant's vocational interests were unrealistic, and that Claimant believed that the testing program was a waste of time.

#### XIV

Claimant participates in a mining partnership with his brothers, and during the summers of 1982 and 1983 visited sites of mining operations in northern Idaho. Claimant performed minor duties while at the mine sites but did not work regularly or perform any substantial duties. Claimant is on the Board of Directors of two mine development companies and plays an active role in the management and operations of those companies. The record indicates that Claimant has some knowledge of mining properties, mining activities, and mining equipment. Claimant does not receive any income from his activities as director of the companies, and Claimant has not thus far received income by virtue of his participation in the Frank Brothers mining partnership.

## XV

William Shecket, a vocational consultant, testified on behalf of Defendant concerning Claimant's opportunities for reemployment. Shecket testified that, taking into consideration Claimant's physical disability, he could perform jobs in telephone sales, as a hoistman at a mine, and as a laboratory technician. Shecket also testified that Claimant might be able to perform job duties as a mill worker operator in a mine with automated controls. The record indicates that for each job that Shecket testified that Claimant could perform, significant accommodations by the employer would be necessary. Additionally, it appears that Shecket may not have taken into account the extent of the physical complaints related by Claimant.

## XVI

Dr. James Flynn, a psychologist, testified on behalf of Claimant with respect to Claimant's vocational opportunities. Flynn testified that the regular labor market cannot accommodate an individual with Claimant's physical limitations (as related by Claimant). Flynn further testified that those same physical limitation factors affect Claimant's ability to be retrained for suitable employment. Flynn testified that he had conducted no studies of employment in the area in which Claimant lived, and that he is not in the business of vocational placement for individuals suffering from physical disabilities. The Commission places greater weight on the testimony of Dr. Flynn.

## XVII

Employer argues, in essence, (and testifies, through its expert witness) that Claimant can perform virtually any unskilled or semi-skilled job which would allow him to change position on a regular basis. The Commission, after considering the testimony of Claimant, finds that this is an incorrect assumption. Just because Claimant spends a substantial amount of time shifting his position to relieve discomfort, it does not follow that he is employable in a job solely by virtue of the fact that he may attempt to move around while performing that job.

## XVIII

Claimant's education is limited and his only work experience is in the field of underground mining. Although Claimant is mildly active as a director of mining property development companies, there is no evidence that Claimant makes any money in this pursuit, nor that Claimant is in any manner employable by virtue of this activity. Claimant lives in an area where competition for work in all phases of the job market is extreme. In view of his physical disabilities and the extent to which most employers would have to accommodate Claimant's constant physical discomfort, he is at a serious competitive disadvantage for the few sedentary jobs which he might otherwise perform. Claimant is an odd-lot worker.

### Status of Employer
#### XIX

Employer is self-insured under the Idaho Workmen's Compensation Law.

### CONCLUSIONS OF LAW

#### I

Several preliminary issues do not appear to be in dispute. Based upon the pleadings of the parties, Employer admits that the parties are within the scope of the Idaho Workmen's Compensation Law, that Claimant was injured within the course and scope of his employment, and that Claimant was totally disabled for an extended period of time. The parties have raised no issues with respect to medical expenses incurred by Claimant.

### Total Temporary Disability
#### II

Dr. Verhoogen testified that Claimant had stabilized as of November 11, 1982 except with respect to his sacroiliac injuries and his right ankle, and that Claimant required no further treatment. The Spokane

panel concluded after its February 28, 1983 examination that Claimant had stabilized and, at that time, rated Claimant as permanently disabled to the extent of 35% of the whole man. Based upon that panel report, Employer ceased total temporary disability payments as of the end of March, 1983. Based upon Dr. Verhoogen's statement that he recommended no further treatment of Claimant as of November, 1982, based upon the panel's determination that Claimant's condition had stabilized, and based upon Employer's decision to pay total temporary disability benefits through March, but no later, the Commission concludes that the period of recovery ended March 31, 1983.

### Average Weekly Wage

III

Although Employer apparently calculated the appropriate weekly wage for Claimant for purposes of total temporary disability payments pursuant to IDAHO CODE, section 72–408, neither the amount of those payments nor the amount of Claimant's average weekly wage appears on the record. Claimant testified that his gross earnings in 1980, prior to his accident, were $26,919. That sum was apparently earned after January 1, 1980, but prior to November 12, 1980, the date of the accident. The Commission cannot, consistent with IDAHO CODE, section 72–429, determine an average weekly wage based solely upon that evidence. Based upon the evidence presented, however, it appears that Claimant worked forty-five weeks during 1980, and that he must therefore have averaged a gross weekly wage of $598.20.

IV

The Commission concludes that Claimant has met his burden of proof in establishing a *prima facie* case that he is a member of the odd-lot category. The Commission reaches its conclusion in spite of the fact that Claimant has not attempted to perform other work. Based upon the number and nature of jobs available in Claimant's locale and based upon Claimant's lack of job experience and physical disabilities, it would have been futile for Claimant to do more. The nature and extent of Claimant's continuous physical discomfort makes his situation analogous to that of claimant in *Cary [Carey] v. Clearwater County Road Department*, et al., — Idaho ——, Opinion No. 67, June 25, 1984 [107 Idaho 109, 686 P.2d 54].

IV

Employer has not met his burden of proof of showing that Claimant is capable of performing a specific function available in the job market. *Nielson v. State of Idaho Industrial Special Indemnity Fund*, — Idaho —, Opinion No. 68, June 27, 1984 [106 Idaho 878, 684 P.2d 280].

### AWARD

The Commission, having adopted the above Findings of Fact and Conclusions of Law, hereby awards Claimant, against Defendant, total temporary disability benefits from November 12, 1980 until March 31, 1983, less amounts paid; reasonable medical and related expenses incurred as a result of the November 12, 1980 accident, less amounts paid; and total permanent disability benefits from March 31, 1983, less amounts paid.

DATED and FILED this 18 day of July, 1984.

INDUSTRIAL COMMISSION

/s/   Will S. Defenbach
Will S. Defenbach, Chairman
/s/   Gerald A. Geddes
Gerald A. Geddes, Member
/s/   L.G. Sirhall
L.G. Sirhall, Member

ATTEST:

/s/   Patricia S. Ramey
Patricia S. Ramey, Secretary
Copies:
John J. Rose, Jr., Esq., Shoshone County Courthouse, Wallace, ID 83873
William F. Boyd, Esq., P.O. Box 659, Kellogg, ID 83837
03/ss

(DUPLICATE ORIGINAL)

Comes now the sixty-four thousand dollar question: With a full Commission final

decision in place, which is wholly in accord with and cites *Carey* [107 Idaho 109, 686 P.2d 59] and relies upon the *Lyons* [98 Idaho 403, 565 P.2d 1360] odd-lot decision from this Court, by what reason in law and fact did the Commission award this Employer a new trial at which it was allowed to introduce evidence which was anything but newly discovered, and was in fact only newly manufactured *after* the Company received the decision?

Otherwise put, where a claimant was injured on November 12, 1980, and the claimant and the employer had 39½ months in which to prepare their respective cases before a hearing which did not take place until February 29, 1984, plus over another month while counsel prepared briefs for the Commission, Tr., p. 205, with yet another approximate 3½ months elapsing while the commission deliberated until its decision was issued on July 15, 1984, on what valid grounds could the Company obtain a new trial from the commission?

The answer is simply stated: The Commission could not do so and erred as a matter of law in granting a new trial on the basis of the allegations, contentions, and theories presented to it, sporadically, by the Company in its three post-decision petitions for rehearing.

While in the process of developing this opinion the Court heard oral argument and took under consideration at the April 1988 Lewiston term the case of *Madison (claimant) v. J.I. Morgan (employer), et al.,* S.Ct. No. 16895, which decision of the Industrial Commission was, as also were *Carey* and *Lyons,* an award of upon application of the odd-lot parts of that doctrine. Certain parts of that decision are highly pertinent to a resolution of the $64,000 question:

Subsequent to the hearing Claimant moved for a protective order prohibiting the deposing of one of Employer's managers by Defendants Employer/Surety. The basis for the motion was the fact that said Defendants intended to elicit information from the manager to the effect that, subsequent to the hearing of this matter, Employer had offered Claimant employment which Claimant had declined to accept. After a telephone hearing and the submission of written memoranda, the Referee granted Claimant's motion. Defendants Surety/Employer have requested reconsideration of that interim motion in closing memorandum, but have provided no new arguments.

The matter is one of discretion with the Commission. Rule IX(b) of the Commission's Revised Rules of Practice and Procedure provides that the testimony of any witness may be presented by deposition, provided the party offering the deposition testimony provides reasonable notice prior to the taking of the deposition that it may be used for testimonial purposes or providing the parties agree. Absence such notice or agreement, depositions are admissable only to the extent allowed by the Idaho Rules of Civil Procedure. Subsection (c) of Rule IX provides that following a hearing the record remains open for the submission of deposition evidence for 28 days after the hearing with respect to Claimant and for 49 days after the hearing with respect to Defendants. *The purpose of allowing the record to remain open after the hearing is not so that the parties may manufacture, solicit, or even gather evidence, but rather to allow a reasonable amount of time for scheduling and taking of post-hearing depositions, usually those of doctors with full and busy schedules who need significant advance notice for such depositions.* Allowing deposition testimony such as that contemplated by Defendants Surety/Employer herein would lead to prolongation of the proceeding for rebuttal and possible surrebuttal of the parties. Moreover, in this particular case it is hard to imagine a less reliable indication of Claimant's probable wage earning capacity than the self-serving offer of employment by an employer involved in litigation on that very issue, which offer was not made until *almost three years after* the industrial accident. These are the reasons Claimant's motion was initially granted. They are the same reasons why the Referee will not reconsider and deny the motion at this time.

*Madison v. J.I. Morgan*, et al., S.Ct. No. 16895, R., p. 256 (emphasis supplied and added).

The foregoing decision was that of the Honorable Cathy L. Naugle, Referee, presiding at the designation of the Industrial Commission. Her findings of fact, conclusions of law, and that particular ruling above set out were adopted as presented by the full Commission. The employer in that case filed a motion for reconsideration, supporting it by an 18 page brief documenting the areas wherein it argued that the evidence did not sustain the findings, and alleging error in the conclusions.

The Commission summarily denied the motion eight days later:

By timely Motion of February 12, 1987, Defendants Employer and Surety have moved the Commission to reconsider its Findings of Fact, Conclusions of Law and Order filed in this proceeding as of January 23, 1987. Although Defendants have submitted an 18–page brief in support of this motion, they have also asked permission to augment the brief after they receive a written transcript of the hearing of this matter which they have since ordered.

After a careful review of the arguments set out in Defendants' brief, the Commission declines, in its discretion, to reconsider its decision and further declines to grant Defendants an extension of time in which to augment their brief.

Defendants' Motion is hereby DENIED.

DATED and FILED this 20 day of February, 1987.

INDUSTRIAL COMMISSION
/s/   L.G. Sirhall
L.G. Sirhall, Chairman
/s/   Will S. Defenbach
Will S. Defenbach, Member
/s/   Gerald A. Geddes
Gerald A. Geddes, Member

ATTEST:
/s/   Patricia A. Ramey
Patricia S. Ramey, Secretary

Careful note should be taken, in light of what will be seen happening to Mr. Frank's final decision, that the employer in the *Madison* case in filing the motion for reconsideration submitted the requisite brief at the same time—as counsel apparently believed and as I believe to be the rule of the practice. A motion unsupported by a brief detailing the insufficiency of the evidence or any alleged errors in evidentiary rulings, or that conclusions of law are unsupported by the evidentiary facts found to exist is entitled to no consideration. It has forever been so required in Idaho jurisprudence.

As early as 1908, some years before the enactment of any workmen's compensation law, Idaho law, both statutory and case-precedential, was well-settled as to the grounds for allowing a new trial once a final judgment had been entered. Twenty years earlier when the statutory law had not been enacted, the Territorial Supreme Court could have been writing about Bunker Hill when 101 years ago it wrote as follows:

While the application for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the court, the authorities seem to agree that such application should be looked upon with suspicion and disfavor *because of the temptation to make a favorable showing after having sustained defeat,* and certainly we find nothing in this application to have warranted the granting of a new trial.

*Black v. City of Lewiston,* 2 Idaho 276, 281, 13 P. 80 (1887) (emphasis added).

Thirteen years later, Idaho had become a state, and statutory law directed the court as to awarding new trials. R.S.1887, See § 4438 through § 4445. Very little change has been made since then, even when the statute evolved into a court rule. Section 4439 of the 1887 Code reads much the same as does Rule 59(a). Under causes (R.S. 1887) and reasons (I.R.C.P.)(3) of both the 1887 and the present day rule both identically require that "Accident or surprise, (be that) which ordinary prudence could not have guarded against." Under (4) "Newly discovered evidence, material for the party making the application (must be that),

which he could not, with reasonable diligence have discovered at trial."

Accordingly, with the statute before it, the Supreme Court in reviewing a denial of a motion for a new trial, had this to say:

> The appellants contend that their motion for a new trial should have been granted because they had newly discovered evidence. We have carefully examined the affidavits of the witnesses used on the motion for new trial, and think that *the so-called newly discovered evidence is, in the main, cumulative*, and that *none of it was beyond the reach of the appellants, who, by proper diligence, could have produced it at the trial.* The affidavits do not show such surprise as will warrant the granting of a new trial. We think that the district judge did not, in denying the motion for a new trial, abuse that discretion vested in him by law, and we are not warranted in reversing the said order upon this ground.
>
> *Knollin v. Jones*, 7 Idaho 466, 476, 63 P. 638 (1900) (emphasis added).

A few years later the Supreme Court made the same ruling, although with fewer words: "The affidavits of newly discovered evidence are mostly cumulative and corroborative, ..." *Heckman v. Espey*, 12 Idaho 755, 88 P. 80 (1906).

Two years later, from the Supreme Court, this:

> *If the appellant contends that this is newly discovered evidence, the statute requires that it must be made to appear that such evidence could not, with reasonable diligence, have been discovered and produced at the trial.* (Sec. 4439, Rev.Stat.) It is clear from the provisions of said section that the accident or surprise therein referred to and diligence in attempting to obtain the evidence desired, must appear from the affidavit. As bearing upon this question, *Schellhous v. Ball*, 29 Cal. 605 [1866]; *Baker v. Joseph*, 16 Cal. 173 [1860]; *Mowry v. Raabe*, 89 Cal. 606, 27 Pac. 157 [1891]. *In such affidavits, diligence must appear, and if one relies on newly discovered evidence, such evidence must not be merely cumulative or tending to impeach or contradict a witness.* (*Wood v. Moulton*, 146 Cal. 317, 80 Pac. 92 [1905]) The showing in this case is insufficient to warrant an order granting a new trial, in this: (1) No diligence shown; and (2) The evidence tends merely to impeach the respondent Finley Monroe.
>
> *Hall v. Jensen*, 14 Idaho 165, 93 P. 962 (1908) (emphasis added).

Thus it is seen that from earliest days the sense of both the legislature and the courts was to achieve a finality to judgments. Judgments once arrived at were not to be taken lightly. Litigants and attorneys became well advised that new trials could not be gained by a losing party who simply averred that surprise caused his loss, and that luckily he had found some new evidence which would enable him to win—if the trial judge would be only so kind as to award him a second trial.

The Supreme Court's stance in upholding the requirements of the legislative statute, and now Court Rule 59(a) was so firm that in the following years few indeed were the reported cases of appeals to the Supreme Court from trial court rulings on motions for new trial based on (3) and (4)—surprise and newly discovered evidence. In addition to the cases above quoted, which show the metamorphosis of the rule of law both before the passage of the statute governing the award of new trials, and then afterwards, there is a reported case in the years 1933, 1953, and 1963 of last-ditch efforts by the losing party:

> Appellant seeks to predicate error upon the action of the trial court in denying his motion for new trial. Affidavits were filed in support of and in opposition thereto. The principal ground relied upon by appellant is newly discovered evidence material to appellant which he could not with reasonable diligence have discovered or produced at the trial. The general rule is that in order to warrant the granting of a new trial on the ground of newly discovered evidence it must appear (1) that the evidence is such as will probably change the result if a new trial

is granted; (2) that it has been discovered since the trial; (3) *that it could not have been discovered before the trial by the exercise of due diligence;* (4) that it is material to the issues; and (5) *that it is not merely cumulative or impeaching.*

Taking up the second and third requirement above stated, it is conclusively shown that Van Slooten, former cashier of the bank of which appellant is receiver, handled the Corbett loan; that all of the negotiations carried on with respondent on behalf of the bank were conducted by Van Slooten. In appellant's affidavit it is also alleged, among other things, that the president of the bank was inactive; that the board of directors acted upon the reports of Van Slooten; and that the latter was in charge of all of the loans and discounts of the bank and was the only person familiar with the transaction in all of its details. It is clearly shown by the affidavits in support of the motion that the evidence alleged to be newly discovered, which related to the facts and circumstances surrounding the execution of the mortgages, known to Van Slooten, must have been known to appellant and his attorney, or by the exercise of reasonable diligence could have been ascertained by them prior to the filing of the action and also that Van Slooten was a material witness. *It has been held that there is no error in denying a motion for new trial where the newly discovered evidence was such as might have been produced by due diligence before or at the time of the trial or where no sufficient reason is disclosed why the evidence could not have been produced at the trial.* A party is bound to know of the materiality of testimony except in case of surprise at the trial, and where he fails to move for a continuance to enable him to obtain absent evidence, the existence of materiality of which he first discovers during the progress of the trial, he is not entitled to a new trial on the ground that the evidence was newly discovered (20 Cal.Jur. 86). No motion for continuance was made and apparently no effort exerted to obtain the testimony of Van Slooten until after the judgment and there is no showing of any reason why the same effort could not have been put forth to obtain the attendance and evidence of Van Slooten before the trial as afterwards.

\* \* \* \* \* \*

In *Stolz v. Scott,* 28 Ida. 417, 427, 154 Pac. 982, 985, the rule is announced:

The granting or denying of a new trial rests in the sound discretion of the trial court, and, *where the motion is based upon an affidavit alleging newly discovered evidence, and it appears that the evidence could have been, by the exercise of ordinary diligence, produced at the trial of the cause, an order denying the motion is not an abuse of that discretion, and will not be disturbed upon appeal.* (*Hall v. Jensen,* 14 Ida. 165, 93 Pac. 962 [1908]; *Montgomery v. Gray* (on rehearing), 26 Ida. 583, 585, 144 Pac. 646 [1914]; *Scanlan v. San Francisco etc. Ry. Co.,* 128 Cal. 586, 61 Pac. 271 [1900]; *Broads v. Mead,* 159 Cal. 765, 116 Pac. 46, Ann.Cas. 1912C, 1125 [1911].)

*Livestock Credit Corp. v. Corbett,* 53 Idaho 190, 198–99, 22 P.2d 874 (1933), (emphasis added).

The Court in the 1953 case of *Papineau v. Idaho First National Bank,* 74 Idaho 145, 258 P.2d 755 (1953), wrote:

It appears from the affidavit of appellant's counsel that before the action was brought, he was advised the deposit slip was questioned, and that examination by a handwriting expert might be advisable. The instrument was in the possession of his client (according to his testimony) from its date. On the trial he produced a number of copies of deposit slips bearing the initials "V." and "V.O.", purporting to have been written by the witness Victoria Olsen, and some of which she acknowledged on the witness stand. These are variously dated as far back as 1945, and presumably have been in plaintiff's possession from their date to the time of the trial. Nowhere does plaintiff say that he made any effort to have any of these instruments acknowledged by the

witness, or to procure any other exemplar of her handwriting, before the trial. *The showing is that no evidence has been discovered since the trial which was not available to the plaintiff, by reasonable diligence, before the trial.* Moreover, the newly discovered evidence is not set out—only its effect is averred, and this on information and belief. Mr. Felton's affidavit infers that he has been informed by an unnamed handwriting expert that the disputed instrument is in the handwriting of Victoria Olsen. No affidavit of such witness is produced, nor is any excuse or reason given for not producing such an affidavit. Under such circumstances it is entirely speculative as to whether the appellant would be able to produce the alleged newly discovered evidence. *Such showing is entirely insufficient to justify vacation of judgment.*

> *Papineau v. Idaho First Nat'l. Bank,* 74 Idaho at 150, 258 P.2d 755. [per Taylor, J., joined by Porter, Givens, Thomas, and Keeton, JJ.]

As concerns the third and fourth subparagraph of the section, assuming that the facts stated in the affidavits presented by appellant were true, and also assuming that such testimony case as a surprise which ordinary prudence could not have guarded against, appellant has wholly failed to show that his substantial rights were materially affected. *The testimony of the challenged witness was cumulative in effect to the testimony of other of appellant's witnesses.* In *Hall v. Jensen,* 14 Idaho 165, 93 P. 962 [1908], this court pointed out that newly discovered evidence, which is merely cumulative or designed to contradict witnesses, is not sufficient to warrant the granting of a new trial.

> *Findley v. Woodall,* 86 Idaho 439, 387 P.2d 594 (1963) (emphasis added). [per McFadden, J., joined by Knudson, McQuade, Taylor, and Smith, JJ.]

In that case sat two justices, McFadden and McQuade, who on request continue to serve on this Court, thus establishing an unbroken chain of continuity of this case law dating backward almost a century.

Although there is no specific statute or Industrial Commission rule which mandates that the procedure of I.R.C.P. 59(a) is applicable in Commission proceedings, common sense would dictate that it should be.[1] Moreover, precedential case law requires that it be so. *Arneson v. Robinson,* 59 Idaho 223, 82 P.2d 249 (1938). The case was before the Supreme Court on appeal from the Industrial Accident Board, and the Court's unanimous opinion was authored by Justice Givens, concurred in by every participating justice. The defendants, employer-surety, on their appeal sought a second board hearing *on grounds of newly discovered evidence and an allegation of fraud.* The Court gave recognition to the right of a party to seek a new trial on grounds of newly discovered evidence:

> Appellants ask this court to remand the case to the board *because of newly discovered evidence* and for fraud of claimant in withholding from the board and from doctors who examined him that he had been treated and examined by a Dr. Stauffer who had previously diagnosed his former ailment as osteomyelitis, the affidavit of appellant's attorney reciting as follows:
>
> .... Said fraud, was brought to affiant's attention particularly by the evidence of Dr. Stauffer of Priest River, Idaho. That Dr. Stauffer, while practicing medicine in Dover, Idaho, on the 8th day of September, 1927, was called upon by claimant, Victor E. Arneson, at the office of said doctor and at that time claimant had a discharging wound on the back of the right middle thigh; that another place on said claimant just below said discharging sinus was about ready to break and Dr. Stauffer opened said gathering and from said wound there was discharged some straw colored watery fluid; *that on the back of the left knee and opposite the knee joint the said Arneson had a discharging sinus from a deep re-*

---

1. The Commission has already seen fit to specifically adopt as its Rule VI, "Discovery," the appropriate provisions of the Idaho Rules of Civil Procedure.

*tracted scar;* .... that Dr. Stauffer advised Arneson at that time and place that he, *Arneson, was suffering from tubercular osteomyelitis;* .... that Dr. Stauffer has the above mentioned notes in his possession and if allowed will present them to the Industrial Accident Board.....

Respondent's past history and his osteomyelitic condition and treatment therefor were inquired into at length and fully covered by physicians called as witnesses for appellant, and *the desired testimony of Dr. Stauffer, if adduced at the hearing would have been merely cumulative and we do not believe that it would have been sufficient to have impeached respondent, or show that he had willfully withheld testimony of the treatment of Dr. Stauffer, since he was not asked concerning this matter.* True, appellants say they did not know of this testimony and therefore could not inquire, but we do not believe the entire circumstance requires a rehearing merely for the purpose of admitting this testimony.

*Arneson v. Robinson,* 59 Idaho at 238, 239, 82 P.2d at 254 (emphasis added).

Believing that the foregoing serves to well-enough set the stage, the next order of business is to ascertain on what basis the Commission saw fit to undo the work of its initial hearing and resultant findings, conclusions, and award of July 1984— which it did by its order of December 10, 1984. That order is wholly summary in nature, by which is meant that *it states absolutely nothing whatever* as to the grounds upon which it purported to take such drastic and unprecedented action. It consists of but three paragraphs of only three lines each.

The first paragraph serves the sole purpose of stating that it has reviewed "the motions, briefs, and affidavits filed herein since the entry of said award." The final paragraph states only that the parties will be notified when and where there will be a further hearing.

The middle paragraph is the gutless guts of this remarkable order:

NOW, THEREFORE, IT IS HEREBY ORDERED that this matter shall be reopened for further hearings to be set at the convenience of the Commission and the parties.

R., p. 143.

The most crucial portion of any order for a new trial, or a rehearing of a Commission proceeding, should be, and is, a statement of the specific grounds which motivate the court or tribunal. No person, including also corporate entity, should ever be required to endure a second trial after the first trial has gone to judgment without being apprised of the grounds. As long ago as *Wolfe v. Ridley,* 17 Idaho 173, 104 P. 1014 (1909) the Supreme Court per Justice Ailshie, was extremely critical of a district judge's order granting a new trial which was as general in nature as is the Commission's, the Court there concluding: "The grounds on which such orders are made ought always to be specified in the order." 17 Idaho at 177, 104 P. at 1015.

Recently, in *Luther v. Howland,* 101 Idaho 373, 613 P.2d 666 (1980), this Court repeated and put teeth to that same requirement. That opinion distinguished between grounds and reasons, saying that although the grounds *must* be specified in an order granting a new trial, the same is not true as to "reasons," which word as I understand it also carries the meaning of "reasoning." Inferentially, what was declared in *Luther* is that where the grounds *must* be stated, it is reversible error to fail doing so. 101 Idaho at 375, 613 P.2d at 668.

Had Mr. Frank sought a certified appeal of the order, this Court should have granted it and reversed the order of December 10, 1984, which allowed a retrial of issues of which had been well tried, and *decided.* Be that as it may, on this appeal that same issue still confronts us and must be not ignored,[2] but addressed.

2. The Chief Justice's opinion does not discuss

*Boshers v. Payne,* 58 Idaho 109, 70 P.2d 391

On what grounds did the Commission allow the second trial? Because we are not told the answer in the summary order which informed as to nothing, and although there should be a reversal simply for that failure,[3] it is not out of order to examine the record and ascertain what motions were properly before the Commission and thought by it to serve as the basis for awarding the Company extreme relief of a second trial.[4]

After the Commission's decision was entered on July 18, 1984, just what motions or petitions had the Company laid before the Commission which might have motivated it to the kindness of awarding the Company a new trial?

The first motion, filed August 7, 1984, was a foot-in-the-door affair in length and breadth as informative as the Commission's order. A nine-liner, it did nothing more than ask for a rehearing or reconsideration.

### I.C. 80–341382
### PETITION FOR REHEARING

COMES NOW, The employer in the above-entitled matter, by and through its attorney, William F. Boyd of the firm of Brown, Keane, Boyd & Gibler, and hereby petitions the Commission for reconsideration and/or rehearing of its decision entered herein on the 18th day of July, 1984.

This petition is made on the grounds and for the reasons that there is not substantial evidence in the record to sustain the Com-

mission's decision, and the Commission has erred as to matters of law.

The employer further petitions the Commission to set a briefing schedule to be followed by the parties upon rehearing and/or reconsideration.

DATED This 7th day of August, 1984.

BROWN, KEANE, BOYD & GIBLER

By William F. Boyd
Attorneys for Employer

/s/ BLAINE EVANS
Blaine Evans
for William F. Boyd

### CERTIFICATE OF MAILING

I hereby certify that I caused a true and correct copy of the foregoing Petition for Rehearing to be mailed, first-class, postage prepaid thereon, to the following named attorney this 7th day of August, 1984.

John J. Rose, Jr.
Shoshone County Courthouse
Wallace, ID 83873

/s/ Blaine Evans
Blaine Evans

Idaho Code § 72–718 allows any party to ask for a reconsideration of any decision it has made by filing a request therefore within 20 days of the decision, and such petitions are routinely filed by losing parties, ordinarily to address questions of law such as failure to apply or misapplication of case law.

---

(1937), relied upon in Mr. Frank's brief in this Court, although it is cited in one instance. As will appear *infra*, it should be controlling authority.

3. Prior cases from this Court lament the failure to be specific as to grounds, but then begrudgingly plough into the record.

4. Following the order of December 10, 1987, although it first heard the case sitting en banc, the full commission assigned the second trial to commissioner Geddes sitting by himself. Geddes, unassisted by the other two commissioners, made all of the evidentiary rulings at trial, and wrote the new findings, conclusions, and award, which in turn were signed by all three commissioners utilizing the same procedure which obtains a decision where a referee has been appointed.

As will be seen, the commission had sent Mr. Geddes on a most difficult mission which conceptually would necessarily involve some weighty propositions of statutory and case law. Page one of his decision recites the employer's two petitions, "Petition for Rehearing" and "Petition for Modification of Award under § 72–719 Idaho Code, Requesting that the Award [of July 18, 1984] Be Set Aside or Modified to Correct a Manifest Injustice and on the Further Ground that the Award was Procedured by Fraud." Following that Mr. Geddes made an accurate and, as a matter of act the only possible, assessment of the situation: "On December 10, 1984, the commission entered its Order and reopened the matter for further hearings *on the issues raised by the motions submitted by employer.*" R., 146, 147.

Where the petition fails to bring the Commission's attention to the specific errors of which complaint is made, or wherein the evidence is believed to be insufficient, such petitions are as routinely denied as they were routinely filed. Which is as it should be. A party cannot invoke the weighing processes of a court or tribunal without being specific wherein it is contended that there was error. It is exactly the same in a district court where motion is made for a new trial based on insufficiency of the evidence and/or error in law. Rule 59(a), and before it the statute, has always required that a motion so based "must set forth the factual grounds therefor with particularity." The recent case of *Scafco Boise, Inc. v. Rigby*, 98 Idaho 432, 566 P.2d 381 (1977), and before it an uninterrupted line of cases going back over 80 years require such last-ditch efforts to be summarily denied out of hand and without oral argument or briefing. In *Scafco* the motion for a new trial, based on newly discovered evidence and insufficiency of the evidence, was drawn and filed by the *pro se* defendants who obviously did not have any legal knowledge. Nonetheless, the Supreme Court reversed the district court's grant of a new trial. The Supreme Court did so solely on the basis that the *pro se* defendants had not complied with the rule by filing a statement of particulars:

... Rule 59(a) requires that,

'Any motion based on subdivisions 6 or 7 must set forth the factual grounds therefor with particularity.'

The language is mandatory and is wholly dispositive of this appeal. We hold that defendants failed to state with any particularity the grounds of their motion for a new trial and thus the motion should have been denied by the trial court. .

In *Paullus v. Liedkie*, 92 Idaho 323, 442 P.2d 733 (1968), the court was faced with a virtually identical fact pattern. Appellant in that case likewise appeared pro se and filed a motion for new trial in terms just as general, vague and conclusory as in the present case. The holding of the Court, though based on slightly different rules and statutes then in effect, is controlling in the present case:

'... if the motion is based upon the insufficiency of the evidence, the motion itself should "specify the particulars in which the evidence is alleged to be insufficient." '

The Court then ruled that, under such circumstances, it is proper to deny the motion for a new trial

'Inasmuch as appellant's for a new trial ... did not particularize where the evidence was insufficient or particularize wherein the court erred in law.' 92 Idaho at 326, 442 P.2d at 736.

The purpose of any rule demanding particularity in a motion for new trial, was stated long ago:

'... the object of the rule requiring these specifications is, first, to shorten the statement of the evidence by excluding everything irrelevant to the specified fact; and, second, to notify the opposite party of the particular finding called in question in order that he may see that the statement fairly and fully presents the evidence bearing upon that particular matter.' *Palmer v. Northern Pacific Ry. Co.*, 11 Idaho 583, 586–587, 83 P. 947, 948 (1905). *Scafco Boise, Inc. v. Rigby*, 98 Idaho at 434, 566 P.2d at 383 (1977).

Ever earlier than the *Palmer* case cited in *Scafco* was *Robson v. Colson*, 9 Idaho 215, 72 P. 951 (1903) where the same issue was before the Supreme Court. After citing authorities from states then having similar statutes, Montana (*Zickler v. Deegan*, 16 Mont. 198, 40 P. 410 (1895)), Utah (*Marks v. Taylor*, 23 Utah 152, 63 P. 897 (1901)), and California (*Swift v. Occidental Min. etc. Co.*, 70 P. 470 (1902)), the Idaho Court held:

Our attention has not been called to any authorities holding a contrary view. We are of the opinion that *it was the intention of the legislature of this state that opposing counsel as well as the trial court should be fully informed of the particular evidence relied upon by the moving party to warrant the court in granting the relief sought by the motion.* There is *no attempt* on the part of appellants in this case *to particularize or call attention to the insuffi-*

*ciency of the evidence in any particular instance,* simply that the various parties are not entitled to the amount of water decreed by the court from certain dates, but are only entitled to so much water from certain dates fixed by appellants. *Under the authorities* above cited and the provisions of *our statute,* we must conclude that *the statement must be disregarded,* and this being true, it necessarily follows that the motion to dismiss the appeal from the order overruling a motion for new trial must be sustained, for the reason that the motion for new trial is barred on the statement.

*Robson v. Colson,* 9 Idaho at 220–21, 72 P. at 953 (1903) (emphasis added).

The Commission should have summarily denied the employer's § 72–718 petition on receipt, solely by reason of its insufficiency—which is not a view peculiar to only this writer, but rather long established case law of Idaho. Nothing in the statutory workmen's compensation law gives or purports to give an unlimited or any extension of time to a party for the purpose of making a delayed full compliance with a statute which allows 20 days, which should have been more than sufficient for counsel—not a *pro se* litigant as in *Scafco*—to spell out his particulars (which as will be seen was done later in a perfunctory effort which encompassed very few pages).

No reason appears in the record why the Commission did not do so even more readily than it acted in the *Madison, supra,* case. Pure surmise could be, based on the observation that it was drafted in Boise and delivered to the Commission barely meeting the 20 day time limit, that the Company's counsel had obtained the Commission's approval to at a later time furnish the required statement of particulars. But if that be so, it would have been improper without the consent of Mr. Frank's attorney.

As was held in *Scafco,* because of the Company's failure to furnish particulars when the petition was filed, the motion should have been denied. That denial would have then and there precluded the entry of the order awarding a new trial. If the commission had denied the petition, as it should have, its jurisdiction would have automatically ceased. "... and in any such events the decision shall be final upon denial of a motion for rehearing or reconsideration ..." I.C. § 72–718. If this Court were to apply the easily understood holding of *Scafco,* which goes unmentioned in the opinion authored by Chief Justice Shepard, it would be brought to the conclusion that the Commission's jurisdiction was *deemed* terminated when it failed to take any action after receiving the August 7, 1984 petition. It had not been presented a petition sufficient to invoke its jurisdiction.

The primary complaint of the manner in which this routine petition was handled is readily deduced:

(a) It served as a foot-in-the-door should the Commission strangely not dismiss summarily, and thus kept the Company in a position to take its own good time in supplying the requisite statement of particulars, which it did, not in a direct manner but encompassed in a so-called supplemental petition for rehearing.

(b) Improperly it would include in that petition allegations by which it hoped to raise the *new* and additional grounds of Mr. Frank's fraud (perjury) at the first hearings. [Commissioner Geddes, as over the recitals of his decision, properly did not give the supplemental petition for rehearing any consideration, as witnessed by his not mentioning it, and also evidenced by the fact that he mentioned the allegation of fraud, as only arising out of the petition for modification. The fact remains, however, that it can not be said that the other two commissioners, and possibly Mr. Geddes, may not have been prejudicially influenced, resulting in the order of December 10, 1984.]

(c) Those improperly included allegations, would undoubtedly provide a high degree of shock value to the Commission. Everyone listens when someone shouts "fraud."

(d) Such would also go hand-in-hand with its (contemporaneously-filed) petition for modification—which was also grounded on a claim of manifest injustice, *completely unspecified as to any particu-*

lars. To see a claim of both fraud and manifest injustice surely would tend to inflame, or at least excite, the commissioners to who it was addressed.

More importantly, the petition for rehearing of the decision it had first entered could not serve as a valid basis for a new trial limited to the receiving of additional new evidence. A motion for a rehearing is much the same as the civil practice in the district courts; it is a request for a rehash of that which has already been decided; only briefs, and oral argument, too, on occasion are allowed.

Of singular importance the petition for rehearing was not, nor did it purport to be a motion for a new trial. It was what it was, and that is all that it was, a request for a rethinking of the Commission's decision, hoping for a result less than an award of permanent total disability. In thus working backward in search of the unknown and undisclosed grounds for the Commission's order of December 10, 1984, it is established that the petition for rehearing can not be said to have filled the bill. That being so, it stands to reason that the supplemental petition, by its own title being a supplement to the August 7 petition also could not suffice, nor, as pointed out, was it even mentioned in Mr. Geddes decision of 1986—nor mention *of any part* of it.

Apparently having always recognized the inadequacy of the August 7, 1984 petition, two weeks after it was filed, a 20 page supplemental Petition for Rehearing was served and filed by the Company on *August 21, 1984.*

Ostensibly it was to serve the purpose of supplying the deficiencies of the petition above mentioned. Part I is devoted to assertion of error in Commission Findings numbered XV, XVI, XVII, and XVIII—discussed only for three pages. Part II thereof complains of Commission errors of law with respect to Conclusions IX and IV, to which but two pages of discussion are de-

voted. This was all matter which should have been in the August 7 petition, but was not, discussed *supra.*

Part III of the Supplemental Petition contained nothing in amplification or support of the Petition filed August 7, 1984, nor did it even pretend to.[5] It alleged fraud (perjury, actually) on Mr. Frank's part in having "testified that he was not receiving compensation from the mining company of which he was an officer when it in fact appears from the document attached to this petition as Exhibit A that he was receiving $2,000.00 a month as president of Goldback Mines Corporation." R., p. 33. Part III was wholly extraneous to the August 7 petition, and not entitled to any consideration. Nor did Mr. Geddes accord it any, mentioned *supra.* The Supplemental Petition for Rehearing even had it been considered as a matter of statute and case law could not suffice as a grounds for awarding a *new trial.* A reconsideration of the evidence which had been adduced at the first trial, "yes." But neither the full commission nor Mr. Geddes individually ever embarked upon a reconsideration or rehearing as such. Properly it would have treated separately the Petition for Rehearing and the petition for modification. But it was not, and in failing to do so it put Mr. Geddes in a most untenable position.

Also, on August 21, 1984, the Company made its final effort aimed at obtaining a new trial and a lessened award, or no award at all. This was the Petition for Modification recited in the recitals of Mr. Geddes 1986 decision. It again charged the same fraud (perjury) against Mr. Frank as did the Supplemental Petition, and additionally alleged that the Commission's decision was manifestly unjust, I.C. § 72–719, presumably on the sole premise that Frank had fraudulently obtained it, as no other grounds or basis for relief was stated.

As alluded to earlier, this petition is *absolutely devoid of* any description of the

---

5. Ten pages of the supplemental petition consisted of a statement of the officials of Nesco Resources and a letter report from its president to its stockholders. Mr. Frank's name was men-

tioned therein. It stated that he was making $2000 monthly for managing Gold Back Mines Corporation.

nature of the manifest injustice, in which regard it was exactly like the initial petition for rehearing. Just as this Court held in *Scafco,* both the court (tribunal)—before it acts—and opposing party—before it defends—are entitled to know exactly the basis upon which a new trial is sought. Fraud, as one prong of the petition, was sufficiently stated, and only to do with the claim that Mr. Frank was receiving $2000 per month as a mining executive while all the while receiving total disability payments. It cannot be said that the claim of manifest injustice was sufficiently, or at all, particularized. The Commission can not possibly be said to have granted a new trial on the grounds of manifest injustice. As is seen by Mr. Geddes disposition of that contention, the fraud allegation would go nowhere, but it had been fully dissipated *before* December 10, 1984, by Mr. Frank's earlier filed affidavit doubly swearing that he had not received $2000 or any monetary compensation as an officer for Goldback Mines—which went wholly unrefuted!

The Company simply did not, either by pleading or by petition, ever claim specifically that it was entitled to a new trial on the grounds of newly discovered evidence. But this was exactly where the Commission allowed the company to go by affording a second evidentiary trial, and ergo, necessarily could have been the only basis—undisclosed—for granting a new trial. It simply does not do to be so careless in procedure that due process is thwarted. But that is the only solution to the riddle earlier poised: On what valid grounds (pleaded) did the Commission grant the Company a new trial?

None, and for that reason there should not have been a second trial. But, goaded and regoaded by the Company's repeated cries of "Wolf, fraud, and injustice," it simply granted the Company a second trial. Errors in law at the first trial, there had been none. Insufficiency of evidence, likewise. The Company, well represented by able counsel with many years of experience, full well knew that there was evidence in the record to amply sustain the commissioner's 1984 findings, knew also

that the conclusions were based on decision law of this Court, and so, rather than waste an appeal went all-out in their effort to stampede the commission into allowing a new trial.

The Company's Petition for Modification stated that it would take Mr. Frank's deposition and inquire of him as to the Nesco report which the Company claimed proved perjury. That Petition closed with this specific commitment:

It should be recognized by the Commission that filed concurrently herewith is the notice of taking the oral deposition of the claimant, Paul Frank, on the 10th day of September, 1984. At that time all of the facts and circumstances concerning compensation in the amount of $2,000 per month paid by Goldback to Mr. Frank will be inquired into. *The transcript of the deposition will be filed with the Commission in further support of this petition.*

The only reasonable reading of that commitment is that the Commission would read and consider the deposition in determining what relief if any the Employer was entitled to. Both parties in their ensuing briefing would selectively incorporate excerpts of the testimony in arguing a point. The point argued by counsel for Mr. Frank was the invalidity of the Company's claim of outright perjury as to the $2000 per month.

The Company's point was to develop its unpleaded claim that because Mr. Frank had misrepresented his physical limitations, the decision and award should be reconsidered, and it added to its brief selected excerpts from the deposition. Obviously both parties were of the view that the deposition would be considered by the full Commission when it ruled on the Petition for Modification. Of importance is that deposition was *not* considered by the Commission, notwithstanding that it had been stated that such was the Company's very purpose on taking the deposition—to which Mr. Frank acceded.

The prejudice to Mr. Frank by the Commission's failure to read his deposition is inestimable. Therein was set out a well-

stated objection to the Company's violation of the terms under which the deposition was scheduled, i.e., limited to one specified issue—the Nesco–Goldback $2000 per month affair.

The Company had changed the deposition taking date to the 13th day of September, 1984, and asked him to bring documentation and data pertinent to the Nesco–Goldback circumstances. The deposition took place and on November 5, 1984, the affidavit of Mr. Frank attaching 21 pages of the Company's examination of Mr. Frank plus 25 pages of the Nesco–Goldback arrangement was filed and served. Mr. Frank's affidavit referred to the same, and with respect thereto testified:

That the pages of testimony attached hereto are true correct questions put to me and answers thereto.

Said questions and answers show the nature of my association with Gold Back Mines Corporation.

That attached hereto are true and correct copies of corporate records further describing my association with Gold Back Mines Corporation.

The Company filed no affidavits refuting or contradicting Mr. Frank's sworn deposition testimony which became doubly sworn to by his affidavit. Nevertheless, in a brief submitted to the Commission on November 16, 1984, the Company did not back away from its claim of perjury:

1. There is a disputed issue of fact surrounding the $2,000.00 per month in compensation which the mining company of which Mr. Frank is an officer pays to Mr. Frank. The documents which the employer has submitted to the Commission reveal $2,000.00 per month. Mr. Frank, however, in his oral deposition explains this away by asserting that he has received no cash, but, instead, is to be paid in stock of the corporation. *Either way, the employer contends he is being compensated at the rate of $2,000.00 per month.*

R., p. 132 (emphasis added).

The Company's ploy here was to then say all in the same sentence, "In this case not only is Mr. Frank receiving monthly compensation from a mining company, he also demonstrated his physical capabilities *by reroofing a house for six days."* R., p. 136 (emphasis added). The blatant mischaracterization of that statement would appear later at the second trial which the Commission was stampeded into giving the Company. There it would be seen that Mr. Frank played a very minor part in being of some slight assistance to his brother.

Equally important, however, the extraneous incorrect information about roofing was clearly extraneous to the two *petitions* filed with the Commission, which are the pleadings by which the allegations of a party so moving claim their right to the relief of a rehearing and to the independent claim of a right to modification. The Commission cannot be found to have acted properly in granting a new trial on the basis of grounds not properly pleaded. *Scafco, supra.* It would ill-behoove any member of this Court to blithely ignore such errors of procedure. The practice of law in court proceedings requires adherence to established rules of procedure and the precedent of case law. The Company's tactics in this case wholly ignored those requirements—yet it prevailed at getting a new trial, courtesy of the full Commission, as is easily seen.

As stated earlier herein, the Company had advised in the filing of its Petition for Modification that it was going to take Mr. Frank's deposition solely to develop its contention that Mr. Frank was receiving $2000 monthly from the Goldback company. Nothing more. At the deposition, however, without even attempting the appearance of going into the perjury charge of the Goldback–Nesco $2000 monthly affair, that which was the issue raised by its Petition for Modification, the Company proceeded to ask Mr. Frank about his post-of judgment physical activities, but without any specific mention of the limited help given to his brother, which the Company per its surveillance had long had notice since early August of that same year, but had not pleaded.

Following is the interrogation which was extraneous to any issue raised by either of the Company's petition:

### DIRECT EXAMINATION

BY MR. BOYD:

Q. Mr. Frank, I'm going to hand you a document marked Exhibit 1 entitled Amended Notice of Taking Deposition. Would you notice that on the third page of the document we'd asked that you produce at this proceeding certain documents?

A. Yes.

Q. And I'm going to hand you documents marked Exhibits 2, through and including Exhibit 9, that have been given to me by Jack Rose and ask if these are the documents in response to the request for documents that you just read?

A. Yes.

Q. Do you have any documents that show the amount of pay, income or compensation received in the year 1984 by you, other than the documents marked 2 through 9?

A. No.

Q. I take it you haven't received any kind of monies in 1984?

A. No.

Q. I was under the understanding that you had received Social Security benefits, is that true?

A. Yes.

Q. Can you tell me from memory how much a month you have received, or per week, in the year 1984?

A. From Social Security?

Q. Yes, sir.

A. I think it's $715 a month.

Q. And that would have been every month so far this year.

A. Yes.

Q. Have you received any income from Frank Brothers' mining partnership?

A. No.

Q. I take it, other than your wife's salary, you haven't received any other monies, is that true?

A. From State Industrial—I guess it's State Industrial Compensation.

Q. Your workmen's compensation weekly payments, is that right?

A. Yes.

To this point the Company's questioning was permissibly within the scope of the purpose of the deposition. But then, rather innocuously at first, the interrogation diverted far astray:

Q. Now, you'll recall that you testified at a hearing on February 29, 1984 in this case?

A. And the hearing was in Coeur d'Alene?

A. Yes.

Q. And did you understand that you were under oath at that time, Mr. Frank?

A. Yes.

Q. And, of course, you're aware that the Industrial Commission made and entered it's award or decision in your case?

A. Yes.

Q. And I gather that you were provided a copy of it and you read it, is that true?

A. Yes.

Q. Is it true that to the best of your knowledge you have been and are being paid in accordance with the Industrial Commission's award?

A. Yes.

Q. That is, paid by the employer?

A. Yes.

Q. Now, at the time of the hearing you testified that your back hurts virtually all the time, is that right?

A. Yes.

Q. That is, that's what you testified to at that time?

A. Yes.

Q. And you testified on February 29, 1984 that if you walk for more than 20 minutes at a time that causes you pain, is that what you testified to?

A proper objection was immediately forthcoming: "I'm going to object for the reason that these questions go beyond the scope of the petition for modification of award and the supplemental petition for fair hearing [sic, rehearing] and the notice thereof filed with the Industrial Commission." Frank Deposition, p. 6. It was then

agreed by counsel that there would be "a continuing objection to all the questions along the lines you're now discussing regarding his current physical condition as compared with that as testified at the hearing." Frank Deposition, p. 7.

The Industrial Commission, and especially the legal member thereof, was in grievous error in considering any portion of that deposition other than that which was in development of the $2000 Goldback affair. That the error was prejudicial cannot be gain-said. Obviously something had to trigger the Commission into awarding the new trial, and everything points only to this "newly discovered" evidence—newly discovered only because the Company did not begin its surveillance of Mr. Frank until *after* the decision against the Company was handed down, although it had the opportunity to have done so anytime after he was released from the hospital. The company had not just months to prepare for trial—but years.

Accepting that this claim of fraud by perjury, had been raised by the Petition for Modification, what validity did it have? Very little, and in actuality, none. Even if the allegation could be proven, at trial it would be not legally sufficient. That issue had been explored at the trial which took place in 1984. This is demonstrated by Finding XIV of the 1984 decision:

> Claimant participates in a mining partnership with his brothers, and during the summers of 1982 and 1983 visited sites of mining operations in northern Idaho. Claimant performed minor duties while at the mine sites but did not work regularly or perform any substantial duties. Claimant is on the Board of Directors of two mine development companies and plays an active role in the management and operations of those companies. The record indicates that Claimant has some knowledge of mining properties, mining activities, and mining equipment. Claimant does not receive any income from his activities as director of the companies, and Claimant has not thus far received income by virtue of his participation in the Frank Brothers mining partnership.

R., p. 13.

That finding flowed from evidence laid before the commission at a contested trial. The Company was without any right to have it tried a second time. The law in this area is firmly entrenched in Idaho. The holding in *Robinson v. Robinson*, 70 Idaho 122, 212 P.2d 1031 (1949), was reaffirmed 20 years later in *Willis v. Willis*, 93 Idaho 261, 460 P.2d 396 (1969) in a unanimous opinion with the Court membership including Justices McFadden, McQuade, Donaldson, and Shepard. The *Robinson* case had been cited 23 times in Idaho reported cases, twice in federal cases, and in two A.L.R. annotations. In short, it has excellent credentials. The main holding of that case is easily read and readily understood:

> Generally speaking, the fraud which will invalidate a judgment must be extrinsic or collateral to the issues tried, by which the aggrieved party has been prejudiced, or prevented from having a fair trial. *It is not sufficient* to charge only intrinsic fraud, or that which is involved in the issues tried, such as the presentation of perjured testimony.
>
> *Robinson v. Robinson*, 70 Idaho at 128, 212 P.2d 1031 (citing 12 additional cases, six of which are Idaho, C.J.S. judgments, and three Am.Jur., Vol. 228–243).

When *Robinson* was reaffirmed in *Willis*, the Supreme Court was constituted of five justices, none of whom were on the Court in 1949. In between *Willis* and *Robinson* there were the *Telfair* cases. In *Telfair v. Greyhound Corporation*, 89 Idaho 380, 404 P.2d 872 (1965), the plaintiff in a personal injury action, came out the loser by jury verdict and judgment both entered on January 27, 1984. Prior to trial plaintiff knew that potential witnesses were 28 of her copassengers on the bus. About a month after the trial had ended to her obvious dissatisfaction, her diligence discovered two of her copassengers from whom she obtained affidavits. Thus armed, she retained new counsel and moved the trial court (a) to set aside the judgment, and (b) to grant a new trial. The trial court denied relief. This Court's decision cited just the *Papineau* case, *supra,* and

the *Livestock Credit Corp.* case, *supra*, stated the rule of those two cases, as set out *supra*, and affirmed, holding that that plaintiff had not been in the "exercise of the due diligence required for locating witnesses and developing evidence prior to trial." 89 Idaho at 385, 404 P.2d at 875.

Such had naught to do with fraud, but, a companion case did. Side by side with that case in Volume 89 of the Idaho Reporter is another *Telfair v. Greyhound Corporation* case, 89 Idaho 385, 404 P.2d 875 (1965). Here the appeal was from denial of the plaintiff's independent action to set aside the final judgment. The grounds of that motion had been that Greyhound falsely answered her interrogatories by omitting the full and complete addresses of at least three passengers whose addresses had been known to Greyhound, all of which she concluded "prevented her from securing evidence which, if presented at the trial, would have resulted in a verdict compensating her for personal injuries." The Court, however, declared that that was no showing of any fraud, "but, as shown by the evidence, appellant did not with due diligence investigate the case." 89 Idaho 385 at 388, 404 P.2d 875 at 876.

Returning to *Willis*, the Court's opinion there relied upon both *Robinson* and *Telfair*:

In *Robinson v. Robinson*, 70 Idaho 122, 212 P.2d 1031 (1949), the court defined extrinsic fraud as being fraud 'by which the aggrieved party has been prejudiced, or prevented from having a fair trial,' and *intrinsic fraud as being fraud 'which is involved in the issues tried, such as the presentation of perjured testimony.'* Completing the categorization of the different species of frauds specified in Rule 60(b), we next consider 'fraud upon the court.' In the case of *Telfair v. Greyhound Corporation*, 89 Idaho 385, 404 P.2d 875 (1965), this court discussed what constituted a fraud upon the court and cited with approval several opinions which defined the phrase. Fraud is perpetrated upon the court where the unsuccessful party has been prevented by fraud or deception from presenting all of his case to the court, *United States v. Throckmorton*, 98 U.S. [8 Otto] 61, 25 L.Ed. 93 (1878), or where an unconscionable plan or scheme was used to improperly influence the court in its decision. *England v. Doyle*, 281 F.2d 304 (9 Cir.1960).

In considering whether any fraud was perpetrated upon the court, we need only determine whether appellant was denied the opportunity to present her case, since there is no allegation in this case of an unconscionable plan or scheme to influence the court.

*Willis v. Willis*, 93 Idaho 261, at 263, 460 P.2d 396, at 398 (emphasis added).

The Court further added:

However appellant presented no evidence of any actions which prevented her from fully presenting her case, and it is undisputed that she was represented at all times by counsel during the various proceedings. On January 6, 1967 a hearing was held on the appellant's motion, her attorney appeared in her behalf, and the court awarded her temporary alimony and attorney's fees. It was not until April 18, 1967, 3 months and 12 days later, that the divorce trial was held. This provided opportunity for appellant to take respondent's deposition and also the depositions of any witnesses who lived in New York, depositions which interestingly enough, she did, in fact, take *after* the trial.

\*　　\*　　\*　　\*　　\*　　\*

The type of perjured testimony necessary to constitute intrinsic fraud sufficient to vacate a final judgment was specified in the oft-quoted case of *Shammas v. Shammas*, 9 N.J. 321, 88 A.2d 204 at page 208 (1952) with Judge (Now U.S. Supreme Court Justice) Brennan speaking for the court:

'\* \* \* *Perjured testimony that warrants disturbance of a final judgment must be shown by clear, convincing and satisfactory evidence to have been*, not false merely, but to have been *wilfully and purposely falsely given, and* to have been *material* to the issue tried and not merely

cumulative but probably to have controlled the result. Further, a party seeking to be relieved from the judgment *must show that the falsity* of the testimony *could not have been discovered by reasonable diligence in time to offset it at the trial* or that for other good reason the failure to use diligence is in all the circumstances not a bar to relief. *Balip Automotive Repairs, Inc. v. Atlantic Casualty Ins. Co.*, supra [7 N.J. 152, 81 A.2d 9 (1959)]. * * * '

*Willis v. Willis*, 93 Idaho 261, at 264–65, 460 P.2d 396, at 399–400 (emphasis added).

Turning again to the Company's post-judgment brief submitted to the Commission, it interspersed the following statement, which was wholly extraneous to both its Petition for Rehearing and its Petition for Modification: "The affidavit of Walt Richard is before the Commission and reveals the specific details of the claimant's ability to work." R., p. 136. This was in conjunction with its equally extraneous argument that the claimant may have misrepresented his ability to engage in physical labor at the time of the hearing in February. Obviously to the extreme the Company, notwithstanding that it had stated conclusory grounds in its Petitions which did not raise the issue of Mr. Frank's trial testimony by pleading or motion, was directing all of its real effort at the hope of stampeding the Commission into a broad grant of a new trial at which it could once again attempt to prove that (1) Mr. Frank was not in the odd-lot category, and/or (2) that he was employable in that he could find employment despite his much battered body. As Mr. Frank's brief in this Court well points out, p. 6, the Company failed to plead the issue upon which the Commission would ultimately changed its ruling. .

The correct appellate ruling in this case can only be that the Commission erred, not just in issuing an order which failed to state the grounds upon which it was entered, but also in awarding the Company a new trial on petitions—which were wholly insufficient as a matter of law, and which at least the lawyer member of the Commission is chargeable with knowledge thereof.

Plain and simple, the only conclusion which can be drawn from this affair is this: The Industrial Commission awarded the Company a new trial on the basis of its new evidence, i.e., the still pictures and the films of Mr. Frank which showed that he was at times capable of being somewhat useful, despite his severe injuries.

Was there any change in his physical condition from the time of the first hearing? None shown, and that takes I.C. § 72-719(1)(a) out of the picture.

Was there any fraud or perjury established by the Company? None, and that removes fraud from consideration. There never was any fraud.

What was the Company's claim of manifest injustice based upon? Fraud, and fraud alone. So manifest injustice does not serve the Commission as grounds for granting a new trial or interfering with its first decision.

What does this Court do when a lower court or tribunal has improperly awarded a new trial? It reverses.

Did the newly discovered evidence qualify as evidence which with diligence could not have been produced at trial? Absolutely not. Early on in this brief the length of time available for preparation for trial was mentioned. The Company, with its substantial resources, assuming that it feels comfortable so playing the game, could have engaged its surveillance people in advance of the trial. Getting an adverse decision, it was only then that they took up spying with the hope of obtaining something which would change the decision. The problem they faced, however, and could not have surmounted except with the help of a willing Commission was that they were not entitled to the grant of a new trial on the basis of newly discovered evidence. That ground was not raised by motion or pleading, and moreover it displayed evidence which was not newly discovered but newly manufactured, only after getting an adverse decision.

As was said by the Territorial Supreme Court years ago of such shenanigans: "the

application for a new trial should be looked upon with suspicion and disfavor because of the temptation to make a favorable showing after having sustained defeat." *Black v. City of Lewiston*, 2 Idaho 281, 13 P. 80 (1887).

What has happened in Mr. Frank's case is exactly that which this Supreme Court declared cannot be done. In *Boshers v. Payne & Doust, Employers and Aetna Casualty and Surety Company, Surety*, 58 Idaho 109, 70 P.2d 391 (1937), the procedure there at issue was precisely the same as in this case, a 1936 petition to the Commission for a new decision which would modify or terminate[6] the award which Mark Boshers had received in 1926 for serious injuries received in 1924. The Court's opinion in that case succinctly gives an account of the accident and the resultant injuries, and the award:

> Respondent (a single man, 41 years of age) had been working for appellants as a powder man in their rock quarry. September 2, 1924, while standing on the bank of the quarry, respondent was struck on the head with 'a flying missile presumably thrown from a cable used to handle a heavy Bagley scraper, rendered unconscious and knocked into the rock pit.' The rock scraper was dragged over and across his body; he was taken up with a load of rocks and dragged over to a rock crusher. As a result of the accident he suffered disabilities to his right leg as follows: Crepitus in the knee joint (equivalent to 75 per cent loss above knee); stretching of the internal lateral ligaments and all ligaments of knee joint relaxed; flail-like motion of leg when walking. His left leg was disabled as follows: Improper alignment of tibia; badly displaced union of fibula; limitation of motion of ankle, interference of blood circulation in leg, ankle and foot; weakness and stiffness of leg muscles, equivalent to 75 per cent loss between knee and ankle. The disability in his legs precluded him from carrying burdens of even moderate weight. His right exter-

nal ear was cut off and one-third of hearing lost.

> Respondent received medical and surgical attendance and treatment in a hospital until February 26, 1925, and further medical attention in Spokane until September 1, 1925. Ten medical examinations were given him from September 2, 1924, to August 18, 1926. August 16, 1927, the Industrial Accident Board approved an agreement entered into between the workman and the contractors, whereby it was agreed between the parties, and approved and ordered by the board, that Boshers should receive compensation for the full period of 400 weeks, at $12 per week, and thereafter $6 per week during the remainder of his life. This order became final.

*Boshers v. Payne*, 58 Idaho 109, 110–11, 70 P.2d 391, 392 (1937).

That employer's petition was based on a change of circumstances, which change was alleged to be an "improvement from that of permanent and total disability as originally determined." *Boshers* at 111, 70 P.2d 391.

The Industrial Accident Board denied any relief and in time an appeal was taken to this Court. This Court, as then constituted, per Justices Ailshie, author, and Justices Morgan, Holden, Budge, and Givens, sensed that the employer was using the modification of award statute more for the purpose of attacking the earlier determination of permanent and total disability than it was in attempting to demonstrate any change, as witnessed by this discourse:

> That *such an application may not be employed to serve as an appeal or as grounds for reversal of an award* which has become final, was held in the case of *Standard A.I. Co. v. Hinson*, 251 Ky. 287, 64 S.W.(2d) 574 [1933], wherein the Kentucky court of appeals said:

>> There are two obstructions in the way of securing a reversal of the judgment on account of the incompetent evidence about which complaint is made: *First, an award is in the na-*

---

6. On the basis of its allegation of Mr. Frank's perjury the Bunker Hill Company's brief actual-ly asked the Commission to take away all of Mr. Frank's compensation benefits. R., p. 132, 133.

*ture of a judgment, and the right acquired under it cannot be destroyed by a mere refusal to recognize it and thereby compelling the injured employee to have the case reopened and prove his right to the compensation;* or, indeed, by doing the same thing by simply petitioning for a review. The burden is upon the one claiming a change in conditions upon which the award rests to sustain his charge.

In considering this same provision, which is common to the workmen's compensation acts, the Texas commission of appeals (with the approval of the supreme court), in *Independence Indemnity Co. v. White* (Tex.Com.App.) 27 S.W.(2d) 529 [1930], said:

*Sections of the various Workmen's Compensation Acts,* which authorize a review of awards on the application of one of the interested parties and *providing that such awards may be modified* on such review, *are not intended to afford a method of correcting errors made in fixing the amount of the original awards,* but are designed to afford a means of enabling an employer or the employee to obtain an increase, decrease, or termination of awards because of a change in the workmen's physical condition occurring subsequent to the entry of the original awards. *Crossfield v. Tanian,* 2 Q.B. (Eng.) 629, 69 L.J.Q.B. 790; *Mead v. Lockhard,* 2 B.W.C.C. (Eng.) 398; *Corbet v. Haines,* W.C.Rep. (Eng.) 288; *State v. District Court,* 136 Minn. 147, 161 N.W. 391 [1917]; *Bloomington, D. & C. Ry. Co. v. Industrial Board,* 276 Ill. 120, 114 N.E. 511 [1916]; *Benton Coal Co. v. Industrial Commission,* 301 Ill. 396, 134 N.E. 37 [1922].

*Boshers, supra,* at 114, 70 P.2d 391 (emphasis included and added).

It is to be understood that the Company here did not attempt to plead a change in condition where the issues had just shortly before been tried and a decision entered. But what it did was much the same as the Court saw being done in *Boshers.* It plead-

ed fraud in the nature of perjury as to $2000 monthly from Goldback. It did not plead any other fraud than that on the part of Mr. Frank. It improperly alluded by comment in its brief that by reason of *having done* a six-day reroofing job, he may have misrepresented his views of the restrictions of his disability.

It declared itself entitled to relief because of manifest injustice—but its pleading spelled out no particulars whatever. Absolutely none, zero.

But what did it finally obtain from the Commission which brings Mr. Frank to this Court? Not a modification on the basis of new medical testimony, which it was not entitled to, but an entire new trial wherein, of all things, it received evidence of Mr. Frank's trivial activities, and thereupon reduced his award drastically. It did so, merely by citing the statute and saying "manifest injustice." This is exactly what the *Boshers* case stands against—the Company used the system and misused a too complaint Commission to obtain what it had not sought on appeal or by forthrightly claiming "a change in the nature or extent of the employee's injury or disability." I.C. § 72–719(1)(a).

If this Court as presently constituted does not heed what we said in *Boshers,* the working people of this state, based on what has been done to Mr. Frank, are in for a long and arduous journey.

Because the foregoing analysis of the manner in which the Company obtained a new trial has been pieced together from a laborious review of a convoluted record, its accuracy is verified on a review of the candid statements of Company's counsel at oral argument:

JUSTICE HUNTLEY: Okay, now tell me what the films show, or the testimony of the two investigators who saw him doing those things as the films were being taken. What do they show that changes the circumstance as to whether the man can, for any sustained period of time, hold a job?

COUNSEL: First, I'd like to make clear that we aren't saying, and it is not

our position, that any circumstances changed. Instead, *we argued to the Commission that they were wrong in the first instance and to prevent manifest injustice they should correct ...*

JUSTICE BISTLINE: Let me interrupt right there. You say you believe they were wrong in the first instance. But in the first instance they didn't have any of this evidence that you went out and acquired after they decided the case.

COUNSEL: That's right.

JUSTICE BISTLINE: To my mind, that is exactly like a situation we're all familiar with where you've got a jury trial in a civil action in district court, and the other side says something you think you would object to, and you might object to, but you didn't object to, and you wait out the jury verdict. Then the jury comes in and they go against you. Then you say, well look at how bad that was, and the court on appeal always says you can't just wait out the jury verdict and then make your move. Now, you could have had your private detectives on this case earlier, could you not?

COUNSEL: Could have.

JUSTICE BISTLINE: But you didn't.

COUNSEL: That's right.

JUSTICE BISTLINE: You waited out the verdict, and then you didn't like the verdict, and then you went out and hired private detectives and got evidence that you could have had in the first place, but you didn't go after.

COUNSEL: You can't, I mean. Yes, your honor, you can say what you're saying, but let me point out an important fact. The house reroofing job wasn't performed until after the initial hearing.

JUSTICE BISTLINE: How do you know that he wasn't doing something similar, if you don't put surveillance on him?

COUNSEL: I guess, I don't know that. We put in all the evidence that we had available to us in the initial hearing about his capability to engage in physical activity....

A question by Justice Bakes brought to our attention the threshold question not discussed at all in the opinion of Chief Justice Shepard:

COUNSEL: All I care about is trying to explain our position to the Court whether it comes in my argument or in answers to questions, but, in short, there was substantial competent evidence in the record to sustain the award on rehearing and we think we've demonstrated that and it doesn't seem like there's a lot of question about the substantial competent evidence in the record. There is conflicting evidence, we admit it, we can't get away from it. There's conflicting evidence, and *I can't get away from the fact that initially the Commission found him totally and permanent disabled* and I considered it our job to convince the commission otherwise within the limits of the law of the state of Idaho, and we did that. And the standard of review of the Commission's award on rehearing, so far as I can ascertain from the law of the state of Idaho, isn't any different than their initial award. In other words, *we submit that this Court has to review the award on rehearing in conformance with the same standards that this Court has consistently adhered to with respect to an initial award.*

JUSTICE BAKES: On that point, Mr. Boyd, there's an argument of Mr. Rose that *there's a certain threshold on a reconsideration argument in the Idaho statute, there's a certain threshold of showing that you've got to climb over before the Commission's got to find, before they're entitled to go back and reconsider their prior decision.* It cites the *Pets* case, which of course is the Cascade case, the Oregon case and the *Duncan* Louisiana Court of Appeals case. Do you want to discuss that point, because that is a legal question in one sense. I mean, you're focusing back and saying, you know, this is a reconsideration, they've made new findings and now you've got to go back and look at the entire record to see if there is evidence to support those new findings. But you can see the problem is, if there'd been no rehearing, if all that evidence had been

before the Commission in the first instance and they had made this finding that they ultimately came to, that's one situation, but if its a situation where they made a total disability finding first and then they went back under the statute and reconsidered and came up with a different finding, his argument is, as I understand it, is that these two cases provide that *there's a certain burden which has to be a showing made before the Commission can do that and absent that showing, they can't go back and alter or amend their decision.*

As is seen by examining the appended second decision of the Commission, of July 2, 1986, it is in many respects a reprint of its 1984 decision.

The only additional medical testimony recited by the Commission is that of Dr. Adams who rated Mr. Frank's disability 4 percent higher than had the three doctor panel as found in the 1984 decision, and the testimony of Dr. Verhoogen taken by deposition on February 22, after the Commission's order of December 10, 1984, had started the ball game over to be played a second time.

Dr. Verhoogen's testimony at the first hearing is located in the Commission's 1984 decision, Findings of Fact VII and VIII, *supra,* and as is readily seen was separately treated by the full Commission as was so of all the witnesses. In the 1986 decision those two findings were combined into Finding VII. See Appendix A, attached.

Dr. Verhoogen's testimony which was given after the Commission order allowed the Company to bring in new evidence is not so readily found, being mentioned only in 1986 Finding VIII, which was the rewrite of the 1984 Finding X which dealt with the panel examination of Mr. Frank, set out supra. As will be noted by examining the 1986 Finding VIII, see Appendix, Dr. Verhoogen had been made aware of the "roofing" affair filed by the Company's hired investigators after the Commission issued its decision. The Commission's account of Dr. Verhoogen's medical opinions does not do justice to the doctor, as is revealed by examining the testimony:

Q. Doctor, you're familiar that Paul helped his brother this past summer roofing a home?

A. Yes.

Q. And did you discuss that project with Paul?

A. Yes, I did.

Q. And you're aware he lifted several sheets of approximately half inch plywood?

A. I don't recall if it was a plywood or shingles or what it was. He told me he was able to work a little while and then he had to stop and rest for a while. And there was a very sporadic type of work.

Q. I would like you to assume that a piece of plywood he lifted weighs about 35 pounds and he may have lifted up to ten pieces of plywood over a period of several hours. Would that change your opinion—what you previously felt Paul was able to physically do?

A. No, I think that *in my previous deposition I stated that I thought he would be able to occasionally lift even up to 100 pounds.* That he would probably suffer for it the next day.

Q. Have you in your common sense and experience seen patients overexert themselves to help loved ones?

A. For a variety of reasons.

MR. GIBLER: I object to the form.

Q. Your answer?

A. For any number of reasons, yes.

Q. Do you feel that Paul could be a roofer with his physical condition—

A. No.

Q. —on a full-time basis?

A. No.

Q. Do you feel, or do you have an opinion on whether or not this roofing activity would have caused the additional spur formation you saw at the back of his ankle?

A. I don't recall exactly how many days he was doing the roofing, but it seems to me it was relatively few, and is not what caused the spur inflamation. If you told me that he had been doing the roofing daily for two months, then, yes, maybe it

did aggravate it. But as I recall we're talking about several days.

Q. Say even if it was up to six or seven, I don't recall the exact amount of days.

A. No, that won't do it. This is a degenerative wear and tear type of phenomenon that takes months to occur.

Q. Has your previous prognosis of Mr. Frank changed?

A. No. If anything, the ankle has worsened since the previous visit.

Q. Regarding your prognosis regarding the back and the pelvis?

A. I think it is looking—I have to admit to you as far, as the back and pelvis is concerned, I am treating the pelvis but there is nothing much to do about it. As far as the back goes, as far as the compression fracture, I leave that up to Dr. Thrasher. So I don't want to make comments with regard to that treatment.

With regard to his ankle, it looks more and more like he's going to require surgery to clean that out eventually.

Q. Do you have a time frame in which that surgery might occur?

A. It depends on his symptoms. No, and I suppose to some extent it will depend on his activity.

Q. I told you earlier that Paul was going to see Dr. Adams for an impairment rating?

A. Yes.

Q. And you previously were reluctant to do an impairment rating because you had been involved with Paul for so long?

A. Correct.

Q. If Dr. Adams were to find an impairment even substantially greater than what the Spokane medical panel found, would you necessarily disagree with that?

A. That's kind of a hypothetical question to answer. It depends on how much higher.

Q. Say *if they found him 60 percent impaired,* just to pull a figure out of the sky?

A. Total, counting the back and ankle and sacroiliac joints, the whole works?

Q. Yes.

A. *I would say that's probably legitimate.*

\* \* \* \* \* \*

Q. Doctor, before I had to go off the record and interrupted you, you were going to elaborate on what your experiences have shown with patients suffering from a severe disability and what they may do in coping with that?

A. Well, I was simply going to state that you asked if it was within my experience that a patient may do something like that for a loved one. I want to make the point it is not just doing something for a loved one, but *sometimes the patient will do something like that out of sheer frustration. That a young vigorous healthy guy who is used to doing anything he wants, who is all of a sudden injured and can't do things, sometimes out of sheer frustration he will simply try to do something to see if he could get away with it.* (emphasis added)

True, this Court more often than not defers to the expertise of the Commission. That proposition is based on the belief that the three commissioners either have, or by reason of the experience gained by sitting on the Commission, become more expert in medical matters than, for instance, Supreme Court justices who are rarely so exposed.

So much for medical expertise, which is not at all paramount in the instant case. In this case the issues presented are almost entirely, if not solely, legal issues, i.e., principles of law. For my part, I live in the fantasy world which believes that attorneys are possessed of their own expertise, and that is in the area of ascertaining the state of the law. And how is that done, one might ask? Simply done, it might be replied. A first precept is to achieve a respectable degree of consistency. What is decided as a principle of law by a thinking jurist or court in 1949 is not to be ignored in 1969. When this Court in the *Lyons* case fell in line with other jurisdictions which had recognized the odd-lot doctrine, and of even greater importance held *as a matter of law* that George Lyons fell into

that class, to those who are called upon to have an expertise in law, that became the law. If there is to be any consistency in the law, it must be strictly adhered to. To ignore it is to abide with judicial anarchy, and attorneys, litigants, district courts and other tribunals will wander in the waste lands of ignorance as to the state of the law. Is today's opinion for the Court sounded on established principles of law? Are the facts of the case discussed with even a scintilla of citation for controlling case precedent? The answers to both questions can only be a "no"—a sad but true commentary indeed.

The opinion authored by the Chief Justice at one point states unequivocally in comparing this case to the Louisiana case cited in Mr. Frank's brief, *Duncan v. Carlo Ditta*, that "In the instant case, by contrast, claimant offered no evidence to rebut Employer's evidence upon the petition for rehearing and modification of the award." (At p. 793, 792 P.2d at 818.) The language is unusually awkward for the Chief Justice, but it is understood that the reference is to the hearing which the Commission by its order allowed, and by the "employer's evidence" necessarily is meant the still pictures and the video film which the Company's retained private investigators obtained *after* the Commission had ruled adversely to the Company. For certain, what is missing here is the introduction of any new medical evidence by the Company which demonstrated any improvement in Mr. Frank's physical condition since the panel, through Dr. Luther, testified to it as Company's witness on January 4, 1984, which was by deposition. This was over fifteen months prior to the second hearing conducted by Commissioner Geddes sitting alone. To the contrary, and belying the quoted excerpt from the opinion authored by the Chief Justice, it was Mr. Frank who produced the only medical evidence of any change in physical impairment during that period of time, to wit, the new testimony of Dr. Verhoogen and Dr. Adams, both of whom saw the claimant's physical condition as having worsened and his medical impairment increased! Those who join the opinion of the Chief Justice are simply not conversant with the record. It was the Company which failed to offer any evidence to rebut the claimant's medical testimony—just the opposite of what has been written.

Had this case come before the Court on a clean slate, without the unprecedented procedural morass created by the Company and the Commission, it would be very difficult to succumb to the platitude that "The determination of the extent of a claimant's disability is a factual matter for the Industrial Commission, and if supported by substantial and competent evidence will not be reversed." (At p. 794, 792 P.2d at 819.) This Court has not always so self-emasculated itself. Fortunately, the Commission generally has followed the principles of law handed down by this Court. An excellent recent example is the case mentioned earlier, *Madison v. J.I. Morgan*, et al. The Commission there found the claimant to be in the odd-lot category and awarded permanent and total disability benefits. Mr. Madison was indeed another severely injured worker:

Claimant apparently sought no treatment for the September, 1982 injuries or any other condition between January 17, 1983 and October 28, 1983, the date on which the third industrial accident relevant to these proceedings occurred. On that date Claimant sustained personal injury to his left hip, left knee, back and left arm while in the course and scope of covered employment for the Employer when part of a tree fell on him, striking him in the mid-back region and pinning him underneath. The blow caused fractures of the left him and right eleventh rib, left knee strain and damage to the right ulnar nerve. He was transported by ambulance to a nearby community hospital, then transferred to a hospital in Ontario, Oregon, where he came under the care of Dr. Bills, an Oregon board certified orthopedic surgeon, who surgically set Claimant's hip and continued to treat him for the injuries received in that accident through late November of 1984.

*Madison v. J.I. Morgan*, et al., I.C. 83-447 888, S.Ct. No. 16895.

Another recent case awarding the same relief is *Carey v. Clearwater County Road Department*, 107 Idaho 109, 686 P.2d 54 (1984).[7] The facts of that case are strikingly similar to the facts in Mr. Frank's case, other than Mr. Carey did not suffer a 170 foot free fall down a mine shaft. They are very well set forth in the opinion authored by Justice Shepard and joined by the other four justices—a unanimous opinion:

Claimant Carey had injured his back in 1968, had a lumbar disc removed, and been off work for a year. Thereafter, although he had had some difficulty with his back and had noted discomfort on occasion, he had had little work difficulty. In November 1977, during the course of his employment with Clearwater County Road Department, and while he was attempting to lift and reset a guard rail post weighing about 200 pounds, claimant felt a ripping, burning sensation in his lower back. He continued to notice discomfort in the area of his low back.

Carey consulted his physician, Dr. Cleto, who diagnosed the problem as low back compressive syndrome and prescribed medications, muscle relaxants, and physical therapy. The pain continued, and Cleto referred claimant to Dr. Thorson, who recommended conservative treatment. Although claimant sustained increasing pain in his back, he was able to continue working until he was laid off on November 30, 1978.

In February 1979, Dr. Thorson performed surgery on claimant to remove a disc at the lumbosacral level. The recovery from surgery was complicated by infections, and claimant felt the surgery did not improve his condition. Another doctor performed nerve block treatments, but those did not relieve the pain. At the time of the commission hearing, claimant was still experiencing constant pain in his back, legs, and groin, which pain impeded his normal activities. He could walk only a short distance and had trouble standing, sitting, or driving for longer than 20 minutes. Dr. Cleto testified claimant would have trouble returning to work, and Cleto found claimant's impairment to be 50%, one-fifth thereof being attributable to the 1968 injury and four-fifths to the 1977 injury.

In June 1980, claimant was evaluated in Spokane, Washington by a panel of physicians consisting of a neurologist and two orthopedists. That panel found claimant to have an impairment of 50% of the whole man, of which one-fifth was attributable to the 1968 accident and four-fifths to the 1977 accident. It recommended that claimant work where he was not required to do any heavy lifting or to remain in one position for long periods of time. While the panel opined that there was work which claimant could do, it did not identify any specific jobs which he could hold.

Witnesses were presented, on behalf of both the Industrial Special Indemnity Fund and the claimant, as to claimant's ability to obtain and handle light work which would not require lifting and which would allow him to stand or sit at will. It is sufficient to say that such testimony was conflicting as to claimant's physical ability and the availability of work which claimant could perform within claimant's geographical area.

Claimant himself testified as to his prior work history. He stated that after the 1968 injury, but prior to the 1977 injury, he had worked at various jobs, such as weigh clerk, grease monkey and mechanic's helper, and he indicated that his back problem had not bothered him to any considerable extent at that employment.

7. The commission's initial decision in favor of Mr. Frank cited and relied upon this Court's *Carey* decision: "... The nature and extent of Claimant's continuous physical discomfort makes his situation analogous to that of claimant in Carey v. Clearwater County Road Department ..." Conclusion of Law IV, R. p. 17. It is to be noted that the *Carey* case goes wholly without mention in Chief Justice Shepard's opinion in Mr. Frank's case, notwithstanding that *Carey* was authored by Justice Shepard. *Carey* also went unmentioned in the commission's 1986 decision which reduced Mr. Frank's total and permanent award by almost one-half.

The commission found that claimant had a permanent physical impairment of 50% of the whole man. It found that 10% of the of the impairment preexisted the industrial accident and 40% was caused by the industrial accident.

The commission further held that claimant's job prospects were poor, at best, given the lack of sedentary work available in the claimant's geographical area, the claimant's lack of qualifications to do most of the sedentary work that was available, his inability to drive or ride in a car for the time necessary to travel to a larger market area, and his inability to work regularly and steadily due to his unreliable physical condition. These problems would prevent him from keeping a job other than for a sympathetic employers. The commission therefore found that claimant fell into the "odd-lot" category and was totally and permanently disabled.

107 Idaho at 110–111, 686 P.2d at 55–56.

In affirming the commission's *Carey* decision (except for directed readjusting of liability as between the Industrial Special Indemnity Fund and the State Insurance Fund Surety), this Court's opinion relied heavily on the language in its well-received landmark opinion authored by Justice Donaldson in *Lyons v. Special Indemnity Fund*, 98 Idaho 403, 565 P.2d 1360 (1977):

[T]he effect of successive injuries may be greater than the sum of the impairments resulting from each. The Commission must therefore evaluate appellant's ability to find employment in the future after considering all of his physical impairments, not just the most recent one.

In addition to the medical factor of permanent impairment, the Commission must also consider nonmedical factors such as age, sex, education, economic and social environment, training, and us-

able skills. I.C. § 72–425.... Appellant has a ninth grade education and no special training or skills. His primary vocational asset was his ability to perform heavy manual labor. While his lack of formal education, special training, and usable skills did not prevent him from working in the past, it will undoubtedly lessen his chances of finding employment in the future. At best, appellant can only offer a prospective employer the ability to perform unskilled light work of a highly restricted nature. His position differs from that of someone such as an accountant who would still have valuable skills to offer an employer in spite of a substantial physical handicap.

It is not necessary for a person to be physically unable to do anything worthy of compensation to be classified as totally disabled.

An employer who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled. *Arnold v. Splendid Bakery*, 88 Idaho 455, 463, 401 P.2d 271, 276 (1965).

Claimants such as those described in the above quotation from Arnold are often classified as 'odd-lot' workers. See 2 A. Larson, The Law of Workmen's Compensation § 57.51 (1976). *While they are physically able to perform some work, they are so handicapped that they will not be employed regularly in any well-known branch of the labor market*—absent a business boom, the sympathy of a particular employer or friends, temporary good luck, or a superhuman effort on their part. *Lyons, supra,* 98 Idaho at 406, 565 P.2d at 1363.

*Carey v. Clearwater County Road Dept.*, 107 Idaho at 112, 686 P.2d at 57.[8]

8. By way of this footnote the reader will become even better acquainted with the similarity of the backgrounds of the three injured working men, Mr. Lyons, Mr. Carey, and Mr. Frank. Of Mr. Lyon's background Justice Donaldson wrote:

The record discloses that appellant Lyons is a 48 year old male with a ninth grade education whose entire labor history consists of nothing but heavy manual labor. In 1942 he went to work in the shipyards cutting iron with an acetylene torch. During the summers between 1942 and 1945, appellant worked in

This Court's decision in *Lyons* was succinctly and forthrightly stated:

It is the opinion of this Court that *the evidence as a matter of law places the appellant within the odd-lot category.* He is a 48–year–old male with a ninth-grade education. His vocational training and skills are confined solely to heavy manual labor, which he can no longer perform. As a result of his injuries, he experiences almost constant pain in both of his legs, his left arm, and the cervical, thoracic, and lumbar areas of his spine. He testified that the pain increases if he either sits in one place or walks around for any length of time. Appellant is also restricted in his ability to lift objects and to use his arms. He lives in a small mountain community where the opportunities for light work are limited. Therefore, the Fund must show that some kind of suitable work is regularly and continuously available to appellant.

*In meeting its burden, it will not be sufficient for the Fund to merely show that appellant is able to perform some type of work. Idaho Code § 72–425 requires that the Commission consider the economic and social environment in which the claimant lives. To be consistent with this requirement it is necessary that the Fund introduce evidence that there is an actual job within a reasonable distance from appellant's home which he is able to perform or for which he can be trained. In addition, the Fund must show that appellant has a reasonable opportunity to be employed at that job. It is of no significance that there is a job appellant is capable of performing if he would in fact not be considered for the job due to his injuries, lack of education, lack of training, or other reasons.*

*Lyons, supra,* at 407, 565 P.2d at 1364 (emphasis added).

As is seen by even a cursory review of those cases, this Court was not remiss in its disposition of the *Lyons* case. It was not a weak-kneed Court which there ruled as a matter of law that Mr. Lyons had become an odd-lot worker, and hence not employable.

As the Commission recently ruled in the *Madison* case, and as it ruled in the *Carey* case, and as this Court on a review of the evidence and application of principles of

---

Idaho as a manual laborer on a road crew for the United States Forest Service. In 1945, he moved to Idaho permanently, locating in the Kooskia area where he worked in the lumber industry setting choker, pulling green chain, driving caterpillar tractor, driving truck, and working as a sawyer. In 1951, appellant moved to the Riggins area where he continued working in the lumber industry until a series of accidents, specifically detailed below, forced him to seek vocational rehabilitation in 1961. Following his vocational training, appellant worked periodically in a body shop in Orofino, Idaho, in addition to continuing work in the lumber industry. This arrangement continued from 1961 until his final injury in 1972. Appellant has no special training or skills other than his vocational training in bodyshop work.

Appellant, obviously a man of starcrossed fortune, has had a long succession of injuries throughout his life. At age 7, he lost his thumb in an accident with a saw. Industrial noise encountered over the years has led to a binaural hearing impairment. In addition to the 1972 injury to his back which led to the filing of this claim, appellant suffered three other back injuries while working for the logging industry. He also reinjured his back while working in the Orofino Body Shop. Ap-

pellant fractured his left leg twice which finally led to the insertion of a three inch screw for support. He also fractured his right leg in the same accident that injured his lower back in 1959 when he slipped off a logging truck. In two separate instances appellant damaged each of his eyes, his right eye when he was struck by a flying piece of brush and his left eye which was pierced by a piece of steel while working at the Orofino Body Shop. Additionally, appellant testified that he suffered permanent lung damage from smoke inhalation while fighting a forest fire in 1967. Appellant's string of misfortune finally culminated on September 22, 1972. While driving a logging truck for Alpine Construction Co., later known as A & T Logging, Inc., he found it necessary to put chains on his truck in order to traverse a muddy road. The chain hangers were so high on the truck that he was forced to make a small jump to rehang the chains and in doing so he felt a sharp pain in his back, as though "somebody hit me right between the shoulders with a sledge hammer." Since that time appellant states he has been unable to work at all due to the almost constant pain he is experiencing in his legs, back and left arm.

*Lyons v. Industrial Special Indem. Fund,* 98 Idaho 403, 404–05, 565 P.2d 1360, 1361–62.

law ruled in *Lyons*, as a matter of law, Mr. Frank became an odd-lot worker, and I would so vote as I did in *Lyons*.

As Chief Justice Shepard wrote in *Carey*, "Odd-lot status is a *factual determination* within the discretion of the Industrial Commission, ...." I am in full agreement. But as Justice Donaldson wrote in *Lyons*, "It is the opinion of this Court that the evidence *as a matter of law* places the appellant within the odd-lot category." I am also in agreement.

Further, I am in agreement with the caveat of the *Lyons* opinion set out earlier herein and worth repeating.

> Therefore, the Fund must show that some kind of suitable work is regularly and continuously available to appellant.
>
> In meeting its burden, it will not be sufficient for the Fund to merely show that appellant is able to perform some type of work. Idaho Code § 72–425 requires that the Commission consider the economic and social environment in which the claimant lives. To be consistent with this requirement it is necessary that the Fund introduce evidence that there is an actual job within a reasonable distance from appellant's home which he is able to perform or for which he can be trained. In addition, the Fund must show that appellant has a reasonable opportunity to be employed at that job. It is of no significance that there is a job appellant is capable of performing if he would in fact not be considered for the job due to his injuries, lack of education, lack of training, or other reasons.
>
> *Lyons v. Industrial Special Indemn. Fund*, 98 Idaho 403, 407, 565 P.2d 1360, 1364 (1977).

I am also in agreement with our unanimous *per curiam* opinion in *Francis v. Amalgamated Sugar Co.*, side by side with *Lyons*, 98 Idaho 407, 565 P.2d 1364 (1977) where this Court wrote:

> The Commission's recitation that it has considered medical and non-medical factors including "the claimant's age, sex, education, economic and social environment and training and usable skills," in concluding that he is only 25% disabled

is not a substitute for an explicit finding of what kind of suitable work is available to the claimant who is in the odd lot category. Indeed, after the Industrial Commission issued its order in this claim, the claimant petitioned the Commission to make "a specific Finding of Fact as to what avenues of gainful employment are at present open to the claimant and whether a reasonably stable labor market now exists for claimant's services in such employment," but the Commission denied this request on the ground that "specific findings of fact relative to avenues of gainful employment open to the claimant and the labor market are not necessary for the adjudication of this matter." But, as *Lyons* makes clear, this is precisely the kind of finding the Commission must make when the claimant falls into the odd lot category. Accordingly, the matter is remanded to the Industrial Commission for further findings. Costs to appellant.

> *Francis v. Amalgamated Sugar Co.*, 98 Idaho 407, 409, 565 P.2d 1364, 1366 (1977).

In my view the Commission's findings in its second decision are highly suspect in the first place, and inadequate at the same time. I do not hesitate to describe the findings as pitiful—a result I do not ascribe to Commissioner Geddes, but to the full Commission which sent him out alone on a Quixotic endeavor. The full Commission, in a circumstance where its lawyer member necessarily must bear the brunt of making a decision which is procedural and legal in nature, heard cries of fraud and manifest injustice—of which there was neither—and without vacating or setting aside its final decision which was nearly so final that it could only be challenged on appeal, declared the case re-opened to allow the Company to bring in its supposed newly discovered evidence of fraud, *no change of condition being alleged*, and in so declaring did Commissioner Geddes a great disservice. Any person put into that position could only be given to understand that the other two commissioners must have had in mind that the employer had not been fairly

dealt with by a decision which awarded the claimant total permanent disability.

The re-opening of this case for further evidence was just the opposite of what happened in the *Madison* case where the referee was in charge, even though in *Madison* there had not been the entry of a final decision. That case had only gone so far as to have been heard, and left open for specific purposes, none of which were for the presentation of evidence which could and should have been presented at trial.

The findings, which are woefully inadequate, are exactly of the kind refused by this Court in *Francis*.

Mr. Bovino, a company employee, said that he believed Mr. Frank "could perform such jobs as receptionist, lab technician, assayer, hoist operator and possibly a motor operator." (Whatever this is or means?) But he didn't testify of knowing of any jobs being open in Shoshone County. Commissioner Geddes failed to point out that the Company had never made a job offer of any kind to Mr. Frank. Mr. Bovino's testimony was worthless, other than to testify that Mr. Frank was a fine gentleman. Tr., p. 106. His statement as set out in the finding was followed by the remark that those were "off the top of my head." Mr. Shecket, a company witness, was retained by the Company, he testified to having been a vocational consultant for two years, with a bachelor's degree in psychology, and a masters degree in counseling and guidance (1975) with which credentials he was employed by Post Falls School District as a school psychologist, prior to which he had worked for the Health and Welfare Department in Coeur d'Alene, and had been a salesman, and a school guidance counselor. Initially he was asked to review the conclusions of Dr. Flynn, with which he had disagreed. Tr., p. 155. His testimony was much like as what was written in Finding XII 1986, Finding XV 1984—other than that he did not say "telephone salesman" but said "telephone auto salesman."

It is significant that Shecket testified only once—at the first hearing before the full Commission. The full Commission found in 1984 that "The record indicates that for each job that Shecket testified that claimant could perform, significant accommodations by the employer would be necessary." In 1986 this finding was distilled down to "Some accommodations may need to be made to accommodate the Claimant's impairments." The testimony of Mr. Shecket justified the 1984 finding. Tr., p. 162. He knew of no openings for laboratory technicians in Shoshone County. Tr., p. 162. Anyone on this Court who would take the time to review his testimony would not be favorably impressed with his candor, or lack thereof. On examination by Mr. Frank's attorney he conceded that he had given all of his testimony as to what Mr. Frank could do without having any personal contact with him whatsoever. Tr., p. 177. Commissioner Geddes did not accept the Shecket testimony that Mr. Frank could be employed as a dental lab technician, given at page 198. Mr. Schecket qualified his answer by saying Mr. Frank was "qualified for entry level...." Mr. Shecket, in short, would say almost anything and everything, but he didn't say that there was any genuine employment available for Mr. Frank that would fall in line with this Court's mandate to employers set out in *Lyons*. Commissioner Geddes did not make a finding that the Shecket testimony filled the bill, nor did the full Commission in its 1984 decision.

Mr. Faraca testified live at the 1984 hearing. The full Commission's 1984 Finding XIII is reflective of his contact with the case, and although more accurately developed than the 1986 Finding XVI in that it shows that it was Mr. Bob Jude who conducted vocational compatibility testing on Mr. Frank (not disclosed in 1986 Finding XVI), does not indicate the extent or contact of Mr. Faraca's testimony at the hearing, which for the most part was simply to identify his case notes in order to have the same admitted, Exhibit No. 22, and to also identify a "job search" which had been proposed by the Department of Employment, Exhibit No. 23.

Testifying as a Company witness, he explained his familiarity with the labor market to which Mr. Frank would have to turn:

Q. (BY MR. BOYD) Now, as a part of your job, do you become familiar with or are you familiar with the labor market in Shoshone County, Idaho, and the nearby surrounding area?

A. Yes.

Q. Why do you have to be familiar with that?

A. It's an integral part of the job for job placement of the injured worker to be aware of jobs that might be available for job placement in case an injured worker is unable to return to his former vocation.

Q. What have you observed the economic job connected circumstance to be in Shoshone County, Idaho at the present time?

A. Very high unemployment rate. Probably one of the highest in the state.

Q. And how long has this situation been in existence?

A. Since the closure of the Bunker Hill which—

Q. If I might refresh your memory—

A. About 1981.

MR. BOYD: Can I ask a leading question to refresh his memory, Mr. Defenbach?

CHAIRMAN: Yes, you may.

Q. (BY MR. BOYD) I would suggest that the Bunker Hill announced it would shut down August 25, 1981. Does that refresh your memory?

Tr., Vol. I, p. 147–48.

Mr. Jude, called to the stand by Mr. Frank was more expansive by far. A professional occupational therapist who has worked for East and West Shoshone Hospital, Shoshone Living Center, Kellogg and Wallace School District, Pinecrest Psychiatric Hospital, and the Department of Vocational Rehabilitation, he established the goals of his profession:

The framework of occupational therapy is to evaluate a person's disability as far as where they are functioning at the present time. And that can include anything from taking care of themselves with daily living skills tasks to vocational training with the ultimate goal of trying to rehabilitate somebody so that they are a happy, productive member of society instead of being disabled and a non-productive member of society.

Tr., Vol. I, p. 88.

Mr. Jude stated that he had interviewed and evaluated Mr. Frank on referral from Transitional Services for the Handicapped (TESH), for whom he had served professionally for three years. He testified that to his knowledge Mr. Frank's physical disabilities in connection with the job market:

The contacts that we made were more on an informal basis, just talking. Mainly in that workshop, we tried to secure light assembly work contracts from different mining companies, which we did have a few at the time before Sunshine shut down and then Bunker Hill shut down. We went with the idea that we could build up a new operation and if we could, we needed to build up some sort of credibility first and then proceed onto, hopefully, open up some doors by having an in-house contract that we could train people to work within the industry. You have to understand that the workshop at that time had only been there about two and a half years and really wasn't developed into what it needed to be as far as the job market in the area.

Q. What response was there in your contact with them?

A. Well, not real good because there wasn't a market at that time for able-bodied persons.

Tr., Vol. I, p. 94.

Q. What did you feel he needed to do to be employable in the Shoshone County job market?

A. To be honest with you, as far as the Shoshone County job market, at that particular time there wasn't much of a job market. So, in order to be realistic with the people that we evaluated, if they weren't willing to go back to school or relocate to a different geographical area, I would honest tell them that they would be in for an extremely difficult time, especially somebody that has severe physical disabilities.

Tr., Vol. I, p. 98.

Q. Were the skills and disabilities that you were aware of that Paul had, were you able to identify any jobs at Shoshone County for him?

A. Not anything specific because he didn't really get to that point yet.

Q. Would you feel he has ability to compete in that job market?

A. Well, physically, I would say he definitely has got some diminished capacity, according to the medical evaluations. I don't know that because of the economic situation that—it would really be difficult to say how well he could compete. The nature of the industry up in the area would not seem conducive to his physical disabilities, unless he had better training and better skills to utilize.

Tr., Vol. I, p. 103–04.

Mr. Jude's evaluation after testing is reflected in 1984 Finding XIII, but with no mention being made of his trial testimony, it is necessarily inferred that the Commission in writing its 1984 decision was only aware of the Evaluation, Exhibit 23, and forgot the testimony.

Similarly, Commissioner Geddes in drafting the 1986 decision which supplanted the 1984 decision, in his 1986 Finding XVI, gave no thought to Mr. Jude's testimony. The Commission was not at liberty to disregard the testimony, as it well knows, so the inadvertence in not giving it the same consideration as was given the other witnesses is highly prejudicial error.

The Commission's 1986 decision did include the 1986 Testimony of Mr. Hauser, Finding XV, who had not previously testified. That finding states that Mr. Hauser "indicated" that there was a lack of sedentary work available for disabled persons. The use of the word "indicated" is too relaxed for my blood. Rather it should be conceded that Mr. Hauser did more than indicate. An examination of the transcript itself is required:

Q. Okay. What's the disadvantages of a person in the Shoshone County labor market with Paul's physical condition?

A. Well, disregarding his educational background, he is tremendously limited as by the medical evidence that I reviewed from almost all types of employment. The fact that there are very few jobs and a number of nondisabled workers looking for employment adds another factor to his disabling condition.

Q. What's been your ability to place disabled workers, nonskilled, in Shoshone County?

A. Real minimal. I could give you numbers of my current caseload, if that would be important.

Q. Well, are you generally able to place disabled workers—

A. No.

Q. —in Shoshone County?

A. No. In particular, not with the kind of disabilities that Mr. Frank has. In fact, when I take an application of a person that is severely limited like this, part of my application process is finding out if they would be willing to move from the area, prior to services being rendered by my agency.

Q. Why is that important?

A. Because there is such a lack of sedentary work, for one thing. And there is a tremendous prejudice against people with back injuries in Shoshone County.

Q. How does—where does Paul fall on the scale of disabled workers?

A. He would be classed as severely disabled, according to—

MR. BOYD: I'm going to object to the question and move to strike the portion of the answer given so far on the grounds there's improper foundation. We don't know—there's no way to tell without more foundation what "the scale" is—that phrase used in the question.

MR. ROSE: I'll rephrase my question.

Q. (By Mr. Rose) How does Mr. frank's disabilities compare with your other caseload disabilities?

A. He is more severely disabled than people currently on my caseload. If he was on my caseload, I would close his case as too severe—

MR. BOYD: I'll object to that and move to strike it on the grounds it's not responsive, and it's irrelevant.

MR. ROSE: Well, he doesn't have the objection of not responsive available to him, because I asked the question. And as far as relevancy, I would—I would—I would submit it is relevant.

COMMISSIONER GEDDES: It's not quite responsive to your question though. And I'm going to sustain the objection. You can ask the question, and we'll see what happens.

MR. ROSE: I'm sorry. I lost my train. Could you read my last question back, ma'am?

(WHEREUPON THE REPORTER READ BACK THE RECORD AS FOLLOWS: "Q (By Mr. Rose) How does Mr. Frank's disabilities compare with your other caseload disabilities?")

MR. BOYD: I don't have any objections to the part where he said it is more severe.

MR. ROSE: Okay.

THE WITNESS: Oh. It's what I added. Okay.

Q. (By Mr. Rose) Mr. Frank is more severely disabled than the majority of your cases?

A. Yes, sir.

Q. What would be the ability to place him, in your opinion?

A. In competitive employment?

Q. Yes.

A. I would say that I wouldn't have the ability to do that; that it would be nearly impossible.

Q. Okay. How would you handle this type of case in your agency?

A. If I had an open case on this gentleman and received the—

MR. BOYD: I'm going to object to that question on the grounds that it's irrelevant. How he would be handled in his agency doesn't have anything to do with the case.

MR. ROSE: I think the man's been established as a vocational rehabilitation person and—well—and I will just rephrase the question.

Q. (By Mr. Rose) In your professional opinion, how would you handle Mr. Frank's case?

A. Gathering the medical information that I have read available to me, I would close his case as too severe for eligibility criteria for vocational rehabilitation services.

Tr., Vol. II, p. 130–33.

Q. And finally, what's your opinion on whether Paul could be employed in Shoshone County or in a reasonable area that he could manage with the criteria placed on him by the medical panel?

A. In my professional opinion, I do not believe he can be.

Tr., Vol. II, p. 136.

Excluding the 1986 Finding XVII, which was based upon the Company's post-hearing, post–1984 decision, so-called newly discovered evidence, the evidence in the record, as a matter of law is in the same category as this Court observed in *Francis, supra,* and does not substantiate the conclusion reached in Finding XIX that "the claimant is not totally disabled for work." That conclusion is necessarily based on either the predicate that the Commission believes it erred in its 1984 decision whereby the Commission concluded that Mr. Frank fell into the odd-lot category, or, if not so, then is based on the "newly discovered evidence" summarized in 1986 Finding XVII. Either way, the Commission cannot be sustained.

If the 1986 decision is thought by the Commission to be responsive to the Company's petition for reconsideration, the newly discovered evidence was impermissibly admitted over a valid objection. If the Commission thought itself proceeding on the grounds of manifest injustice, i.e., the claim of fraud by alleged perjury in Mr. Frank's having testified that he received no compensation out of the Goldback–Nesco affair, again the Commission's own 1986 Finding XVIII destroys that theory.

Wholly missing from the 1986 decision is even a scintilla of a finding which meets this Court's mandated requirement in *Lyons:*

If the evidence of the medical and nonmedical factors places a claimant *prima facie* in the odd-lot category the burden is then on the employer, the Fund [Employer] in this case, to show that some kind of suitable work is regularly and continuously available to the claimant. *Employers Mut. Life Ins. Co. v. Industrial Comm'n*, 25 Ariz.App. 117, 541 P.2d 580 (1975); *Transport Indem. Co. v. Industrial Accident Comm'n*, 157 Cal.App.2d 542, 321 P.2d 21 (1958); *Brown v. Safeway Stores, Inc.*, 82 N.M. 424, 483 P.2d 305 (1970); *Hill v. U.S. Plywood—Champion Co.*, 12 Or.App. 1, 503 P.2d 728 (1972); 2 A. Larson, *supra*, at 10–136. It is much easier for the Fund [Employer] to prove the employability of the appellant for a particular job than for appellant to prove the universal negative of not being employable at any work.

It is the opinion of this Court that the evidence as a matter of law places the appellant within the odd-lot category. He is a 48–year–old male with a ninth-grade education. His vocational training and skills are confined solely to heavy manual labor, which he can no longer perform. As a result of his injuries, he experiences almost constant pain in both of his legs, his left arm, and the cervical, thoracic, and lumbar areas of his spine. He testified that the pain increases if he either sits in one place or walks around for any length of time. Appellant is also restricted in his ability to lift objects and to use his arms. He lives in a small mountain community where the opportunities for light work are limited. Therefore, the Fund [Employer] must show that some kind of suitable work is regularly and continuously available to appellant.

In meeting its burden, it will not be sufficient for the Fund [Employer] to merely show that appellant is able to perform some type of work. Idaho Code § 72–425 requires that the Commission consider the economic and social environment in which the claimant lives. To be consistent with this requirement it is necessary that the Fund [Employer] intro-

duce evidence that there is an actual job within a reasonable distance from appellant's home which he is able to perform or for which he can be trained. In addition, the Fund [Employer] must show that appellant has a reasonable opportunity to be employed at that job. It is of no significance that there is a job appellant is capable of performing if he would in fact not be considered for the job due to his injuries, lack of education, lack of training, or other reasons.

> *Lyons v. Industrial Special Indem. Fund*, 98 Idaho 403, 406–07, 565 P.2d 1360, 1363–64 (1977).

Equally against the 1986 decision is the Court's unanimous declaration to the same effect in *Francis, supra,* where again we held as a matter of law that claimant was in the odd-lot category:

> The claimant, who was employed as an electrician by respondent Amalgamated Sugar Co., was injured when he was pinned beneath the transmission of a switch engine when the transmission slipped as he was doing maintenance and repair work. The accident aggravated an existing injury to his back. The Commission found that the most recent injury produced an additional disability equal to 15% of the whole man which, when combined with the prior disability of 10% of the whole man, produced a total disability equal to 25% of the whole man. Although the commission did not distinguish between disability and impairment ratings, it is implicit in its findings and conclusions that in this case it equated the rating of the claimant's permanent impairment with its rating of his disability without explicit consideration of the types of employment the claimant can now perform. Because, as we explained in *Lyons*, this is improper if a claimant falls in the odd lot category and *because this claimant falls in the odd lot category*, this matter must be remanded to the Industrial Commission for further proceedings.
>
> The claimant in this case has the equivalent of a twelfth grade education. He is now in his mid-forties. His work histo-

ry has been in construction or heavy equipment repair and has always involved heavy lifting. However, since the time of the industrial accident he testified that he has been unable to do the moderate to heavy lifting necessary for performance of his former work. Since that time he has not found permanent employment. He has discontinued the types of employment that he has attempted which involved bench or chair work because he has experienced pain in his lower back and legs after prolonged sitting. *His efforts at vocational rehabilitation have not been successful. A Department of Employment job counselor testified upon the claimant's behalf that there was no stable labor market for the type of work that the claimant could perform,* although he did not preclude the possibility that the claimant might be retained for work in other fields.

After examining the claimant's history and experience, his physical condition, and the testimony concerning his potential for finding work that he can perform, *we conclude as a matter of law that the claimant has made out a prima facie case that he should be placed in the odd lot category. Lyons, supra,* 98 Idaho pp. 405–407, 565 P.2d pp. 1362–1364. This being the case, the burden is shifted to the employer "to show that some kind of suitable work is regularly and continuously available to the claimant." *Id.,* at 406, 565 P.2d at 1363. While there is evidence in the record to support a finding that the claimant suffers at 25% permanent impairment as defined by I.C. § 72–424, nevertheless without evidence of the type of work that the claimant can perform there is no evidence in the record to support the finding by the Industrial Commission that the claimant's permanent disability rating as defined by I.C. § 72–425 is only 25%. The Commission's recitation that it has considered medical and non-medical factors including "the claimant's age, sex, education, economic and social environment and training and usable skills," in concluding that he is only 25% disabled

is not a substitute for an explicit finding of what kind of suitable work is available to the claimant who is in the odd lot category. Indeed, after the Industrial Commission issued its order in this claim, the claimant petitioned the Commission to make a "a specific Finding of Fact as to what avenues of gainful employment are at present open to the claimant and whether a reasonably stable labor market now exists for claimant's services in such employment," but the Commission denied this request on the ground that "specific findings of fact relative to avenues of gainful employment open to the claimant and the labor market are not necessary for the adjudication of this matter." But, as *Lyons* makes clear, this is precisely the kind of finding the Commission must make when the claimant falls into the odd lot category. Accordingly, the matter is remanded to the Industrial Commission for further findings. Costs to appellant.

*Francis v. Amalgamated Sugar Co.,* 98 Idaho 407, 408–10, 565 P.2d 1364, 1366–67 (1977) (emphasis added).

Although Justice Bakes dissented in the *Lyons* case, he did not do so in *Francis;* hence a second odd-lot decision from this Court, which is a unanimous opinion, should have some persuasion with those justices who join the opinion authored by the Chief Justice, and is absolutely binding on the Industrial Commission. The Commission, as I see it, by reopening for the reception of evidence as to events which occurred after its 1984 decision had boxed itself in where it apparently thought it had to do something or appear foolish. It performed exactly as a very candid counsel for the Company informed us at oral argument:

First, I'd like to make clear that we aren't saying, and it is not our position, that any circumstances changed. Instead, *we argued to the Commission that they were wrong in the first instance and to prevent manifest injustice they should correct* ...

The Commission could only point to the additional evidence taken at the second

hearing to sustain its drastically different second decision in 1986:

> Based upon the additional evidence received by the Commission at its hearing in April, 1985, it is concluded that it would have been a manifest injustice to the Employer to have awarded the Claimant benefits for total and permanent disability.

Immediately prior to that statement was the remarkable statement, "Since the matter is pending before the Commission on a motion for reconsideration also, the commission may modify its prior decision in any respect." *Id.* That for certain is an *ipse dixit* in pure form. Not fortified by a citation of authority from where it was drawn, it stands nakedly alone and without precedent. With enough justices joining the Chief Justice, it henceforth will be precedent. Equal precedent being made this day is the welcome advice to employers and suretys that hereafter they only need use the magic words "fraud and manifest injustice" in connection with a petition for reconsideration, and they will be back in court to put in evidence anything which was omitted at the first hearing, or anything else which they were able to manufacture anew after they learned that they were not the prevailing party.

Mention should also be made that Professor Larson, author of the leading treatise on worker's compensation, recognizes that courts, unlike today's silent majority, have cautioned against over-reliance on films:

> Although on the surface it might appear that nothing could be more cogent and even dramatic refutation of a disability claim than motion pictures of claimant jacking up a car or playing tennis, the courts have rightly observed that such evidence must be used with great caution. For example, in a Louisiana case, the insurer had managed to take pictures showing claimant doing certain heavy work. What the pictures did not show was that the claimant had to rest between the scenes shown in the films, that he was in constant pain, and that he had to go to bed the next day. Moreover, it did not show what every intervertebral disc victim knows, that a characteristic of disc pains in the early stages is that they come and go, and may leave the injured person intervals of weeks and months in which he is practically normal.
>
> 3 Larson's Law of Workmen's Compensation § 79.75, pp. 15–426.280–.281 (1983 edition) (footnotes and citations omitted); *see also Nolan v. Stamper Drilling Co., Inc.,* 488 So.2d 312, 314 (La.App.1986).

Other courts have severely limited the utility of film evidence by concluding that films are not sufficient to satisfy the employer's burden of proving an improvement in disability from total to partial:

> [T]he films fail to rebut claimant's testimony that he has "good and bad days." Claimant may have been able to perform the filmed activities on a good day and still may have suffered total incapacity on a bad day. The films, taken over a period of only two days, do not in themselves rebut claimant's testimony about the degree of his disability on a bad day, because they do not reveal whether he was photographed on a good or bad day. *A mere showing that he is able to engage in sporadic physical activity does not sustain employer's burden of proving that claimant is no longer totally disabled.*
>
> *Matter of Compensation of Petz,* 58 Or.App. 347, 648 P.2d 372, 375 (1982) (emphasis added).

However, it is clear that films alone are inadequate to sustain appellant's burden of showing a reduction of claimant's disability from total to partial.

. . . . .

The films produced by the appellant have questionable value. In *DeBattiste* [*v. Anthony Laudadio & Son,* 167 Pa. Super. 38, 74 A.2d 784 (1950) ], *supra,* a case particularly relevant to the problem at hand, the Superior Court of Pennsylvania aptly pointed out the questions left unanswered by motion pictures. The Court said, 'The pictures show claimant's activity for very limited periods of time. Was claimant then working faster or slower than before the accident? The

pictures cannot accurately measure his speed, energy and efficiency at work; they do not constitute an infallible measure of either disability or earning power.' 167 Pa.Super. at 43, 74 A.2d at 787. *John B. Kelly Co., Inc. v. Workmen's Compensation Appeal Board*, 8 Pa. Cmwlth. 589, 303 A.2d 255, 257 (1973).

All considered, I cannot think of any opinion in this area of the law which has been as great a disservice to the Idaho worker as is today's opinion of the Court. While it might be said of my effort that it is over-encompassing, it can be more readily said that the majority opinion says far too little. Issues which were preserved for appeal, and argued, have gone unanswered—simply because they cannot be answered and still uphold the Commission's retromingency in its handling of the compensation case of Paul Frank. I would welcome an opinion by Justice Bakes which could satisfactorily explain why and how the Commission is at liberty to summarily enter an order reopening a case which has been tried and decided, without any justification having been presented to it by the Company. None has been forthcoming, and so, for the betterment of the practice in that area of the law it has devolved on these shoulders to make a reasonably thorough, although not by any means exhaustive, review of the many principles of case law which are being washed down the drain.

APPENDIX

BEFORE THE INDUSTRIAL COMMISSION STATE OF IDAHO
IC 80–341382
FINDINGS OF FACT, CONCLUSIONS OF LAW, AND AWARD ON RECONSIDERATION

This matter initially came before the Commission for hearing on February 29, 1984. The matter was tried and submitted to the Commission for decision. A decision was issued by the Commission July 18, 1984. The Commission awarded the Claimant total temporary disability benefits from November 12, 1980, the date of his injury, until March 31, 1983; medical expenses incurred as the result of the November 12, 1980 injury; and total permanent disability benefits commencing March 31, 1983. On August 7, 1984 Employer filed a timely Petition for Rehearing. On August 22, 1984 Employer filed a Petition for Modification of the Award under § 72–719 Idaho Code, requesting that the Award be set aside or modified to correct a manifest injustice and on the further ground that the Award was procured by fraud. On December 10, 1984 the Commission entered its Order and reopened the matter for further hearings on the issues raised by the motions submitted by Employer. On February 5, 1985 the Commission entered a further Order requiring the Employer to reinstitute compensation benefits pending a rehearing. The Commission conducted its additional hearing in this matter in Coeur d'Alene on April 23, 1985 with Commissioner Gerald A. Geddes presiding. Further oral and documentary evidence was presented. Thereafter, counsel for the parties submitted briefs and the matter is now before the Commission for decision. Having considered the evidence submitted, the Commissioner recommends that the decision of July 18, 1984 be set aside and that a new decision, issued with consideration of all evidence in the record, be entered by the Commission. The Commissioner recommends that the full Commission approve and adopt the following Findings of Fact, Conclusions of Law, and Award.

FINDINGS OF FACT

I

On November 12, 1980 the Claimant was employed by the Bunker Hill Company as an underground miner. His employment was covered by the provisions of the Idaho Workmens' Compensation Law, and the Employer was an authorized self-insured employer under that law.

II

On the date of the injury, November 12, 1980, the Claimant was 34 years old, married, with three dependent children under the age of 18. Mr. Frank was born and grew up in Kellogg, Idaho. He graduated from high school with a grade point average of 1.39. During at least the last year Mr. Frank attended high school, he worked a full night shift at the Bunker Hill mine, and at the time of his accident, had been an employee there for almost 17 years. Im-

mediately after high school, Claimant was drafted into the military, and after approximately two years of service returned to Kellogg and to his employment at Bunker Hill mine. During his military service, Claimant was trained as a helicopter mechanic, but he testified that his training was basic in nature and that he had no significant transferrable skills as a result of that training. Prior to the accident, Mr. Frank's primary recreation consisted of outdoor activities, such as hunting and fishing, and bowling. He had no physical complaints of any substance nor any preexisting physical impairments.

### III

The Claimant's average weekly wage at the time of his injury is determined pursuant to § 72–419(4)(a) Idaho Code. Based upon Exhibit # 36, introduced at the second hearing in this matter, the Commissioner finds that the 13–consecutive-calendar-week period immediately preceding the Claimant's accident was the highest period of earnings of any of the consecutive 13–week periods in the 52 weeks immediately preceding the accident. The Claimant earned $7,950.14 during this period. His average weekly wage is computed by dividing that amount by 13, which produces a figure of $611.55. The Commissioner finds that the Claimant's average weekly wage at the time of his injury was $611.55.

### IV

On the morning of November 12, 1980 the Claimant was traveling to his work position within the mine on a device known as a mine skip. The cable which pulled the skip broke, and the Claimant fell approximately 170 feet, sustaining multiple injuries. The Claimant was transported to Sacred Heart Medical Center in Spokane for treatment and remained at that hospital until December 23, 1980. The Claimant suffered a number of injuries, including fracture of the T–10 vertebrae, which was displaced, fracture of the left femur mid-shaft, compound fracture of the right tibia and fibula, fracture of the left hemopelvis, including the sacroiliac joint, a nasal fracture, and a deep wound of the left buttock.

### V

On November 24, 1980 harrington rods were inserted during surgery at the site of the vertebral fracture. A spinal fusion was performed from T–7 to L–1 on December 10, 1980. A third surgery was performed to insert a rod to reduce the fracture of the left femur.

### VI

The Claimant improved slowly for the first several months after his discharge from the hospital. X-rays indicated that the separations of the pelvis still remained and that healing of the broken leg bones was progressing, though slowly. The Claimant complained of aching in the area of the fractures but was looking forward to returning to work for Bunker Hill as an underground miner.

### VII

In July, 1982 Dr. Alex Verhoogen, the Claimant's treating physician, noticed that x-rays of the right ankle indicated an angulation of the joint showing compression of the joint on one side and formation of a large bone spur on the front of the ankle. Dr. Verhoogen concluded that this condition was the result of a compression fracture which had not been previously diagnosed. Dr. Verhoogen believed that arthritic changes in the ankle were continuing and that at least some damage to the cartilage and articulating surfaces within the ankle had occurred and would continue to occur. At some time during the latter part of 1982 the Claimant began to experience increasing discomfort relating to his back, described as an aching sensation in the low back area across the lumbosacral junction and the sacroiliac joints, with pain radiating out into the two sides along the musculature. The Claimant indicated that the pain was worsened by any activity such as bending or lifting. When Dr. Verhoogen examined the Claimant in November, 1982 he determined that no further treatment was necessary and that the Claimant was stable in all respects except that he believed that Claimant's right ankle might continue to worsen. Also, since Claimant's pelvic separations had not fused, those injuries could either worsen or improve. Dr. Verhoogen noted that Claimant walked with a slight limp of unknown cause. He

testified that the tibia of the right leg was fractured obliquely which might have resulted in a slight shortening of the leg, though he could not recall whether or not there was an actual shortening. Dr. Verhoogen noted that the motion of the left hip was decreased compared to the right hip, that flexion of the ankle joint was decreased as was hyperextension of the back. The Claimant also had reduced flexibility with respect to lateral bending. X-rays taken on November 11, 1982 were generally satisfactory to Dr. Verhoogen except for the ankle condition and except for some calcification around the sacroiliac joint. Dr. Verhoogen did not rate the Claimant for purposes of permanent physical impairment in November, 1982, but noted that the Claimant had limitations of motion in several respects as well as what Dr. Verhoogen believed to be a significant residual disability. Dr. Verhoogen expressed an opinion that the Claimant would have difficulty returning to employment based upon the constant discomfort he experienced because of his many injuries.

VIII

On February 28, 1983 the Claimant was examined by a medical panel in Spokane. The panel was headed by Dr. R.D. Luther. It concluded that the Claimant's condition was stationary and that no further treatment was indicated. The panel rated the Claimant's total body impairment, including residuals of all his injuries, as 35% of the whole man. Though Dr. Verhoogen had been reluctant to rate the Claimant for purposes of permanent impairment, he testified at the time of his October 24, 1983 deposition that he concurred with the rating with respect to range of motion. Dr. Verhoogen indicated that he did not believe the impairment rating was indicative of the Claimant's overall disability or his ability to work. Dr. Verhoogen examined the Claimant again on December 18, 1984 and testified on February 22, 1985 during a deposition which was admitted in evidence. At the time of this examination, the Claimant's main complaint concerned his right ankle. The Claimant described slowly increasing pain in the ankle, and it was Dr. Verhoogen's impression that the condition of the ankle had worsened to some extent. He believed that it was more and more likely that the Claimant may require surgery on the ankle. Dr. Verhoogen found no significant change with respect to the Claimant's other injuries. Dr. Verhoogen had been informed that the Claimant had performed some work on a roofing project during the summer of 1984. He questioned the Claimant about that incident. Dr. Verhoogen indicated that it was possible for the Claimant to do some lifting and some physical work if he could stop and rest periodically. He indicated that heavy lifting might cause the Claimant to feel pain subsequently and that "he would probably suffer for it the next day."

IX

The Claimant was examined by Dr. Warren J. Adams, an orthopedic specialist of Spokane, on March 20, 1985. Dr. Adams testified at a deposition taken March 27, 1985 and the deposition is admitted in evidence. Dr. Adams obtained a history from the Claimant and also reviewed additional medical information, including the report of the Spokane panel of doctors. He used the American Medical Association Guide to Impairment to determine the Claimant's permanent physical impairment and found that his total impairment was 39% of the whole man. With respect to physical limitations, he indicated that the Claimant could perform activity up to the point that it caused him significant discomfort. Dr. Adams did not believe that the Spokane medical panel had correctly calculated the Claimant's permanent physical impairment in accordance with the AMA guides. Dr. Adams believed that the Claimant's arthritis of his right ankle would likely progress.

X

Having considered the various impairment ratings in the record, the Commissioner finds that the Claimant has a permanent physical impairment of 35% of the whole man.

XI

The Claimant testified that he experiences almost constant back pain except when reclining or lying down and that he can get relief from his back pain only by reclining or lying down. He testified that he was able to sit for approximately 30 minutes, walk for five to six minutes, and

then is able to sit again. The Claimant must lie down for extended periods of time 25 or more days a month for relief of his back pain and regularly reclines for 45 to 60 minutes at a time interspersed between periods of sitting and briefly walking. The Claimant testified that he experiences severe pain five to ten times a day, depending upon his activity, and states that he experiences nearly constant pain in his ankle which is increased by walking.

### XII

A vocational consultant, William Shecket, testified on behalf of the Defendant concerning the Claimant's opportunities for reemployment. Shecket testified that the Claimant could perform jobs in telephone sales, as a hoistman at a mine and as a laboratory technician. Shecket also testified that the Claimant might be able to perform job duties as a mill worker operator in a mine with automated controls. Some accommodation may need to be made to accommodate the Claimant's impairments.

### XIII

Dr. James Flynn, a psychologist, testified on behalf of the Claimant with respect to the Claimant's vocational opportunities. Dr. Flynn testified that the regular labor market cannot accommodate an individual with the Claimant's physical limitations as related by the Claimant. Flynn also testified that those same physical limitation factors affect the Claimant's ability to be retrained for suitable employment. Flynn did not conduct any studies of employment in the area where the Claimant lives and is not in the business of vocational placement.

### XIV

Vincent Bovino, Manager of Human Resources for the Defendant, testified that he believed the Claimant could perform such jobs as receptionist, lab technician, assayer, hoist operator and possibly a motor operator.

### XV

Michael Hauser, a vocational rehabilitation counselor for the Idaho Department of Vocational Rehabilitation, testified that there has been considerable loss of employment in Shoshone County due to economic conditions. He indicated that there was a lack of sedentary work available for disabled persons and that there is tremendous prejudice against people with back injuries. He believed that it was nearly impossible to place the Claimant in competitive employment in Shoshone County.

### XVI

Jim Faraca, a field consultant for the Rehabilitation Division of the Industrial Commission, undertook to assist the Claimant to seek other vocational opportunities and discuss the potential for retraining with the Claimant. The Claimant expressed little or no interest in reeducation or retraining and desired to either return to underground mining or to become self-employed owning a tavern/restaurant in the Coeur d'Alene area. Vocational testing was performed in January, 1983 by a service in Coeur d'Alene. The results of the testing indicated that the Claimant had adequate reading skills but inadequate arithmetic skills. The Claimant displayed average ability with respect to following oral directions, intellectual function capabilities, numerical skills, ability to visualize objects in space, and shop arithmetic skills. The Claimant had above average ability to manipulate mechanical tools, and although testing indicated that the Claimant's abilities in the area of eye-hand coordination and mechanical knowledge were average or less, the evaluator was unsure of the validity of these results. The individual who evaluated the Claimant's tests concluded that the Claimant's vocational interests were unrealistic and also believed that the Claimant thought the testing program to be a waste of time.

### XVII

The Defendants presented evidence concerning observations made of the Claimant by private investigators during the first part of August of 1984. The primary observations were of the Claimant engaged in assisting others in reroofing a house in Coeur d'Alene. Both still pictures and extensive video tape was made of the Claimant's activities. In particular, the Claimant engaged in this physical activity on August 1, August 3, August 6, 7, and 8 of 1984. The Claimant was observed driving his pickup, cutting plywood with a power saw, bending over, bending underneath plywood supported on sawhorses, lifting plywood

from the truck to the sawhorses, handing pieces of plywood up to persons on a scaffold or on the roof, climbing the ladder to the scaffold, climbing on the roof, balancing himself on the roof, straddling the peak of the roof, hammering, and, in general, performing work in connection with the roofing job. A number of other individuals, presumed to be family members, were assisting in the operation. On August 10 the Claimant was observed driving from his residence to Clark Fork, Idaho, a trip which consumed 2½ hours, during which the Claimant stopped three times. The Claimant was observed washing his pickup, unloading items from the pickup, and driving a lawn mower from the back of the pickup. The investigators observed no indications that the Claimant was in pain during any of his activities.

## XVIII

Evidence was also presented that the Claimant acts as president of a mining company, Gold Back Mine, but that he performs no significant duties for the mine. The Claimant visits the mine property periodically to prevent vandalism, discusses mine business with shareholders and officers, and receives correspondence and telephone inquiries concerning mine business. The company has agreed to pay the Claimant $2,000 per month for his work as president and has agreed to pay him in stock of the corporation because the corporation is without funds. The evidence also indicates that the stock has no ready market and has virtually no value at the present time. The Commissioner finds that the Claimant actually receives no income from his activities in connection with the mine.

## XIX

Upon evaluation of all of the evidence, including the Claimant's testimony of his complaints, the observations of the investigators, and the opinions of the various witnesses who have testified, the Commissioner concludes that the Claimant is not totally disabled for work. While the Claimant is unable to engage in hard or vigorous physical activity, he is able to engage in moderate physical labor over extended periods of time and can do so without significant discomfort. The Commissioner concludes that the Claimant has somewhat overstated the extent of his complaints of pain and has somewhat underestimated his ability to engage in physical activity. The evidence does not establish that the Claimant is able to engage in employment as a roofer on a permanent basis, but that he is able to perform many of the activities performed by roofers for significant periods of time. Thus, it is concluded that the Claimant is able to engage in employment in those specific occupations described by witnesses Bovino and Shecket, as well as other occupations requiring mild or moderate physical activity and various sedentary activities. The Commissioner further finds that the Claimant's education is limited and his only significant work experience is in the field of underground mining. It is recognized that the Claimant lives in an area where competition for employment is extreme. The Claimant's physical condition is a significant factor limiting the Claimant's employability. The Commissioner finds and recommends that the Claimant be awarded, in addition to his permanent physical impairment of 35%, an additional 20% of the whole man rating for non-medical factors and that the Claimant receive a total permanent partial disability rating of 55% of the whole man.

## XX

Based upon the report of the panel examination which was issued in March, 1983, the Employer ceased payment of total temporary disability income benefits to the Claimant on March 31, 1983. Based upon the panel report and the testimony of Dr. Verhoogen that the Claimant was substantially stable as of November 11, 1982, the Commission finds that the Claimant was totally disabled for work from the date of his accident through March 31, 1983.

## CONCLUSIONS OF LAW

### I

As a direct result of Claimant's accident and injury of November 12, 1980, the Claimant was totally disabled for work through March 31, 1983 and is entitled to income benefits for total temporary disability during that period.

### II

As a direct result of Claimant's accident and injury, he has a permanent physical impairment of 35% of the whole man.

## III

The evaluation of permanent disability is an appraisal of the employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent non-medical factors. As a direct result of Claimant's accident and injury, the Claimant has a permanent partial disability of 55% of the whole man, which includes consideration of the medical factor of permanent impairment and the non-medical factors described in the foregoing Findings of Fact. The Claimant is entitled to income benefits for his permanent partial disability at the statutory rate of 55% of the 1980 average weekly state wage commencing April 1, 1983.

## IV

This matter is pending before the Commission on the Defendant's timely motion for reconsideration or rehearing, filed pursuant to § 72–718 Idaho Code, as well as Defendant's Motion for Modification of the Award previously entered, which is filed pursuant to § 72–719 Idaho Code. The Commission may, on its own motion, review the matter to correct a manifest injustice which is brought to its attention by motion of any party. *Banzhaf v. Carnation Company,* 104 Idaho 700 [662 P.2d 1144 (1983)]. Since the matter is pending before the Commission on a motion for reconsideration also, the Commission may modify its prior decision in any respect. Based upon the additional evidence received by the Commission at its hearing in April, 1985, it is concluded that it would have been a manifest injustice to the Employer to have awarded the Claimant benefits for total and permanent disability. The Findings of Fact show that the Claimant is not totally and permanently disabled and is not entitled to the award which was previously entered. Therefore, it is appropriate to set aside the Award entered July 18, 1984 and enter the following modified award, which the Commissioner recommends that the full Commission approve and adopt as its decision.

## AWARD

IT IS HEREBY ORDERED, ADJUDGED, and DECREED, and this does order, adjudge, and decree, that the Claimant have and recover from the Defendant total temporary disability benefits from November 12, 1980 through March 31, 1983, reasonable medical and related expenses incurred as a result of the November 12, 1980 accident, and partial permanent disability benefits of 55% of the whole man commencing April 1, 1983, with Defendant entitled to credit for any amounts previously paid to or on behalf of the Claimant.

/s/ Gerald A. Geddes
Gerald A. Geddes, Commissioner

## ORDER

The Commission has reviewed the record and the foregoing Findings of Fact, Conclusions of Law, and Order, and hereby approves and confirms the same, and adopts them as the Decision and Order of the Commission.

DATED and FILED this 2d day of July, 1986.

INDUSTRIAL COMMISSION
/s/ Gerald A. Geddes
Gerald A. Geddes, Chairman
/s/ L.G. Sirhall
L.G. Sirhall, Member
/s/ Will S. Defenbach
Will S. Defenbach, Member

ATTEST:
/s/ Patricia A. Ramey
Patricia S. Ramey, Secretary

Copies:
John J. Rose, Jr., Esq., Shoshone County Courthouse, Wallace, ID 83873
William F. Boyd, Esq., P.O. Box 659, Kellogg, ID 83837
01/ss

## ADDENDUM TO THIS COURT'S ORIGINAL OPINION

BOYLE, Justice.

Appellant Paul Frank appeals from an order of the Industrial Commission which modified a previous award.

Appellant was injured in a mining accident in the course of his employment with respondent Bunker Hill, after which he filed a claim for worker's compensation. The Industrial Commission found that appellant suffered thirty-five percent disabili-

ty of the whole man, however due to limited education, work experience and competition in employment, appellant was classified as an odd-lot worker and awarded total permanent disability. This award was based on testimony which established that although appellant could work, poor economic conditions in Shoshone County and a lack of sedentary work available for disabled persons made it nearly impossible to place him in competitive employment.

Bunker Hill thereafter timely filed a petition for rehearing and a motion requesting that the award be set aside or modified in order to correct a manifest injustice. *See* I.C. § 72–719. Upon rehearing the Industrial Commission reviewed new evidence which consisted of testimony, written reports, photographs and videotapes of appellant engaging in roofing activity over several days for significant periods of time. After considering this new evidence on rehearing, the Industrial Commission determined appellant was not totally and permanently disabled, but was impaired thirty-five percent of the whole man, and due to limited education, work experience, and competition in employment awarded an additional twenty percent of the whole man.

In reviewing the findings of the Industrial Commission this Court is limited to a review of the questions of law before the Commission and absent clear error must affirm the Commission's decision. *Graham v. Larry Donohoe Logging*, 103 Idaho 824, 654 P.2d 1377 (1982). Thus, as stated in this Court's original opinion filed May 24, 1988, we hold that the Industrial Commission's findings of fact and award of fifty-five percent permanent disability are supported by the record.

1. The opinion is reported at 117 Idaho 790, 792 P.2d 815 (1988).
2. In its first decision the Industrial Commission as a specific finding stated that in September 1981, Mr. Frank became aware of the imminent closure of Bunker Hill's mine and his bleak prospects for returning to work there. R. 15. He was injured on November 12, 1980. The mine closure became a forecast fact long before Paul Frank had recuperated to the point where he was ready to submit his compensation claim to the Industrial Commission, which was not until February 29, 1984. Unmentioned in the Court's opinion of May 24, 1988, was that by February of 1984 Bunker Hill Company was off

On rehearing we continue to adhere to the views expressed in our original opinion authored by the late Chief Justice Shepard. *Frank v. Bunker Hill*, 117 Idaho 790, 792 P.2d 815 (1988).

The orders and decision of the Industrial Commission are affirmed.

BAKES, C.J., and JOHNSON, J., concur.

BISTLINE, Justice, dissenting.

PART I.

Of the five members of the Court who first heard the oral argument over thirty months ago, only Justice Bakes and I remain to participate in what may be the last hurrah for Paul Frank. Frank's only remedy under Idaho law is the "sure and certain relief" which the Workers' Compensation Act provides in lieu of the preexisting and now precluded right of a worker to obtain the damages awardable to him by a jury of his peers who learn of his injuries and the cause of those injuries at a trial in the county where he has lived and worked all his life. The reader of the first majority opinion, filed May 24, 1988,[1] will find that the contents therein accurately report on the accident which befell Paul Frank, now almost ten years ago. He was on the job and traveling within the mine, underground, in a mine skip, which presumably was faulty equipment,[2] because a cable parted, plummeting Paul Frank and his iron vehicle down into the mine a distance of over 170 feet. It is easy to visualize that no man could survive such a ride in such a contraption, but Paul Frank was more than an average man, and he did survive.

Justice Shepard, in authoring the first opinion for the Court,[3] portrayed generally the extent of the terrible injuries which the scene. Paul Frank's opponent in seeking just compensation was not his long-time employer, but its successor-in-interest, Pintlar Corporation.

3. The appeal was not taken by Pintlar Corporation, but by Paul Frank after experiencing the most unusual, and unprecedented turn-about by the Industrial Commission's reduction of his initial award from total permanent disability down to 55 percent of that initial amount. All because Pintlar called "fraud" loud enough and often enough to unduly excite the Commission, that ordinarily stable body, into precipitate action.

runaway mine skip inflicted on Frank, which Justice Shepard confines to one short paragraph found on page two of the first opinion for the Court:

> [A] bursting-type fracture of the T–10 vertebrae; fracture of the left femur midshaft; compound fracture of the right tibia and fibula; fracture of the left hemopelvis including the sacroiliac joint; nasal fracture; and a deep wound of the left buttock. Some of the injuries were treated the day of the accident, and later several surgeries were performed on some of the fractures, including a spinal fusion.

117 Idaho at 791, 792 P.2d at 816. For some undisclosed reason, that opinion makes no mention of the "Harrington Rod Instrumentation." Yet the Industrial Commission had done so in its written decision:

> Claimant was held in skeletal traction, and on November 24, 1980, Harrington instrumentation was performed on the vertebral fracture. This process involved the insertion of rods with hooks on either side of the spine, and a spinal fusion was performed.

R. 7. The Commission did not further inform its readers on Harrington instrumentation. Dr. P.R. Harrington devised the method which bears his name in 1958. In 1962 the Texas Institute for Rehabilitation and Research, Division of Orthopedic Surgery, Baylor College of Medicine, Houston, commenced a fourteen year study of ninety-five patients treated by the Harrington method. The Harrington method consists of insertion of the instrumentation plus fusion of various severely damaged vertebrae. The report of the study, published in 1978 by the Journal of Bone and Joint Surgery, Inc., was admitted in evidence as claimant's exhibit 11, and is attached hereto as Appendix A, and is the best illustration of the extreme severity of Frank's injuries and the radical techniques needed to put back together what was left of him.

The Court's initial opinion of May 1988 provided no indication whatever of the man Paul Frank was until his injury occasioned by the faulty equipment, other than that we learn that he was thirty-four years old and in the ten months of 1980 before disaster overtook him he had earned $27,000, and in the previous years of 1978 and 1979, he had earned $24,000 and $28,000 respectively. We learn from that opinion that he had no physical impairments. In short, we ascertain therefrom that it was one heck of a miner who earned that kind of money working in a mine.

Although we are told by the 1988 majority opinion that Frank's grade point average on graduating from Kellogg High School was 1.39, we are not told that Frank worked a full night shift throughout his entire senior year. We are not told whether his grade point average was higher or lower in the previous two years. The Commission's Finding No. 1, issued in July of 1984, leaves an inference that he might also have worked night shifts prior to his senior year. R. 11. Other than for two years of military service, responsive to being drafted, his whole life in Kellogg, Idaho, was dedicated to underground mining at the Bunker Hill mine, for which he was paid well because he worked well, and he had a wife and three minor children who were the beneficiaries of his hard and dangerous work.[4]

4. Comparable injuries were suffered at the Bunker Hill mine by Mike Carroll in September of 1975, when while working below a skip cage the skip fell upon him due to a defect. Carroll, also precluded from suing Bunker Hill Company because of the Workers' Compensation Act, made a run at suing the United Steel Workers of America for their negligence in not fulfilling their contractually assumed duty to regularly inspect the mine for safe working conditions, procedures, and equipment. In a 4–1 decision, Carroll did not even get to take his case to a jury. *Carroll v. United Steelworkers*, 107 Idaho 717, 692 P.2d 361 (1984). On May 2, 1972, ninety-one miners perished underground at the Sunshine Mine at Kellogg when a fire swept through the mine. Four widows filed suit, claiming that the state of Idaho and the United Steelworkers of America both failed in their obligations for the safety of the miners. Over the dissent of Bistline, J., the Court absolved the state on the basis of sovereign immunity. The case against the United Steelworkers was allowed to continue. It has been in and out of this Court and the United States Supreme Court a number of times, but now is finally on its way to total demise by the May 14, 1990, opinion *Steelworkers v. Rawson*, —— U.S. ——, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) of the High Court which essentially found, six to three, that the agreement of Sunshine and the United Steelworkers did not create any obligation to the ninety-one miners.

What I have not understood throughout the course of this controversy is the purpose of the Court in pointedly stating Frank's low grade point average at his graduation. A likely surmise is that the Commission so noted that factor in connection with Frank's *physical* limitation, concerning which a psychologist testified that such "factors affect claimant's ability to be retrained for suitable employment." Finding No. XVI, R. 17. Another finding of the Commission's initial decision adds that:

Claimant's education is limited and his only work experience is in the field of underground mining.... Claimant lives in an area where competition for work in all phases of the job market is extreme. In view of his physical disabilities and the extent to which most employers would have to accommodate Claimant's constant physical discomfort, he is at a serious competitive disadvantage for the few sedentary jobs which he might otherwise perform. Claimant is an odd-lot worker.

R. 15. Certainly those findings taken together were more than enough to support the Commission's Conclusion No. IV in its entirety:

The Commission concludes that Claimant has met his burden of proof in establishing a *prima facie* case that he is a member of the odd-lot category. The Commission reaches its conclusion in spite of the fact that Claimant has not attempted to perform other work. Based upon the number and nature of jobs available in Claimant's locale and based upon Claimant's lack of job experience and physical disabilities, it would have been futile for Claimant to do more. The nature and extent of Claimant's continuous physical discomfort makes his situation analogous to that of claimant in *Cary [Carey] v. Clearwater County Road Department, et al.,* —— Idaho —— Opinion No. 67, June 15, 1984. [107 Idaho 109, 686 P.2d 54 (1984)]

R. 13. All told, the Commission, which in this case conducted the hearing before the full Commission, and not by just a referee or one member, performed commendably in reaching its decision.

Not heretofore mentioned, I remember reading somewhere in the appeal record that Frank was not only a diligent worker, but a worker well-endowed in size and strength, standing six feet four inches. I recollect also that someone in employment testified that Frank was the Company's top ore producer, hence his high earnings.

### PART II.

The opinion authored by Justice Shepard did not discuss at all the main theme of Frank's appeal to this Court, which was to accurately portray the gross errors and omissions of the Industrial Commission.

Both parties had far more than the usual time to prepare the cases which they would, through able counsel and expert witnesses, present for the Commission's consideration. Although Frank was injured on November 12, 1980, the Commission's hearing was not conducted until February 29, 1984, and was not decided until the Commission's written findings of fact, conclusions of law, and award was entered on July 18, 1984. Bunker Hill had contended throughout that the Commission should take into account that Frank, despite his severe injuries, as a corporate officer had been receiving income of $2,000 monthly. This issue was addressed in the Commission's decision in its Finding No. XIV, which in full is as follows (with emphasis added, italicizing that part of the finding which found against the aforesaid contention of Bunker Hill):

### XIV

Claimant participates in a mining partnership with his brothers, and during the summers of 1982 and 1983 visited sites of mining operations in northern Idaho. Claimant performed minor duties while at the mine sites but did not work regularly or perform any substantial duties. Claimant is on the Board of Directors of two mine development companies and plays an active role in the management and operations of those companies. The record indicates that Claimant has some knowledge of mining properties, mining activities, and mining equipment. *Claimant does not receive any income from his activities as director of the companies, and Claimant has not thus*

*far received income by virtue of his participation in the Frank Brothers mining partnership.*

R. —.

On the twentieth day after the issuance of the Commission's decision, Bunker Hill filed with the Commission a petition for rehearing which was rote in nature in that it simply alleged that the evidence did not sustain the findings which had been entered. Not in accordance with standard practice before the Commission, the Bunker Hill petition set out nothing to support its bare allegation,[5] and set out nothing that had not already been asserted two years ago. The petition should have been dismissed or denied out of hand. But it was not, and to this day no one in now two majority opinions has offered any justification for such disparate treatment of a claimant. Nor can anyone do so, because it cannot be done. What can be done, and has been done, and I know not why, is that the Court simply ignores the issue, which may be in accord with some principle of divine right.

Somewhat of an improvement, in form at least, but wholly out of time was a second Bunker Hill petition, entitled "Supplemental Petition," which was based on allegations of fraud supposedly committed by Paul Frank, in that he was alleged to have deceived the Commission into its finding above set out that he had received no income from his position as a corporate officer. This petition was different from the first petition because it attached a brief of sorts and some documents upon which it relied for asserting that Frank was guilty of fraud (perjury), and that as a result thereof had received more of a monetary award than he was entitled to receive. As a second thought, citing I.C. § 72–801,[6] Bunker Hill urged upon the Commission that, because of the alleged fraud, Frank (and this would by operation of law include his wife and three minor dependent children) must forfeit *all* compensation benefits which the severity of his injuries and non-medical factors entitled him to. The allegations of fraud were immediately responded to by alert and astute counsel representing Frank, and that response included an affidavit by Frank which averred that he was not guilty of fraud or perjury, and again averred that he had *not* received the $2,000 monthly income as claimed by Bunker Hill. The claim of fraud asserted by Bunker Hill was just that and nothing more. The issue involved, of course, had been decided at trial, and Frank by affidavit had reasserted his innocence of fraud, and reasserted that he had not received $2,000 monthly, or any income.

Bunker Hill filed its brief arguing against Frank's response, and continued to urge that the fraud disentitled him from compensation benefits.[7] This preliminary issue was squarely before the Commission and required that it make a decision. The Bunker Hill contention of fraud was the one and only possibly viable issue by which it could obtain the reopening of the case which it so desperately and deviously sought. The claim of fraud also was used to allege the issue of manifest injustice. That issue would be, and eventually was, resolved.

Commissioner Geddes, to whom the full Commission assigned the task, would eventually, after a second hearing which was held after reopening, draw another finding relative to Bunker Hill's contention that Frank had indeed been receiving $2,000 monthly. That second finding, as Paul Harvey might write, tells the rest of the story as to Bunker Hill's contention that Frank, whose ambition had been and still

5. *See,* for instance, the disposition of a similar petition which was submitted to the Industrial Commission in *Madison v. J.I. Morgan, Inc.,* 115 Idaho 141, 765 P.2d 652 (1988).

6. Idaho Code § 72–801 reads in full:

    **72–801. False representation a misdemeanor—Forfeiture of compensation.**—If, for the purpose of obtaining any benefit or payment under the provisions of this law, either for himself or for any other person, any one wilfully makes a false statement or representation, he shall be guilty of a misdemeanor and upon conviction for such offense he shall forfeit all right to compensation under this law.

7. Had Bunker Hill published such allegations of fraud and perjury outside of a quasi-judicial proceeding, in a slander or libel suit brought against it by reason thereof, it would have been obliged to prove truth, or suffer the imposition of damages for the injury done to Frank's reputation.

was, to be the best producer Bunker Hill had ever had, was a liar, a perjurer, and a defrauder. Commissioner Geddes wrote Finding XVIII which is set out so the reader may compare this with the 1984 finding, set out earlier. The critical portion is italicized:

### XVIII

Evidence was also presented that the Claimant acts as president of a mining company, Gold Back mine, but that he performs no significant duties for the mine. The Claimant visits the mine property periodically to prevent vandalism, discusses mine business with shareholders and officers, and receives correspondence and telephone inquiries concerning mine business. The company has agreed to pay the Claimant $2,000 per month for his work as president and has agreed to pay him in stock of the corporation because the corporation is without funds. *The evidence also indicates that the stock has no ready market and has virtually no value at the present time. The Commissioner finds that the Claimant actually receives no income from his activities in connection with the mine.*

R. 157.

For further emphasis, after withstanding a second hearing, here are the salient portions, side-by-side, of the 1984 and 1986 decisions:

| 1984 | 1986 |
| --- | --- |
| Claimant does not receive any income from his activities as director of the companies, and Claimant has not thus far received income by virtue of his participation in the Frank Brothers mining partnership. | The evidence also indicates that the stock has no ready market and has virtually no value at the present time. The Commissioner finds that Claimant actually receives no income from his activities in connection with the mine. |

There may be another reported case where a Court, or the Commission, or any agency, reopened a closed case on mere and unproven allegations of fraud, but I am unable to find it.

### PART III.

Having concurred in Justice McDevitt's opinion, I feel compelled to comment on the difference between what he has written as compared to what Justice Boyle has written to serve as the opinion for the Court. A close perusal of Justice Boyle's opinion need not long detain anyone. The first paragraph is a succinct, correct, and readily understood statement of what the Commission found and ruled, other than that it improperly is couched in terms of "appellant could work," and seems to suggest that his not working was based on "poor economic conditions in Shoshone County and a lack of sedentary work for disabled persons." Such is not an accurate portrayal of the Commission's July 18, 1984, decision, all of which is set out verbatim in the May 24, 1988 opinion of Bistline, J., and certain excerpts of which have already been mentioned previously in this opinion.

The second paragraph of the majority opinion supposedly reports that which Justice Shepard authored in his May 24, 1988 opinion, but is inaccurate, just as Justice Shepard was loosely inaccurate in writing in the 1988 Op., 117 Idaho at 791, 792 P.2d at 816, that Bunker Hill in August of 1984 filed petitions (plural) for rehearing and for modification of the award, followed by the statement that the grounds for said petition (singular) were fraud, manifest injustice, and *change in claimant's physical condition.*[8] Bunker Hill's actual petition for rehearing is set out in the opinion of Bistline, J., 1988 Op., 117 Idaho at 843, 792 P.2d at 868. All that it was based upon is found in this one sentence: "This petition is made on the grounds and for the reasons that there is not substantial evidence in the record to sustain the Commission's decision, and the Commission has erred as to

---

8. Nowhere in any of the petitions or motions filed by Bunker Hill was there any allegation of a *change in Paul Frank's physical condition.* Yet Justice Shepard wrote that Bunker Hill's grounds "were fraud, manifest injustice, and change in claimant's physical condition." 1988 Op., 117 Idaho at 791, 792 P.2d at 816. *Three justices did not hesitate to join it, obviously either unaware of the misstatement, or, if aware, then indifferent.*

matters of law." R. 24. Let it be *well noted* that the only issue it attempted to raise was that the evidence was insufficient to sustain the award—which amounts to nothing but a bunch of poppycock. It has no allegation of anything evidencing either fraud or manifest injustice. It was signed not by counsel who tried the case but by uninvolved associate counsel, and it was dated on the last possible day, August 7, 1984, and filed that date. The authority for such a motion (petition) is I.C. § 72–718. That section specifically cuts off the time to so move to within twenty days. Moreover it does not authorize the filing of a later petition after the twenty days has expired. There is no provision for allowance of an out-of-time filing. That petition did not contain a brief, and it did not attach a brief. It suggested that upon the rehearing it requested that it might then submit a brief. Yet, completely at odds with the statutory law and case precedent suggesting that the statutory law will be even-handedly administered, two weeks after filing its motion for reconsideration, Bunker Hill (actually Pintlar Corporation, as we now know) filed a supplemental motion (petition) and included therein, for the first time, outrageous and defamatory allegations of fraud on the part of Paul Frank, namely perjury in testifying that he was not receiving compensation from a mining company of which he was an officer. R. 33–45.

Contemporaneously with the Supplemental Petition, Bunker Hill (Pintlar) moved, purportedly under I.C. § 72–719, to modify the award which had only been entered five weeks earlier on July 18, 1984. Bunker Hill's modification petition was based on the same allegation of fraud that was contained in the untimely Supplemental Petition for Rehearing. It tossed in additional grounds that because "the award was procured by fraud" it "should be set aside to correct a manifest injustice." R. 46. Bunker Hill inserted in its petition a short brief which did *not* set out *all* of the provisions of I.C. § 72–719, but only subpart 3, which instructs the Commission that "at any time within five years of the date of the accident causing the injury ... it may

review a case to correct a manifest injustice." Bunker Hill also cited to *Banzhaf v. Carnation Co.*, 104 Idaho 700, 662 P.2d 1144 (1983), and *Sines v. Appel*, 103 Idaho 9, 644 P.2d 331 (1982), for the proposition that "by our holding today we are making it known that claimants, and in some instances, employers and their sureties, are not precluded from making the same motion, ..." R. 48. Clearly, Bunker Hill was by its petition asserting its right to move the Commission "that the award be set aside to correct a manifest injustice." The Court's final remarks in *Banzhaf* were:

We note that I.C. § 72–719(3) becomes operative on the Commission's own motion, but that fact does not preclude the Commission from exercising its powers when notice of a purported manifest injustice is brought to its attention either by a party or a third party.

*Banzhaf*, 104 Idaho at 703, 662 P.2d at 1147.

The petition filed by Bunker Hill served the purpose of alerting the Commission's attention to Bunker Hill's allegation that Paul Frank obtained his July 18, 1984, award by means of fraud (false testimony) and that *on that basis* the award was supposedly a manifest injustice which required modification. But, the Commission did not conduct a hearing for the purpose of determining whether Bunker Hill had presented a sufficient showing for the case to be reopened. That was the fatal breakdown; the Commission simply took that action on the basis of allegations alone.

The Commission's order that the case be reopened was absolutely uninformative as to which of the three Bunker Hill motions precipitated its drastic action. The December 10, 1984, order was simply that—an order. *In full* it reads:

The Commission has reconsidered the award entered on July 18, 1984, based upon the motions, briefs and affidavits filed herein since the entry of said award.

NOW, THEREFORE, IT IS HEREBY ORDERED that this matter shall be reopened for further hearings to be set at the convenience of the Commission and the parties.

IT IS FURTHER ORDERED that the parties shall be notified of the date, place and time of said hearing by the Industrial Commission in the near future.

R. 143. Although the order well served Bunker Hill's purposes in that it would be able to introduce post-hearing, post-award surveillance, which evidence had not been the grounds of any of their three motions, the order perpetrated a great injustice on Paul Frank and his counsel.

The Commission was grossly in error in entering its order without responding in any way to a succinct but forceful brief relative to the Bunker Hill fraud allegations, which logically were what stampeded the Commission into reopening a case which had been thoroughly and well-tried by both sides, and decided by the full Commission in a well-written decision. Following is an excerpt of Frank's brief submitted to the Commission and ignored by the Commission, and the content of which also was not responded to in the Court's initial opinion authored by Justice Shepard, and even more so ignored in today's opinion authored by Justice Boyle:

### DEFENDANT'S ALLEGATION OF FRAUD

The defendant requested reconsideration or rehearing on the last day to do so after the Commission had rendered its decision. No mention of fraud was made. As will be shown no fraud occurred. Therefore, it is submitted the Commission should rule on the Petition For Rehearing Or Reconsideration, let the decision become final and leave defendant with its appellate rights.

Defendant's Petition For Rehearing should be denied due to lack of grounds. As will be shown the grounds of defendant's allegations of fraud were nonexistent at the time of Paul's testimony and are nonexistent today. Further, defendant's petition asserting fraud was beyond the twenty day limit to request rehearing.

It is submitted the initial petition for rehearing should be considered in light of I.R.C.P. 59(A)(B)(C) governing motions for a new trial. Rule 59(C) requires an affidavit asserting newly discovered evidence be served with a motion for new trial. Here none was served and none has yet been served. To move for a new trial because of newly discovered evidence:

'Newly discovered evidence must be of facts existing at the time of trial.' *Wright and Miller Federal Practice and Procedure:* Civil § 2808 Vol. 11 p. 55.

'If it were grounds for a new trial that facts occurring subsequent to trial have shown an inaccurate prophecy, litigation would never come to an end.' *Nordin Construction Company v. City of Nome,* 489 P.2d 455 (Alaska 1971).

Defendant should not be allowed to boot strap itself to a position where it can raise the question by a late supplemental petition. Therefore, the Commission should rule on the petition in regard to insufficiency of evidence and errors of law. If the Commission desires to consider the issue of alleged fraud it should be done pursuant to the authority under which defendant petitions for modification of award. Defendant makes no showing of fraud at the time of hearing. The compensation claimant is alleged to be receiving has not been received and was not authorized at the time for hearing. See Affidavit of Paul Frank submitted herewith.

WHEREFORE, Defendant having shown insufficient reason for reconsideration or rehearing the claimant moves that defendant's petition for reconsideration and rehearing be dismissed and the decision become final.

R. 126–28.

It is important to keep in mind that the Commission had Paul Frank's brief in hand at the time it entered the ill-starred order of December 10, 1984. In fact, the Commission's order itself, while it provides no reasons or reasoning whatever, does acknowledge the receipt of briefs: "The Commission has reconsidered the award entered on July 18, 1984, based upon the motions,

briefs, and affidavits filed herein since the entry of said award." R. 143.

Attention is directed to use of the word "affidavits." There is one, and only one, affidavit in the record, and that affidavit is Paul Frank's, subscribed and sworn to by Paul E. Frank on the 29th day of October, 1984. R. 68. It was a verification of the questions put to him by Bunker Hill's attorney at a deposition taken by Bunker Hill of Frank, and the answers given by Frank. The purpose of the affidavit was to refute Bunker Hill's bald allegations of Frank's supposed fraud (perjury) in not disclosing that he was receiving $2000 monthly. The matter of Frank's fraud was eventually put to rest, by Commissioner Geddes himself, and approved, confirmed, and adopted by the full Commission in its July 2, 1986, second and final decision: "The Commission finds that the Claimant actually receives no income from his activities in connection with the [Gold Back] mine." R. 157; 1986 Finding XVII (almost identical with 1984 Finding XVI).

The terrible irony of this finding is that it is indeed the only finding which the Commission could properly make, but it should have not been delayed until July 2, 1986. After all, it was the Bunker Hill untimely supplemental petition for rehearing which first raised an issue of fraud (perjury), coupled with its petition for modification based on fraud (perjury) which precipitated the Commission into recklessly reopening the case, when it had before it the brief and supporting affidavit of Frank refuting those allegations of fraud (perjury) relative to Bunker Hill's assertion that Frank had lied in denying that Gold Back Mine had paid him $2000 monthly. It was a wholly spurious move on the part of Bunker Hill in its devious effort at causing the Commission to reopen a closed case. Nowhere has the Commission ever justified its indolence in not passing on that issue when it was early on presented.

The Commission was hornswoggled into reopening the case on one allegation, and that allegation was the cry of fraud resulting in a manifestly unjust award to Mr. Frank because he was earning $2000 monthly and denying it. Worse than that the Commission cannot justify its conduct is that this Court has simply ignored the issue, which it does notwithstanding that counsel for Frank correctly reminds us that the claim of fraud which gained for Bunker Hill the reopening of the case was itself found to be a false claim, and worse yet, was successfully refuted by Frank before the order reopening was entered.

As I wrote two years ago, Justice Bakes alertly pointed out at oral argument:

Mr. Boyd, there's an argument of Mr. Rose that *there's a certain threshold on a reconsideration argument in the Idaho statute, there's a certain threshold of showing that you've got to climb over before the Commission's ... entitled to go back and reconsider their prior decision.* It cites the *Pets* case, which of course is the *Cascade* case, the Oregon case and the *Duncan* Louisiana Court of Appeals case. Do you want to discuss that point, because that is a legal question in one sense.... *[T]here's a certain burden which has to be a showing made before the Commission can do that and absent that showing, they can't go back and alter or amend their decision.*

1988 Opinion, 117 Idaho at 817–818, 792 P.2d at 842–843 (emphasis in original). As to just how spurious that issue of fraud creating manifest injustice was, one needs to review Volume I of the Reporter's Transcript, the 1984 hearing, and Bunker Hill's counsel's cross-examination of Paul Frank which encompasses thirty-three pages, at pages 36 to 69. At page 52, there appears counsel's examination into Nesco Resources, Inc., and Frank's admission that he had been on Nesco's board of directors for six months, and his activities with Gold Back Mine as a member of the Nesco board. Counsel took a good deal of time with Paul Frank, asking about a flight from Spokane, Washington, to Calgary, Canada, and a motor vehicle trip from Osborn, Idaho, to Spokane to attend a board meeting. In all of that cross-examination, and on three careful readings, if counsel ever asked Paul Frank if he received any remuneration from such activities, then I must confess to being

remiss in my reading abilities, and necessarily hope that someone on the majority opinion will enlighten me. My hope is undoubtedly a futile one, which I saw based upon the lack of comment which my opinion of two years ago elicited from those who comprised that majority, other than at least one in that number joined with me in voting for a rehearing.

That same cross-examination of Frank by counsel for Bunker Hill at the initial hearing did serve the laudable purpose of providing testimony which showed physical activity, post-injury, during recuperation which was on a par with what he did in helping his brother's roofing project; driving to, and fishing and hunting on the St. Joe River; twenty-five days hunting in the fall of 1983; plowing snow in the winter with an H.D. track-loader; helping out in his brothers' mine at Bovill; carrying steel bits into an underground mine; assisting his brothers in equipment repair; driving to look at Gold Back Mine property; and going underground in two mines since his injury. Tr., Vol. II, 40–62.

As summarized by claimant's counsel, the very claim of fraud which served to garner Bunker Hill a second hearing was not proved, nor was the proof even attempted. Bunker Hill seized upon the reopening to spring on Frank and the Commission the testimony of the private investigators which Bunker Hill had retained to spy on Frank and to testify, for whatever it might be worth, that they believed they saw Frank give no visible evidence of hurting.

The Commission did not attend to its obligation of deciding whether there were indeed grounds to reopen. Up until now two majorities of this Court have ignored the procedural morass which was created by the indifference of the Commission relative to its reopening without deigning to explain how or why it thought it could do so.

Under our case law precedent it is understood that any party to a workers' compensation case, meaning the claimant and the employer/surety together (which they are in practically all instances), or the employer or the surety each individually can move the Commission to reopen a closed case, within the statutory five year limitation from the date of the accident causing the injury on the grounds of a perceived manifest injustice.[9]

In the instant case, it was Bunker Hill, being both employer and surety, which moved the Commission to reopen on the grounds of Paul Frank's *alleged* fraud, which was immediately refuted by Claimant's affidavit and documentation. The Commission should have reviewed the evidence, oral and documentary, which was admitted relative to that issue in the 1984 hearing, and, depending on what it discovered and accordingly found as to fraud claimed by Bunker Hill, determined whether there was enough of a scintilla of the scent of fraud to justify a reopening. But the Commission did not do that.

Under the case law which has developed (*i.e.*, the *Banzhaf* case and the *Sines* case), the Commission on sufficient showing *and* on making proper findings and conclusions, could have *on its own motion*, as I.C. § 72-719 is so worded, entered an order reopening the case. But, again, it did not do so, but instead entered the wholly bare bones order on December 10, 1984, which did *not* say it was reopening the case *sua sponte*. Rather, it recited the filing of Bunker Hill's three petitions (motions) for reconsideration, recited the receipt of briefs, recited the receipt of affidavits (in actuality, as mentioned earlier, only the affidavit of Frank is in the record), and declared the case reopened for a further hearing, which it put off apparently for the convenience of Bunker Hill. For certain, Paul Frank had no reason to seek any delay, and had already served and filed his affidavit, supported as aforesaid, that he was not guilty of fraud.

Moreover, had the Commission in its order stated that it was reopening to ascer-

9. A case where a surety might do so *solamente* would be where it had claimed no coverage, or where two sureties were exposed, and the Commission had in its decision per inadvertence awarded too great a share of the ultimate award to a given surety, all of which is of no concern here, because no surety is involved. Bunker Hill was qualified as a self-insurer.

tain if there was any fraud on claimant's part, and yet failed to state the quantum and quality of the proof which it had so received and accepted as a basis for its action, just as surely as night follows day, Frank's attorney would have been in the court system seeking one or all of the various extraordinary writs which are available where a tribunal has acted without or in excess of its authority, or has stated or threatened that it was preparing to do so. There is not in this record anywhere, and certainly not under date of December 10, 1984, any order entered by the full Commission, or by Commissioner Geddes, which declared *that the Commission, sua sponte,* was reopening the case.

It may not be legally, socially, ethically, or morally impermissible for a disgruntled employer/surety to post-trial and post-decision conduct private-eye surveillance on a private citizen who has just recently prevailed in a contested hearing. But a great and likely everlasting concern is the propriety of so doing, and then deposing the successful claimant under the deceptive smoke-screen of a patently false and unprovable mere allegation that the claimant was guilty of having given false testimony at a contested hearing.

Illuminating are excerpts out of a deposition which Bunker Hill took over objection when the case had *not* been reopened, and were the Commission would not rule on claimant's motion for a protective order which would have precluded the taking of the deposition. The deposition was taken *after* Bunker Hill had obtained the results of its surreptitiously obtained surveillance of Paul Frank's daily life following the favorable decision of the Commission. Neither Paul Frank nor his attorney had any knowledge of the surveillance, and did know only that Bunker Hill was attempting to get the case reopened on its allegations of fraud, but after perfunctorily going through the motions of pursuing fraud in the Nesco/Gold Back affair, the interrogation switched to an entirely different subject:

BY MR. BOYD:

Q. I want to clarify one thing, Mr. Frank. I'd asked you about your physical activities this summer and what you could do. Is it your feeling from knowing your physical condition that you are not able to do plumbing?

A. I can do plumbing.

Q. You're physically able to?

A. I'm physically able. That's my problem. I'm physically able to do things but then I have to pay for it later.

Q. What are you telling me there? Please explain further.

A. Well, it's just like mucking a hole. I can muck a hole. My arms aren't broke. I can muck a hole. It's the pain and whatever after that's the problem.

Q. And—

A. It's not the ability of being able to do it, it's the consequences.

Q. If you were to make plumbing repairs, let's say around your home for a day, fix the sprinkler system, fix the trap underneath the sink and spent, let's say, six or seven hours doing those kinds of chores and repairs, then what happens?

A. Then I would have lots of pain, yes.

Q. When?

A. Well, it would probably start somewhere around three or four hours after I got into it, yes.

Q. Then how would you feel the next day?

A. Rough.

Q. That is, would you be able to repeat that the next day?

A. If I could tolerate the pain, yes.

Q. Then I asked you if you actually did carpentry around your home and your answer was something to the effect that you weren't much good at carpentry?

A. Right.

Q. But are you now able to do carpentry-type jobs and repairs?

A. I can do it, yes.

Q. But would you say the same thing that you already said to me about plumbing repairs?

A. Yes.

Q. And if I understand you correctly, you haven't done it this summer?

A. No.

MR. BOYD: That's all the questions I have.

CROSS EXAMINATION

BY MR. ROSE:

Q. Even though you're able to do some of these things, say for a day or whatever, what's your physical ability to carry on those activities, or even a desk-job type activity, eight hours a day, 50 weeks a year, five days a week?

A. I can't.

Q. Why is that?

A. I couldn't tolerate it.

Q. Referring back to what's been marked on the record as Exhibit 10, which an objection is made to, in addition, because it has not been properly authenticated, but it indicates in that letter, and I think you testified that you went with somebody to the Miracle Mine area in 1981?

A. Yes.

Q. And some channel samples from across the vein were taken there?

A. Yes.

Q. Who did that?

A. Dave Robbins.

MR. ROSE: That's all the questions I have.

R., ——.

Obviously, Bunker Hill, under the camouflage or smoke screen of its fraud allegation was attempting to get some comments out of Frank to the effect that he was physically helpless, all as a prelude to springing on Frank and his counsel at the reopening hearing, the video and still pictures showing his participation in the re-roofing of his brother's house. A sad commentary is that these deposition questions and answers never received any notice, not in Commissioner Geddes' drafted opinion, and worse yet, not in a four member majority opinion. On the next occasion when I write that I have read the record, I can but wonder if we judges are thought to be credible.

All of which brings me to say that Justice Boyle has the capabilities of making his own careful review of a rather complex record, but it cannot be felt that he has done so when his one page opinion does little more than indicate he has read Justice Shepard's opinion and is content to endorse it notwithstanding the frailties which I have pointed out in now two opinions, plus Justice McDevitt's opinion of which almost every line is a message highlighting the inattentive review and justify-nothing tone of the two majority opinions. If we Justices have no concern as to the inquiries and concerns of each other, what then can the litigants and their counsel expect?

McDEVITT, Justice, dissenting.

I dissent from the majority opinion in this case because I believe that its facile deference to the Industrial Commission vitiates the function of appellate review. Our purpose in reviewing this case is to ascertain whether there is substantial and competent evidence in the record to sustain the Industrial Commission's decision, in order to ensure that the appellant's case is not decided on the arbitrary basis of passion and prejudice. The majority upholds a conclusion that was reached by the Industrial Commission in some fashion not discernible from the record.

Appellant was examined by a medical panel in the course of the evaluation of his Worker's Compensation claim. That panel of physicians rated his disability at 35% of the whole man. Appellant's personal physician generally concurred in that estimation.

At the first Industrial Commission hearing, that rating was accepted. Thus, appellant was rated with a 35% medical disability. The remaining factors leading to the total permanent disability rating were nonmedical, and comprised the Commission's conclusion that employment opportunities for persons with appellant's degree of disability were severely limited due to economic circumstances in his area. The evidence at the first Industrial Commission hearing established that appellant could work, but would need to spend his working day alternately sitting, standing and lying down. The Commission found that anyone employing appellant would have to make significant accommodations for appellant's

disability, putting appellant "at a serious competitive disadvantage for the few sedentary jobs which he might otherwise perform." Since respondent was unable to show to the Commission's satisfaction that appellant in his present physical condition was employable within a reasonable distance from his home, appellant was classified as an odd-lot worker and awarded total permanent disability payments.

Respondent subsequently renewed inquiry into appellant's physical condition. Investigators produced photographs and videotapes of appellant's participation in a roofing project on his brother's house. These photographs and videotapes recorded intermittent portions of appellant's activities over the period of several days.

Respondent filed a timely petition for re-hearing, and a motion requesting that the award be set aside or modified to correct a manifest injustice under I.C. § 72–719. The Industrial Commission agreed to review the new evidence, which consisted of the photographic, documentary, and testimonial evidence of the investigators, and testimony about appellant's employability in the job market where appellant resides. The Commission modified its original award, finding that appellant's activities were inconsistent with categorization as an odd-lot worker. The Commission reduced the award of compensation to 55% total disability.

The amount of disability based on medical factors remained *unchanged* at 35%, and appellant was awarded an additional 20% disability based on non-medical factors, *i.e.* the disadvantage created by his disability in competing for scarce employment in the area where he resides.

Appellant argues that the Commission's second decision was not supported by substantial and competent evidence.

To uphold the Commission's revised award this Court must find that as a matter of law the evidence supporting the decision was substantial and competent. *Lopez v. Amalgamated Sugar Co.*, 107 Idaho 590, 691 P.2d 1205 (1984). In order to make this evaluation, it is first necessary to determine what evidence the Commission considered when it deviated from appellant's first disability rating. The Commission stated in Conclusion of Law IV that it was modifying the original award on the ground of manifest injustice based on "the additional evidence received by the Commission" at the second hearing. Therefore, this Court should review only the evidence presented at the second hearing to determine whether it was sufficient to justify modification of the original award.

Appellant was originally classified as an odd-lot worker as a result of the first hearing. The odd-lot worker category is defined in Idaho case law:

"An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, may well be classified as disabled." While they are physically able to perform some work, they are so handicapped that they will not be employed regularly in any well known branch of the labor market—absent a business boom, the sympathy of a particular employer or friends, or a superhuman effort on their part.

*Carey v. Clearwater County Road Dep't*, 107 Idaho 109, 112, 686 P.2d 54, 57 (1984) (citations omitted).

The evidence presented by respondent in support of modification at the second hearing consisted primarily of photographs, videotapes, written reports and testimony concerning the observations of respondent's investigators of appellant's participation in a roofing project. This evidence is said to have established that appellant had engaged in roofing activity over the course of several days for "significant periods of time." It does not appear from the record, however, that appellant was ever observed working for more than one hour at a time. There was also evidence presented that appellant drove a car for two and a half hours, stopping occasionally. The longest continuous driving time was one hour and five minutes.

In addition, two investigators were each asked in the course of their testimony the

single question of whether they observed the appellant exhibiting any signs of pain during the roofing activity from their point of observation across the street from appellant. Both answered in the negative. This testimony was elicited without any foundation or elaboration.

One witness, Bovino, also testified as to employment opportunities available to appellant. However, he acknowledged that his opinion was based solely on the testimony received by the Commission from an employment expert at the first hearing, and thus must be disregarded for the purposes of examining the sufficiency of the evidence presented at the second hearing.

Most of the evidence presented by the investigators is not inconsistent with appellant's status as an odd-lot worker. It was never disputed at the first hearing that appellant is capable of labor, even physical labor, for short periods of time. The substance of appellant's medical disability is the pain which such activity leads to, and the resulting need to rest in between periods of work. Appellant's odd-lot categorization is based on the fact that employers in an area of fierce competition for employment are unlikely to go out of their way to accommodate appellant's needs. The fact that appellant has been proven capable of working up to an hour at a time does not suffice to overcome his odd-lot categorization.

The key to appellant's disability is the pain that he suffers as a result of extended activity. Therefore, the investigators' testimony that they did not see evidence of pain during appellant's roofing activity might be sufficient to warrant a modification of the original award. That testimony however, was without any foundation. The investigators simply made the bald assertion that from their observation point some distance from appellant they did not witness any evidence of pain on appellant's part and said nothing more on the issue. This cannot be considered to be substantial, competent evidence, particularly since the Commission evidently did not consider this evidence sufficient to alter the percentage of appellant's medical disability rating. As that medical rating was not changed, we must assume that the reason for the change relates to the non-medical factors, the employability of appellant in the area where he resides. No new evidence whatsoever was received on this point.

In short, the evidence presented in the second hearing before the Industrial Commission was not inconsistent with the evidence presented in the first hearing. The evidence going to appellant's pain at the second hearing was not substantial enough to justify overturning appellant's classification as an odd-lot worker.

The majority opinion seemingly assumes that the Commission reviewed the case *de novo*, but this cannot be determined from the record. The Commission expressly stated that the modification was based on the new evidence alone, but even assuming that there is ambiguity in the record, the case should be remanded for clarification as to the basis for the Commission's actions. This Court is not empowered to assume matters not reflected in the record. The prior opinion issued in this case, upon which the majority relies, cursorily recites the "substantial and competent evidence" standard of review, but does not elaborate on what relevant evidence it considers sufficient to uphold the modification of the award. Instead, it cites testimony to the effect that appellant was not enthusiastic about the vocational training program. Although he participated as required by the Worker's Compensation system, the opinion notes that the appellant was "unrealistic and disinterested in completing the program."

I note that this Court's longstanding policy is to afford Worker's Compensation law a broad and liberal construction, resolving doubtful cases in favor of compensation. *Sines v. Appel,* 103 Idaho 9, 13, 644 P.2d 331, 335 (1982), quoting *Smith v. University of Idaho,* 67 Idaho 22, 26, 170 P.2d 404, 406 (1946). I do not believe that this policy is consistent with the majority's decision to castigate appellant for his lack of enthusiasm. Worker's Compensation law does not require enthusiastic compliance with its programs, nor are workers required to overcome the natural discouragement which results from sudden and severe disablement.

## APPENDIX A

Copyright 1978 by The Journal of Bone and Joint Surgery, Incorporated

# Results of Reduction and Stabilization of the Severely Fractured Thoracic and Lumbar Spine*

BY JESSE H. DICKSON, M.D.†, PAUL R. HARRINGTON, M.D.†, AND WENDELL D. ERWIN, M.D.†, HOUSTON, TEXAS

*From the Texas Institute for Rehabilitation and Research, Division of Orthopaedic Surgery, Baylor College of Medicine, Houston*

ABSTRACT: From 1962 to 1976, ninety-five patients with fracture-dislocations of the spine were treated with Harrington instrumentation and fusion within ninety days of injury. This report presents the results of this procedure related to reduction, stabilization, return of neural function, and total hospital stay. Mean follow-up was twenty-one months. Reduction and stabilization were attained without a substantial number of complications, but no more return of neural function in the patients was evident than has been reported in the literature for patients treated with postural reduction and bed rest. Total hospital stay averaged 107 days from day of injury.

The treatment of severe fracture-dislocation of the thoracic and lumbar spine has varied widely over the past 100 years. The principal controversy now centers around how best to achieve the goals of reducing the fracture-dislocation and stabilizing the spine. Until the late 1940's, emphasis was placed on attaining anatomical reduction by whatever means necessary, including surgery in severe cases. In 1940, Watson-Jones wrote that "Perfect recovery is only possible if perfect reduction is insisted upon. Even slight degrees of wedging of the vertebrae may cause persistent aching pain". However, several major studies conducted during the 1940's brought about a change in this emphasis.

In 1947, Stanger reviewed a series of forty-three thoracic and lumbar fracture-dislocations; he found that several years after injury, the spinal deformity which had previously been reduced had recurred in a high proportion of patients treated by hyperextension, surgery, or both. In 1949, Nicoll reported on 166 patients who had been working for at least two years following injury. He reported excellent functional results in those patients who had sustained severe spinal deformities; in fact, pain was more pronounced in the patients treated by reduction and immobilization in a cast. Guttmann showed that patients with spinal cord injuries could return to productive lives and found that postural reduction was preferable to open reduction and internal fixation. Thus, the conservative method of treatment had strong advocates, and the practice

of using postural reduction and bed rest to achieve stability continues to be popular today in the majority of spinal cord-injury centers throughout the world.

In 1958, Harrington first applied his method for instrumentation and fusion of the spine, originally devised for scoliosis, to a patient with a fracture-dislocation of the spine. We now report the results of this procedure on a series of such patients, to show the quality of the reduction and stabilization, the degree of return of neural function, and the duration of hospitalization in ninety-five patients.

### Materials

The patients, a consecutive series, were seen between 1962 and 1976, and were treated within twenty days of their injury. There were seventy-one male and twenty-four female patients, including seventy-three whites, ten blacks, eleven Latin Americans, and one Asian. Their mean age was twenty-nine years (range, eight to sixty-three years). The mean follow-up was two months (range, three to ninety months).

Thirty patients were injured in a fall, twenty-seven were in an automobile accident, eighteen sustained a direct blow, fifteen were in motorcycle accidents, and five were in an airplane crash. Associated injuries occurred in forty-six patients, thirty-three of whom had multiple associated injuries, while thirteen had only one additional injury associated with the spinal lesion. Fractures of ribs (ten) and of the long bones of the lower extremities (twenty-three) were the most common fractures, no other single bone being fractured in more than two patients. Seven patients had a hemopneumothorax and six, an abdominal injury requiring laparotomy. Four patients had a flail chest, two with cerebral concussion and two with pneumothorax. A few had other assorted injuries (lacerations and so forth).

There were sixty-three patients in whom laminectomy was done — prior to instrumentation and fusion in twenty-three, and in conjunction with that surgery in forty.

None of the patients was admitted directly to our facility following injury. The instrumentation and fusion was performed at the admitting hospital in most cases, and only twenty-three patients were operated on after transfer to the Texas Institute for Rehabilitation and Research. All the other patients then either were admitted to the Institute for rehabilitation, where they were under the care of

* Supported in part by Grant No. 16-P-56813/6 Research Training Center No. 4, Social and Rehabilitation Service, U S. Department of Health, Education and Welfare.
† 6535 Fannin, Houston, Texas 77030.

CHART I

Fracture levels in the study group of ninety-five patients.

physicians specializing in the treatment of spinal cord-injured patients, or were under our care as private out-patients. Mean time from injury to spinal instrumentation and fusion was 15.7 days (range, zero to ninety days). Thirteen of the ninety-five operations were performed by other orthopaedic surgeons. In the majority of patients the spinal injury was located in the thoracolumbar region (Chart I).

### Operative Technique

Two distraction rods, one on each side, are used for spinal instrumentation and fusion in these cases. The technique is exacting and should be undertaken only by those experienced in the use of Harrington instruments. Under general endotracheal anesthesia, the patient is carefully log-rolled onto the operating table, where the chest and pelvis are supported by chest rolls. A bone graft is taken from one iliac crest prior to exposing the fracture site. The incision over the spine is made so that the vertebrae bordering two interspaces above and two below the fractured interspace can be exposed. The area of the fracture is exposed with great care.

Two superior distraction hooks are placed under the inferior articular processes of the superior vertebra two interspaces above the fracture level and two inferior hooks are placed on the inferior lamina at the second interspace below the fracture. For example, when there is a fracture of the twelfth thoracic vertebra with anterior displacement of the eleventh thoracic vertebra, the superior hooks are placed on the ninth thoracic and the inferior hooks, on the second lumbar vertebra. Two intact vertebrae above and two below the fracture must be spanned to provide a lever arm long enough to reduce the fracture and to maintain the reduction. The distraction hooks are placed in the same manner as in the treatment of scoliosis [11].

After the hooks are in place, an outrigger is engaged in the hooks on one side of the vertebral column and tightened. The resulting distraction restores the fractured segment to near-normal height and provides partial reduction. The first distraction rod is then inserted in the hooks on the opposite side, and just enough distraction is applied to attain reduction. Placement of this rod with very little distraction facilitates temporary removal of this rod at the time of decortication for fusion on this side. The reduction attained by the insertion of the first distraction rod results, not from distraction, but from leverage that produces posterior forces exerted by the two superior and inferior hooks and an anterior force applied by the rods at the apex of the kyphos. As a result of this three-point pressure, the fracture is reduced and stabilized.

If indicated, a laminectomy may now be performed. If not, a fusion extending from the superior to the inferior distraction hooks is performed on the side where the outrigger is in place, or fusion may be performed only across the fractured vertebra and the two adjacent interspaces. We generally fuse the entire area in patients who have complete lesions, but fuse only across the fractured segment in patients with incomplete cord lesions. Once the fusion is completed on this side, the outrigger is removed and the second distraction rod is inserted in its place. Distraction is applied until the hooks are firmly implanted. Over-distraction is prevented by the posterior longitudinal ligament, which is intact. With the second rod in place, the first rod is removed, fusion is performed on this side, and the rod is reinserted. A C-washer is applied on the ratchet just below the superior hook on each rod to prevent the hooks from moving down the ratchets as the patient is mobilized. Routine closure is performed.

The patient is cared for postoperatively on a regular bed and is log-rolled from back to side to back every two hours. Beginning on the first or second postoperative day, the patient is moved to a standing bed and gradually increasing vertical loading of the spine is begun. A molded body cast is applied after the seventh day if the patient has good sacral sensation. However, if a patient lacks sensation in the pelvic region, a removable plastic body jacket is used instead of the cast. This jacket is removed two times a day for inspection of the skin. The cast or body jacket prevents excessive rotation and flexion, the motions that will dislodge the distraction hooks.

Wearing the cast or jacket, the patient may begin walking if he has enough muscle strength to walk without a gluteal gait. If there is paralysis, the patient should begin sitting for progressively increasing periods while the staff watches for evidence of excessive pressure on the buttocks. Gait training with crutches and knee-ankle orthoses is started eight weeks postoperatively. Paraplegic patients with total loss of neural function wear the body support for three months; those who have incomplete loss and show substantial return of neural function wear it for six months.

If the fusion does not extend across all instrumented vertebrae, the distraction rods are usually removed be-

FIG. 1

The *angle of deformity* is determined by drawing a line along the posterior surfaces of the vertebral bodies above and below the fracture and measuring the angle of the intersected lines (50 degrees in the drawing).

The *displacement percentage* is the distance that the displaced vertebra has moved forward (fifteen millimeters) relative to the posterior surface of the fractured vertebra, divided by the width of the normal vertebra (thirty-one millimeters) immediately below the fractured one (fifteen divided by thirty-one equals 49 per cent displacement).

Neurologic Function at Follow-up

| | | A | B | C | D | E |
|---|---|---|---|---|---|---|
| | A | 35 | 2 | 5 | | |
| | B | | 1 | 1 | 13 | |
| | C | | | 2 | 19 | 2 |
| | D | | | | 6 | 3 |
| | E | | | | | 4 |

CHART II

Neural function of the ninety-three surviving patients after injury and at follow-up (mean, twenty-one months) using Frankel and associates' five grades of function.
A: Complete motor and sensory loss below the fracture level.
B: Some sensory preservation below the level of fracture, but no motor function.
C: Some motor power below the fracture level, but of no practical use to the patient.
D: Motor power below the fracture level that is useful to the patient.
E: Normal motor and sensory-function, including no sphincter disturbance.

Chart II shows the data on the neural status of the patients following injury and at follow-up. Improvement of one or more grades was evident in 48 per cent. In the fifty-one patients with incomplete loss of function (Grades B through D), 75 per cent showed an improvement of at least one grade.

A comparison was made between patients who had the operation on the day of injury (Group I) and those who did not have it until eight to thirty-five days later (Group II), to see if there was a difference between the degree of neural recovery in the two groups. The second group was chosen to provide a representative sample of patients with delayed surgery that had approximately the same number of individuals as the immediate-surgery group.

The two groups were compared (Table I) with regard to age, cause of injury, fracture level, angle of deformity, and displacement. The groups appear to be comparable in terms of cause of injury and fracture level, but there are slight differences in mean age, angle of deformity, and other variables. A statistical analysis was considered inappropriate because of the small numbers of individuals in the subgroups and the large number of variables.

The return of neural function was approximately the same in both groups (Chart III). In Group II, two patients had a lower grade of neural function at the time of surgery than immediately following injury. One of these patients had Grade-C neural function after injury that deteriorated to Grade A within two days. A laminectomy was performed five days following injury, and reduction and stabilization was done twenty-nine days later. The patient has shown no return of neural function to date. The other patient had Grade-C neural function immediately following injury. A laminectomy was performed on the day of injury, but neural function deteriorated to Grade B. Re-

tween the ninth and twelfth postoperative months, a short procedure that necessitates only two to five days of hospitalization.

## Results

A method of measuring the kyphotic deformity and the amount of displacement was developed to enable quantitation of the deformity of the spine (Fig. 1). The measurements provide a baseline for evaluation of reduction and so on, but it should be understood that the roentgenogram made shortly after the injury may not show the total displacement of the fracture at the time of injury. The measurement technique works well for all injuries except bursting fractures and those that show only lateral dislocation. In our series there were six bursting fractures and two fractures that showed only lateral displacement. Omitting these eight lesions, the mean preoperative angle of deformity was 31 degrees and the mean displacement percentage, 46 per cent in the remaining eighty-seven patients. Postoperatively, corresponding mean measurements were 11 degrees and 10 per cent. At follow-up the measurements were 15 degrees and 9 per cent.

Neural function was determined following injury and at follow-up using the criteria developed by Frankel and associates. Even though this method is not exact, it has been very useful in grading functional neural recovery.

TABLE I

DATA ON PATIENTS OPERATED ON ON THE DAY OF INJURY (GROUP I) AND THOSE OPERATED ON LATER (GROUP II)

| Group | Time of Surgery | Mean Age (Yrs. + Mos.) | Cause of Injury* | | | | Fracture Level Thoracic | | | | | | | | | Lumbar | | | | Angle of Deformity/Displacement | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | AA | MA | F | DB | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 | 4 | Preop. | Postop. |
| I (24 pts.) | Day of injury | 29 + 9 | 7 | 6 | 6 | 5 | 1 | | | 1 | | 1 | 1 | 1 | | 9 | 5 | 3 | | 2 | 25°/35% | 8°/2% |
| II (25 pts.) | 8-35 days post-injury | 23 | 6 | 5 | 9 | 5 | | | 1 | 2 | | 3 | 3 | 7 | | 7 | 1 | | 1 | 31°/51% | 12°/13% |

* AA, automobile accident; MA, motorcycle accident; F, fall; and DB, direct blow.

duction and stabilization was performed thirty-four days after injury. At follow-up (fifty-nine months), the function of all muscle groups except those controlling the ankle and foot had returned (Grade D). The patient was able to walk with posterior ankle-foot orthoses and had full return of bowel and bladder function.

Four patients showed improvement in neural function prior to reduction and stabilization. Of these four, three experienced the improvement during the first seven days following injury and then showed no further improvement until after reduction and stabilization was performed at a mean of twenty days after injury. The fourth patient had shown a very slow improvement, progressing from complete paraplegia to having a trace of adductor and quadriceps function, prior to surgery. After reduction and stabilization, performed sixteen days following injury, this patient's neural function improved rapidly. One year after injury, the patient was able to walk with the aid of crutches, one knee-ankle orthosis, and one ankle-foot orthosis, but bowel and bladder function had not returned. From our experience thus far we are convinced that the neural recovery experienced by fifteen of the twenty-five patients in Group II (Box C, Chart III) would not have occurred without reduction and stabilization.

Nine patients were never admitted to our rehabilitation center because their neural function was normal or had returned to near-normal status so rapidly that they could convalesce at home, and two additional patients died. The remaining eighty-four patients spent an average of eighty-two days (range, twenty-four to 151 days) in our institution. The mean interval from the day of injury to the day of admission to our hospital for these eighty-four patients was twenty-five days (range, five to seventy days). Therefore, the mean total hospital stay from injury to discharge was 107 days. In those patients who did not have associated injuries necessitating bed rest, the mean time from injury until they were able to sit in a wheelchair for six hours per day was twenty-five days.

## Complications

There were twenty-six patients with complications related to the operation (Table II): incorrect placement of instruments; broken rods; broken rods and pseudarthrosis; broken rods, pseudarthrosis, and loss of angular correction; death; hook displacement; infection; and persistent pain.

The error in placing the instruments always was that the rod spanned an insufficient number of vertebrae. In three patients, the span above the fracture interspace was one segment short (Cases 2, 4, and 5). In three patients the span below was a segment short (Cases 3, 6, and 7), and in one (Case 1) both deficiencies were evident. The dislocation was reduced in six of these seven patients, but at follow-up the angulation had returned and was sometimes

**Box A**

Neurologic Function at Follow-up

| Neurologic Function on Day of Injury | A | B | C | D | E |
|---|---|---|---|---|---|
| A | 7 | 1 | 2 | | |
| B | | | 1 | 4 | |
| C | | | | 4 | 1 |
| D | | | | 3 | 1 |
| E | | | | | |

**Box B**

Preoperative Neurologic Function

| Neurologic Function on Day of Injury | A | B | C | D | E |
|---|---|---|---|---|---|
| A | 10 | 1 | 1 | | |
| B | | | 2 | 2 | |
| C | | 1 | 1 | 3 | |
| D | | | | | |
| E | | | | | 4 |

**Box C**

Neurologic Function at Follow-up

| Preoperative Neurologic Function | A | B | C | D | E |
|---|---|---|---|---|---|
| A | 10 | | | 1 | |
| B | | | 4 | | |
| C | | | | 5 | 1 |
| D | | | | | |
| E | | | | | 4 |

CHART III

Comparison of recovery of neural function using Frankel and associates' five grades of function in twenty-four patients who had stabilization and fusion on the day of injury (Group I) and in twenty-five patients who were operated on eight to thirty-five days (mean, thirty days) after injury. Box A shows the neural recovery at follow-up (mean, twenty-two months) of the twenty-four patients in Group I (operation on the day of injury). Box B shows the preoperative neural status of the twenty-five patients in Group II who were operated on eight to thirty-five days after injury. Box C shows the neural recovery of the Group-II patients at follow-up (mean, eighteen months).

855

TABLE II

COMPLICATIONS AND RELATED DATA IN TWENTY-SIX PATIENTS

| Case | Age (Yrs. + Mos.) | Compli-cations* | Sex | Level of Fracture | Cause of Injury | Time from Injury to Surgery (Days) | Level of Instru-mentation | Angle of Deformity/ Displacement | | | Length of Follow-up (Mos.) | Neural Function | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Preop. | Postop. | Follow-up | | Preop. | Follow-up |
| 1 | 19 + 8 | IPR | M | T12 | DB | 19 | T10-L1 | 28°/ 54% | 14°/ 0% | 23°/ 0% | 12 | A | A |
| 2 | 20 + 6 | IPR | M | L1 | F | -34 | T11-L3 | 31°/ 23% | 16°/ 0% | 18°/13% | 22 | B | B |
| 3 | 29 | IPR | M | L4 | DB | 0 | L2-L5 | 20°/ 0% | 0°/ 0% | 32°/ 0% | 12 | D | D |
| 4 | 25 + 2 | IPR | M | T12 | AA | 1 | T10-L2 | 17°/ 35% | 15°/ 0% | 25°/ 0% | 15 | C | D |
| 5 | 44 + 3 | IPR | M | L1 | F | 5 | T11-L3 | 32°/ 30% | 15°/ 5% | 20°/ 9% | 38 | C | D |
| 6 | 27 + 7 | IPR | M | T11 | DB | 10 | T8-T12 | 21°/ 33% | 7°/ 0% | 20°/19% | 12 | A | A |
| 7 | 24 + 11 | IPR | M | L1 | DB | 17 | T10-L2 | 45°/ 45% | 17°/36% | 20°/36% | 38 | C | D |
| 8 | 24 | FR | M | T12 | MA | 0 | T10-L3 | 25°/ 40% | 3°/ 0% | 7°/ 0% | 42 | A | A |
| 9 | 40 + 6 | FR | F | L2 | F | 78 | T11-L4 | 25°/ 0% | 12°/ 0% | 15°/ 0% | 84 | C | D |
| 10 | 30 + 5 | FRP | M | L1 | MA | 0 | T10-L3 | 21°/ 55% | 13°/ 9% | 18°/ 5% | 35 | B | D |
| 11 | 24 + 1 | FRP | M | L1 | AA | 0 | T10-L3 | 43°/100% | 2°/ 0% | 12°/ 0% | 36 | A | A |
| 12 | 39 + 2 | FRPC | M | T12 | F | 34 | T9-L2 | 38°/ 20% | 15°/ 0% | 46°/ 0% | 59 | C | D |
| 13 | 8 + 1 | FRPC | M | L2 | DB | 0 | T11-L4 | 20°/ 25% | 0°/ 0% | 31°/ 0% | 30 | B | D |
| 14 | 40 + 5 | D | F | T8 | AA | 7 | T5-T12 | 25°/100% | — | — | — | A | — |
| 15 | 27 + 1 | D | M | L1 | AA | 3 | T10-L3 | 30°/ 48% | — | — | — | B | — |
| 16 | 17 + 10 | HD | M | T4 | F | 0 | T1-T7 | 30°/ 0% | 30°/ 0% | 39°/ 0% | 38 | A | D |
| 17 | 47 + 6 | HD | M | T6 | MA | 0 | T4-T11 | 36°/ 0% | 15°/ 0% | 27°/ 0% | 3 | A | A |
| 18 | 45 + 2 | HD + P | F | L1 | AA | 1 | T11-L2 | 36°/ 0% | 28°/ 0% | 30°/ 0% | 6 | C | D |
| 19 | 50 + 1 | HD | M | T4 | DB | 5 | T1-T8 | 33°/ 46% | 11°/ 0% | 24°/ 0% | 3 | A | A |
| 20 | 37 + 10 | HD | M | L1 | AA | 2 | T10-L3 | 35°/ 30% | 15°/ 8% | 22°/10% | 13 | B | D |
| 21 | 24 + 4 | HD | M | L1 | DB | 0 | T11-L3 | 35°/ 38% | 19°/17% | 38°/21% | 11 | A | C |
| 22 | 37 + 9 | I | M | L2 | DB | 0 | T11-L4 | 38°/ 45% | 11°/ 0% | 11°/ 0% | 26 | E | E |
| 23 | 39 + 5 | I + P | M | L1 | MA | 0 | T10-L3 | 30°/ 47% | 0°/ 0% | 0°/ 0% | 34 | B | D |
| 24 | 36 + 7 | P | F | L1 | DB | 3 | T9-L3 | 90°/100% | 5°/ 0% | 5°/ 0% | 9 | A | A |
| 25 | 63 + 5 | P | M | L1 | F | 4 | T11-L3 | 17°/ 0% | 9°/ 0% | 27°/ 0% | 37 | C | D |
| 26 | 38 + 4 | P | M | L2 | DB | 59 | T10-L4 | 25°/ 30% | 0°/ 0% | 0°/ 0% | 38 | A | A |

* IPR, incorrect placement of rods; FR, fractured rods; FRP, fractured rods with pseudarthrosis; FRPC, fractured rods, pseudarthrosis, and collapse; D, dea HD, hook dislodgment, I, infection; and P, pain.

† AA, automobile accident; DB, direct blow; F, fall; and MA, motorcycle accident.

greater than the preoperative angle of deformity. This type of complication will be avoided if the hooks are placed two interspaces above and two below the fracture interspace.

Four of the six patients in whom a rod broke showed no important change in the reduction at follow-up (mean, forty-eight months). In two of the four (Cases 8 and 9) pseudarthrosis did not develop and they had no appreciable change in alignment; the other two (Cases 10 and 11) had pseudarthrosis and showed minimum change in alignment at follow-up. Two patients (Cases 12 and 13) had pseudarthrosis and showed complete loss of angular correction. This loss occurred within eighteen months of surgery and there was no further collapse at follow-up (mean, forty-four months). All patients with rod complications received the same postoperative management as the patients without complications.

One patient (Case 15), who was operated on three days after injury, died from respiratory failure two days later. A second patient (Case 14), who was operated on seven days after injury, died from respiratory failure fourteen days later.

There were six patients in whom hooks became dislodged. In one (Case 16), only one hook was disengaged and no change in alignment resulted. Both upper hooks or both lower hooks were disengaged in the other five patients (Cases 17 through 21) prior to their transfer to our facility. These patients lost the reduction i angulation.

but the amount of dislocation showed no change from the status immediately after the operation.

Two patients had deep infections. The infection developed immediately after surgery in one patient (Case 22) who was treated by incision, drainage, débridement, and insertion of inflow and outflow tubes. The infection cleared within two weeks. In the other patient (Case 23), the infection occurred thirty-one months after injury and was considered to be the result of bacteremia secondary to an infection of the genito-urinary tract. On evaluation in our institution's clinic, pain in the back, buttocks, or leg that was experienced by four patients (Cases 18, 23, 25, and 26) was considered to be secondary to a traumatic lesion of the cauda equina. Two of these patients (Cases 18 and 23) also had other complications. In the fifth patient experiencing continued pain (Case 24), most of the symptoms were considered to be the result of a psychological overlay.

### Discussion

Ancient methods of reducing fractured spines used the basic concept of traction to restore normal height to the fractured vertebra and pressure applied at the gibbus to complete reduction. The Harrington instrumentation technique embodies these principles. Distraction at the fracture site beyond the normal anatomical limits is prevented by the anterior longitudinal ligament, which is in-

tact. In autopsy specimens, Bedbrook [1] never found the anterior longitudinal ligament ruptured when flexion had been one component of the forces creating the fracture. In 1929, Davis reported that this ligament was strong enough to withstand the stresses necessary to obtain a reduction of the fracture-dislocation by traction and hyperextension. He tested the tensile strength of the anterior longitudinal ligament in seven specimens and found the average load at the breaking point to be 153 kilograms [5].

That goal of treatment of fracture-dislocations of the spine is not in question. The means of achieving the goal, however, remain controversial. Postural reduction and rest in bed are used to gain stabilization at the majority of spinal cord-injury centers, and undoubtedly this treatment is successful in most cases. However, of 394 fractures of the thoracic and lumbar spine, Frankel and associates were unable to reduce 0.07 per cent at all, and only partial reduction was achieved in 13 per cent. Burke and Murray provided no figures related to the amount of reduction achieved in their study.

The meaning of the term *reduction* is clear and needs no explanation. The term *stabilization*, on the other hand, is another matter. When discussing stability of a fractured spine, there is a lack of consensus as to what is or is not a stable fracture. The recorded incidence of unstable fractured spines has ranged from 0.65 to 10 per cent [2,6-9]. However, these figures refer to stability months later, not immediately after injury. We think that time should be considered in the assessment of stability since undoubtedly, if rest in bed is continued long enough, almost all fractures of the spine will become stable.

We reviewed roentgenograms of our patients to determine which fractures were stable and which were not, and to identify the patients who could get out of bed shortly after injury using some form of external immobilization without risk of a substantial increase in their deformity. The stability of a fractured spine depends on three major factors: (1) integrity of the vertebral body, (2) integrity of the posterior structures composed of the bone elements and the ligaments, and (3) alignment of the spine (in terms of angulation and displacement). If any two of these factors are lost, the spine is unstable, and further deformity will occur if the patient is allowed out of bed before stability is attained.

These criteria for stability apply more accurately to injuries at the junction of the thoracic and lumbar spines than to those located in the middle and upper thoracic areas. For example, a patient with a complete neural deficit and fracture-dislocation of the third and fourth thoracic vertebrae with the third anteriorly displaced on the fourth and a 30-degree kyphotic angle, we would consider to have a stable spine because of the stabilizing effect of the rib cage. However, if this same patient had a laminectomy, the resulting instability of the spine would necessitate instrumentation and fusion. We realize that these criteria are not absolute, that there are degrees of malalignment and loss of integrity of the vertebral body,

but we have found the criteria helpful in assessing spinal stability in individual patients.

The presence and extent of neural deficit also help in assessing stability. Roentgenograms do not show the maximum displacement that occurred at the time of injury. This displacement may have been much greater than that visible on roentgenograms which show only mild malalignment and slight anterior compression of a vertebral body in a patient who is totally paraplegic or shows only sacral sparing. We believe that such a patient has a more unstable spine than one with similar roentgenograms but no neural deficit.

We have shown that reduction and stabilization can be attained shortly after injury without an excessive number of complications. Although twenty-eight complications after ninety-five operations could be considered excessive, it should be kept in mind that the surgery reduces and stabilizes the spine so that patients may be mobilized quickly and avoid the additional problems associated with recumbency that may delay or jeopardize their recovery. Five patients in this series had serious operative complications which affected the reduction, stabilization, hospital stay, morbidity, or mortality: two deaths, two pseudarthroses with complete loss of correction, and one postoperative infection that necessitated a second operation. Although the remaining operative complications should not be overlooked, we think that they do not justify rejection of the operative technique because they did not affect either the reduction and stabilization or the morbidity.

An important consideration in any comparison of the lengths of hospital stay for two types of treatment is the condition of the patients at the time of discharge and their preparation to function outside the hospital setting. The total hospital time for the patients in this series averaged 107 days from time of injury. At the time of discharge they had been instructed in the care of their skin, bladder, and bowels; their home situations had been modified to permit wheelchair independence; the patients as well as their families had acquired an insight relative to the implications of the disability; and most patients had started their re-education for gainful employment. Although these results, to a considerable degree, are reflections of the efficiency of a modern spinal cord-injury center, and we have found no comparable data on patients treated with postural reduction and rest in bed in the literature, we think that immediate stabilization of the spine in our patients shortened their total hospital stay.

We had hoped to achieve greater return of neural function after early reduction and stabilization compared with the recovery after other means of treatment. However, using the five grades of neural function of Frankel and associates, our patients' recovery rate was no better than that reported by Frankel and co-workers and by Burke and Murray. This absence of any difference may be due, in part, to the wide range of function encompassed by Grade D in the rating system. The deficits in this group can range

from loss of bowel and bladder function with total paralysis of the lower limbs except for fair hip-flexor power which facilitates transfer or turning in bed, to loss of only anterior tibial power with normal bowel and bladder function. Our clinical impression is that within the broad range of Grade D the quality of recovery may be higher after immediate reduction and stabilization compared with the recovery after other methods, an impression that will require further investigation to determine adequately. No patients in this study lost neural function as a result of operative treatment.

Although some patients with severe injuries should not undergo immediate surgery, we advocate reduction and stabilization as an emergency procedure on the day of injury if at all possible, for the following reasons.

1. The majority of patients with severe fracture-dislocations of the spine do not have any associated injuries, or their injuries are of such nature that they do not preclude immediate surgical treatment of the spine. For example, only eleven of the ninety-five patients in this study had associated injuries severe enough to have prevented surgery on the day of injury.

2. Most patients with these injuries are young adults, twenty to thirty years old, who are in good condition prior to injury. These patients' physical condition will never again be as good as it was immediately before injury.

3. If surgery is delayed for ten to fourteen days following injury, physiological changes occur that tend to increase the risk of further deterioration of the patient's condition during the stress of surgery.

4. If pressure on the spinal cord or nerve roots is causing some of the neural deficit, there should be a better chance of recovery if the pressure is released as soon as possible.

5. If immediate surgery is performed, the patient can recover from the injury and the surgery at the same time, instead of partially recovering from the injury only to undergo surgery and then have to go through a second recovery period.

This study has shown that immediate reduction and stabilization can be accomplished with instrumentation and fusion, and that the patient can then be mobilized within a short time after the fracture-dislocation. At the same time, the study shows that to date there is no evidence that this treatment program results in any greater return of neural function than is seen in patients treated by postural reduction and rest in bed.

Note The authors thank Vicki L. Albright, M.P.H., for her assistance in the preparation of this manuscript

### References

1. BEDBROOK, G. M.: Personal communication.
2. BEDBROOK, G. M.: Stability of Spinal Fractures and Fracture Dislocations. Paraplegia. 9: 23-32, 1971.
3. BURKE, D. C., and MURRAY, D. D.: The Management of Thoracic and Thoraco-Lumbar Injuries of the Spine with Neurological Involvement. J. Bone and Joint Surg., 58-B: 72-78, Feb. 1976.
4. DAVIS, A. G.: Fractures of the Spine. J. Bone and Joint Surg., 11: 133-156, Jan. 1929.
5. DAVIS, A. G.: Tensile Strength of the Anterior Longitudinal Ligament in Relation to Treatment of 132 Crush Fractures of the Spine. J. Bone and Joint Surg., 20: 429-438, April 1938.
6. DURBIN, F. C.: Fracture-Dislocations of the Cervical Spine. J. Bone and Joint Surg., 39-B: 23-38, Feb. 1957.
7. ELLIS, V. H.: Injuries of the Cervical Vertebrae. Proc. Roy. Soc. Med . 40(1): 19-26, 1946.
8. FRANKEL, H. L.; HANCOCK, D. O.; HYSLOP, G., MELZAK, J.; MICHAELIS, L. S.; UNGAR, G. H.; VERNON, J. D. S.; and WALSH, J. J.: The Value of Postural Reduction in the Initial Management of Closed Injuries of the Spine with Paraplegia and Tetraplegia. Part I. Paraplegia, 7: 179-192, 1969.
9. GALLIE, W. E.: Fractures and Dislocations of the Cervical Spine. Am. J. Surg., 46: 495-499, 1939.
10. GUTTMANN, LUDWIG: Surgical Aspects of the Treatment of Traumatic Paraplegia. J. Bone and Joint Surg., 31-B: 399-403, Aug. 1949.
11. HARRINGTON, P R.: Treatment of Scoliosis. Correction and Internal Fixation by Spine Instrumentation. J. Bone and Joint Surg., 44-A: 591-610, June 1962.
12. NICOLL, E. A.: Fractures of the Dorso-Lumbar Spine. J Bone and Joint Surg., 31-B: 376-394, Aug. 1949.
13. STANGER, J. K.: Fracture-Dislocation of the Thoracolumbar Spine. With Special Reference to Reduction by Open and Closed Operations. J Bone and Joint Surg., 29: 107-118, Jan. 1947.
14. WATSON-JONES, R.: Fractures and Other Bone and Joint Injuries. p. 211. Baltimore, Williams and Wilkins, 1940.